**FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| RAFAEL DIAZ-RODRIGUEZ, | No. 13-73719 |
| Petitioner, | Agency No. A093-193-920 |
| v. | |
| MERRICK B. GARLAND, Attorney General, | OPINION |
| Respondent. | |

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted En Banc June 22, 2022
Pasadena, California

Before: Mary H. Murguia, Chief Judge, and M. Margaret McKeown, Kim McLane Wardlaw, Ronald M. Gould, Consuelo M. Callahan, Milan D. Smith, Jr., Sandra S. Ikuta, Daniel P. Collins, Patrick J. Bumatay, Lucy H. Koh and Gabriel P. Sanchez, Circuit Judges.

Opinion by Judge Ikuta;
Concurrence by Judge Collins;
Dissent by Judge Wardlaw

# SUMMARY[*]

## Immigration

Denying Rafael Diaz-Rodriguez's petition for review of a Board of Immigration Appeals' decision in which the BIA concluded that he was removable under 8 U.S.C. § 1227(a)(2)(E)(i) for having committed a "crime of child abuse, child neglect, or child abandonment," the en banc court concluded that the BIA did not err in concluding that a conviction under California Penal Code section 273a(a) qualifies as an offense under § 1227(a)(2)(E)(i).

Diaz-Rodriguez was convicted under section 273a(a) of the California Penal Code for willfully permitting a child under his care or custody to be "placed in a situation where his or her person or health is endangered" "under circumstances or conditions likely to produce great bodily harm or death." The IJ and BIA concluded that this conviction rendered Diaz-Rodriguez was removable under 8 U.S.C. § 1227(a)(2)(E)(i).

Applying the categorical approach to determine whether section 273a(a) is a match to § 1227(a)(2)(E)(i), the en banc court first looked to California courts' construction of section 273a(a) and concluded that the least of the acts criminalized by that section requires proof that a defendant [1] had care or custody of a child, whether or not a parent or legal guardian; and [2] with criminal negligence, meaning in a manner that a reasonable person would have known creates a high risk of death or great bodily injury; [3] purposely put the child into an abusive situation in which the probability of serious injury was great.

Turning to the federal generic crimes encompassed by the phrase "child abuse, child neglect, or child abandonment," a plurality of the en banc court concluded that the normal tools of statutory construction do not lead to an unambiguous interpretation. Because § 1227(a)(2)(E)(i) does not provide a definition, or cross-reference a criminal statute, the plurality of the en banc court reviewed dictionary definitions contemporaneous with the provision's enactment, explaining that some definitions of "child abuse" included offenses that do not cause injury and are

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

committed with negligence, while others contemplated intentional conduct and injury. The dictionaries also did not limit the definition of "child neglect" to conduct committed by a parent or legal guardian. The plurality further explained that the surrounding provisions of the Immigration and Nationality Act (INA), and definitions in other federal statutes, are likewise inconclusive. Moreover, the plurality concluded that a survey of relevant state statutes did not reveal a uniform approach. Thus, the plurality concluded that the phrase is ambiguous, agreeing with this court's sister circuits that have considered the issue.

Next, the plurality deferred to the BIA's interpretation of the phrase. Under the BIA's interpretation, as set out in *Matter of Velazquez-Herrera*, 24 I. & N. Dec. 503 (BIA 2008), and *Matter of Soram*, 25 I. & N. Dec. 378 (BIA 2010), the term "child abuse," or the unitary phrase "crime of child abuse, child neglect, or child abandonment," means any offense involving an intentional, knowing, reckless, or criminally negligent act or omission (including acts or circumstances that create a substantial risk of harm to a child's health or welfare, rather than causing actual injury) that constitutes maltreatment of a child or that impairs a child's physical or mental well-being, including sexual abuse or exploitation. The plurality explained that the BIA's definition is consistent with the text, nature, and purpose of the statute, and therefore is within the bounds of reasonable interpretation.

Finally, the en banc court concluded that section 273a(a), is a categorical match to § 1227(a)(2)(E)(i). The en banc court explained that the BIA's definition includes the element of a mens rea of criminal negligence (a match to the second element of a section 273a(a) conviction), and the element of allowing a child to be placed in a situation that create a substantial risk of harm to a child's health or welfare (a match to the third element of a section 273a(a) conviction). Also, because the state offense requires proof of care or custody, it is narrower than the generic federal offense of "child abuse" or "child neglect," which does not require such proof. The en banc court thus agreed with the BIA's reasoning and conclusion that all violations of section 273a(a) are encompassed by the BIA's definition of a crime of "child abuse, child neglect, or child abandonment" in § 1227(a)(2)(E)(i).

Concurring in part and concurring in the judgment, Judge Collins, joined by Judge Bumatay, agreed with the ultimate conclusion that the BIA did not err in concluding that Diaz-Rodriguez was removable, but did not join the plurality opinion in full because his reasoning differed from the plurality's analysis. Specifically, Judge Collins disagreed with the plurality's finding of ambiguity and concluded that § 273a(a) is a categorical match for the sub-category of a "crime of . . . child neglect" set out in INA § 237(a)(2)(E)(i). 8 U.S.C. §

1227(a)(2)(E)(i).

Judge Collins explained that ordinary principles of statutory construction lead to the conclusion that a "crime of . . . child neglect" is one that contains the following minimum elements: (1) the person had a duty towards a child; (2) the person breached that duty in a manner that constitutes a gross deviation from accepted standards; and (3) the person acts with criminal negligence – meaning that the person should have been aware that his or her conduct presented a substantial and unjustifiable risk of serious physical or emotional harm to the child. Applying that definition, Judge Collins explained that section 273a(a) categorically fits within INA § 237(a)(2)(E)(i) because all of its elements are equal to or narrower than the elements of the federal offense.

Dissenting, Judge Wardlaw, joined by Judges Murguia, McKeown, Koh, and Sanchez, concluded that the text of 8 U.S.C. § 1227(a)(2)(E)(i) unambiguously forecloses the BIA's interpretation of the provision as encompassing negligent child endangerment offenses such as section 273a(a). Looking to contemporaneous dictionary definitions, the structure of the INA, and a survey of state criminal codes, Judge Wardlaw explained that § 1227(a)(2)(E)(i) renders noncitizens removable if they are convicted of one of three discrete criminal offenses: child abuse, child neglect, or child abandonment. Judge Wardlaw concluded that Congress did not inadvertently omit child endangerment; rather, the fact that Congress enumerated three crimes and failed to enumerate a fourth justifies the inference that the omission was deliberate.

Judge Wardlaw further wrote that missing in the plurality's anodyne analysis is recognition of a troubling fact: under the BIA's interpretation, individuals who for reasons of poverty, cultural difference, work schedules, or bad luck make parenting mistakes may be permanently separated from their families. Observing that the court's responsibility is to ensure that regulated parties know what conduct will trigger the "civil death penalty" of removal, Judge Wardlaw wrote that the BIA's vague, sweeping interpretation of 8 U.S.C. § 1227(a)(2)(E)(i), countenanced by the plurality, provides no guide.

# COUNSEL

David J. Zimmer (argued), Edwina B. Clarke, and Jenna Welsh, Goodwin Procter LLP, Boston, Massachusetts; Jerry Shapiro, Law Offices of Jerry Shapiro, Encino, California; for Petitioner.

Erica B. Miles (argued), Senior Litigation Counsel; Ilissa M. Gould and Sara J. Bayram, Trial Attorneys; M. Jocelyn Lopez Wright, Senior Litigation Counsel; John W. Blakeley, Assistant Director; Brian M. Boynton, Principal Deputy Assistant Attorney General; Joyce R. Branda, Acting Assistant Attorney General; United States Department of Justice, Civil Division, Office of Immigration Litigation, Washington D.C.; for Respondent.

Oliver Dunford, Pacific Legal Foundation, Palm Beach Gardens, Florida; Caleb Kruckenberg, Pacific Legal Foundation, Arlington, Virginia; for Amicus Curiae Pacific Legal Foundation.

Andrew Wachtenheim, Immigrant Defense Project, New York, New York; Sabrina Damast, American Immigration Lawyers Association, Washington, D.C.; Daniel Woofter, Goldstein & Russel P.C.; Bethesda, Maryland; for Amici Curiae Immigrant Defense Project and American Immigration Lawyers Association.

David J. Sutton, Public Defender; Rachael E. Keast, Deputy Public Defender; Marin County Office of the Public Defender; San Rafael, California; for Amici Curiae California Public Defenders Association, Marin County Office of the Public Defender, Santa Clara County Office of the Public Defender, Alameda County Office of the Public Defender, Sacramento County Office of the Public Defender, Imperial County Office of the Public Defender, Biggan Christensen and Minsloff, and The Public Defenders of Santa Cruz County.

**OPINION**

IKUTA, Circuit Judge, with whom GOULD, CALLAHAN, and M. SMITH, Circuit Judges, join:

This case raises the question whether an alien who has been convicted under section 273a(a) of the California Penal Code (criminalizing offenses against children) is removable under 8 U.S.C. § 1227(a)(2)(E)(i) for having committed a "crime of child abuse, child neglect, or child abandonment." After using the ordinary tools of statutory construction to define these terms in the federal statute, dictionary definitions, the structure of the Immigration and Nationality Act (INA), contemporaneous federal statutes, and evidence from state criminal codes, we conclude that the terms "child abuse" and "child neglect" are ambiguous. We therefore defer to the reasonable interpretation of the Board of Immigration Appeals (BIA) that the phrase "crime of child abuse, child neglect, or child abandonment" can include offenses that involve a mens rea of criminal negligence and acts or circumstances that create a substantial risk of harm to a child's health or welfare, rather than causing an actual injury to the child. We also defer to the BIA's treatment of this phrase as a unitary category of crimes against children. Applying the BIA's interpretation and the categorical approach outlined in *Taylor v. United States*, 495 U.S. 575 (1990), we determine that the BIA did not err in

2

concluding that a conviction under section 273a(a) qualifies as a removable offense under § 1227(a)(2)(E)(i).

I

Rafael Diaz-Rodriguez, a native and citizen of Mexico, entered the United States in 1990 as a legal permanent resident.

Since his admission to the country, Diaz-Rodriguez has been convicted multiple times for driving while intoxicated, including at least two convictions for driving while intoxicated with a minor child in the vehicle. In November 2003, Diaz-Rodriguez was pulled over by a police officer as he was driving his five-year-old son home. Diaz-Rodriguez's blood alcohol level was .20, over twice the legal limit. He was subsequently convicted under section 23152(b) of the California Vehicle Code for driving while intoxicated and under section 273a(a) of the California Penal Code for willfully permitting a child under his care or custody to be "placed in a situation where his or her person or health is endangered" "under circumstances or conditions likely to produce great bodily harm or death."

In 2009, Diaz-Rodriguez was again pulled over by a police officer, this time while driving intoxicated with his six-year-old daughter. He was convicted for driving while intoxicated, Cal. Veh. Code § 23152(b), driving without a license (revoked for the prior drunk driving violations), Cal. Veh. Code § 14601.2(a), and

3

also convicted under section 273a(a) of the Penal Code. He was sentenced to imprisonment and other penalties, including a 52-week child abuse program.

After this 2009 conviction, the government started removal proceedings, alleging that Diaz-Rodriguez had been convicted of the offense of child abuse in violation of section 273a(a) and was therefore removable as an alien convicted of a "crime of child abuse, child neglect, or child abandonment." 8 U.S.C. § 1227(a)(2)(E)(i). In December 2012, Diaz-Rodriguez appeared before an immigration judge (IJ) with counsel and denied the charge of removability. He also filed an application for cancellation of removal.

The IJ determined that Diaz-Rodriguez was removable as charged. In considering whether Diaz-Rodriguez's conviction under section 273a(a) constituted the removable offense of "child abuse, child neglect, or child abandonment" in § 1227(a)(2)(E)(i), the IJ relied on the BIA's interpretation of that phrase in two precedential opinions, *Matter of Velazquez-Herrera*, 24 I. & N. Dec. 503 (BIA 2008), and *Matter of Soram*, 25 I. & N. Dec. 378 (BIA 2010). The IJ concluded that a section 273a(a) offense "falls squarely within the definition of 'crime of child abuse' set forth by the [BIA]." The IJ therefore denied Diaz-Rodriguez's application for cancellation of removal and ordered him removed to Mexico.

4

Diaz-Rodriguez filed an administrative appeal to the BIA, which agreed with the IJ that a violation of section 273a(a) qualifies as a crime of child abuse under § 1227(a)(2)(E)(i). The BIA also affirmed the IJ's decision to deny Diaz-Rodriguez's application for cancellation of removal, and dismissed the appeal.

Diaz-Rodriguez timely petitioned for review, challenging only the BIA's determination that he was removable under § 1227(a)(2)(E)(i). A three-judge panel granted the petition for review. *Diaz-Rodriguez v. Garland*, 12 F.4th 1126 (9th Cir. 2021), *reh'g en banc granted*, 29 F.4th 1018 (9th Cir. 2022) (Mem.). We took the case en banc to consider whether section 273a(a) qualifies as "a crime of child abuse, child neglect, or child abandonment" under § 1227(a)(2)(E)(i).

We have jurisdiction under 8 U.S.C. § 1252(a). We review de novo questions of law, including whether a state conviction qualifies as a federal generic crime under the INA. *See Arellano Hernandez v. Lynch*, 831 F.3d 1127, 1130 (9th Cir. 2016).

II

The question before us is whether Diaz-Rodriguez's conviction under section 273a(a) makes him removable under 8 U.S.C. § 1227(a)(2)(E)(i).[1] Section 1227(a)(2)(E)(i) lists generic federal offenses (child abuse, child neglect, and child abandonment), and does not provide the elements of those offenses or cross-reference specific state or federal criminal statutes. When a federal statute refers to a generic federal offense, we generally apply the categorical approach set forth in *Taylor*, 495 U.S. at 588–89, to determine whether the state offense matches the

---

[1] 8 U.S.C. § 1227(a)(2(E)(i) provides:

> (E ) Crimes of domestic violence, stalking, or violation of protection order, crimes against children and
>
> (i) Domestic violence, stalking, and child abuse
>
> Any alien who at any time after admission is convicted of a crime of domestic violence, a crime of stalking, or a crime of child abuse, child neglect, or child abandonment is deportable. For purposes of this clause, the term "crime of domestic violence" means any crime of violence (as defined in section 16 of title 18) against a person committed by a current or former spouse of the person, by an individual with whom the person shares a child in common, by an individual who is cohabiting with or has cohabited with the person as a spouse, by an individual similarly situated to a spouse of the person under the domestic or family violence laws of the jurisdiction where the offense occurs, or by any other individual against a person who is protected from that individual's acts under the domestic or family violence laws of the United States or any State, Indian tribal government, or unit of local government.

6

federal generic offense, *see Mellouli v. Lynch*, 575 U.S. 798, 804–05 (2015).

Under this approach, we must identify the elements of both the state offense and

the federal generic offense, because the consequences imposed by the federal

statute are "triggered by crimes having certain specified elements, not by crimes

that happen to be labeled [with the same terms as] the laws of the State of

conviction." *Taylor*, 495 U.S. at 588–89. In defining the elements of the state

offense of conviction, we consider only "the least of the acts criminalized" by the

state offense, *Moncrieffe v. Holder*, 569 U.S. 184, 191 (2013) (cleaned up), to

ensure that "anyone convicted under [the state] law is necessarily guilty of all the

generic crime's elements," *Descamps v. United States*, 570 U.S. 254, 261 (2013)

(cleaned up). We then compare the elements of the state statute of conviction with

the elements of the federal generic offense, as we have defined them. *Id.*; *see also*

*United States v. Gonzalez–Monterroso*, 745 F.3d 1237, 1240 (9th Cir. 2014). If the

least state offense has the same elements as the generic federal crime, then the state

statute of conviction is a categorical match to the federal generic offense. *See*

*Descamps*, 570 U.S. at 261; *see also Mathis v. United States*, 579 U.S. 500, 505

(2016). But if the state statute of conviction "sweeps more broadly than the

generic [federal] crime, a conviction under that law cannot count as" the generic

federal offense "even if the defendant actually committed the offense in its generic

7

form." *Descamps*, 570 U.S. at 261.  An alien's actual conduct is not relevant to this inquiry.  *See Moncrieffe*, 569 U.S. at 190.

A

We begin by determining the least of the acts criminalized by section 273a(a) of the California Penal Code.  *See id.* at 191.  The California Supreme Court has referred to this statute as an "omnibus statute that proscribes essentially four branches of conduct."  *People v. Valdez*, 27 Cal. 4th 778, 783 (2002).  Section 273a(a) provides:

> Any person who, under circumstances or conditions likely to produce great bodily harm or death, [1] willfully causes or permits any child to suffer, or [2] inflicts thereon unjustifiable physical pain or mental suffering, or [3] having the care or custody of any child, willfully causes or permits the person or health of that child to be injured, or [4] willfully causes or permits that child to be placed in a situation where his or her person or health is endangered.

Cal. Penal Code § 273a(a); *see also Valdez*, 27 Cal. 4th at 783 (providing

bracketed numbers dividing statute into "four branches of conduct").[2] The first

three branches criminalize the infliction of physical or mental injury or suffering,

but the fourth branch does not. Therefore, we focus on the fourth branch as the

least act criminalized by section 273a(a).

The California Supreme Court has instructed that "two threshold

considerations govern all types of conduct" under section 273a(a). *People v.

Sargent*, 19 Cal. 4th 1206, 1216 (1999) (cleaned up).

_____

[2] Although the four branches of conduct are phrased in the disjunctive, we have previously held that they are alternative means for accomplishing the same offense, rather than different offenses, and therefore section 273a(a) is not divisible. *See Ramirez v. Lynch*, 810 F.3d 1127, 1138 (9th Cir. 2016). Accordingly, we do not employ a "modified categorical approach," which would require us to identify the branch under which Diaz-Rodriguez was actually convicted and determine whether that branch was a categorical match to the offenses listed in 8 U.S.C. § 1227(a)(2)(E)(i). *See Gonzales v. Duenas-Alvarez*, 549 U.S. 183, 187 (2007). *People v. Napoles*, 104 Cal. App. 4th 108 (2002), is not to the contrary. *Cf.* Concur. at 3–4 n.1. *Napoles* held that when the government prosecutes a defendant for a specific harmful action in violation of section 273a(a), but offers evidence of "many separate acts and omissions that might constitute abuse," the jury must unanimously agree as to what act or omission constituted unlawful abuse. *Id.* at 115, 118. But *Napoles* did not address jury unanimity as to the applicable branch of section 273a(a). *Cf.* Concur. at 3–4 n.1. Regardless of the applicability of *Napoles*, the modified categorical approach would not help us here, because the extra-statutory materials that we may examine in this case, *see Shepard v. United States*, 544 U.S. 13, 16 (2005), do not reveal which prong of section 273a(a) Diaz-Rodriguez was convicted of violating.

First, the "conduct must be willful." *Id.* Willfulness as used in the statute "does not require any intent to violate [the] law, or to injure another, or to acquire any advantage." *Valdez*, 27 Cal. 4th at 788 (alteration in original). Rather, the term "implies simply a purpose or willingness to commit the act, or make the omission referred to." *Id.* at 787–88. "Someone commits an act willfully when he or she does it willingly or on purpose." *People v. Chaffin*, 173 Cal. App. 4th 1348, 1352 (2009); *see also People v. Schneider*, 6 Cal. App. 3d 983, 985–86 (1970) (reversing a conviction under section 273a(a) where there was no evidence showing that the defendant's violent seizure, which injured a two-year-old boy, was purposeful).

Second, the defendant's act "must be committed 'under circumstances or conditions likely to produce great bodily harm or death.'" *Sargent*, 19 Cal. 4th at 1216 (quoting Cal. Penal Code § 273a(a)). The California Supreme Court has interpreted this phrase as criminalizing "abusive situation[s] in which the probability of serious injury is great." *Id.*; *see also Valdez*, 27 Cal. 4th at 784. The phrase "great bodily harm" in this context means "significant or substantial injury." *People v. Clair*, 197 Cal. App. 4th 949, 954 (2011). The word "likely"

means there is "a substantial danger, i.e., a serious and well-founded risk." *People v. Wilson*, 138 Cal. App. 4th 1197, 1204 (2006).[3]

The fourth branch of section 273a(a) requires proof that a defendant has "the care or custody of any child." California law attaches "no special meaning to the terms 'care and custody' beyond the plain meaning of the terms." *People v. Perez*, 164 Cal. App. 4th 1462, 1475 (2008). The "care and custody element" requires "only a willingness to assume duties correspondent to the role of a caregiver," and there is no requirement that the state prove the defendant "affirmatively demonstrated or expressed a willingness to assume caretaker duties." *Id.* at 1476. For example, a California appellate court held that a jury could have reasonably found that a defendant transporting a minor in his speeding car "undertook caregiving responsibilities or assumed custody over her while she was in his car"

---

[3] Diaz-Rodriguez argues that the term "likely" requires that the risk of harm to a child be only "reasonably foreseeable," relying on a state appellate court decision stating that "reasonably construed, [section 273a(a)] condemned the intentional placing of a child, or permitting him or her to be placed, in a situation in which serious physical danger or health hazard to the child is reasonably foreseeable." *People v. Hansen*, 59 Cal. App. 4th 473, 479–80 (1997). We reject this argument, because *Hansen* was superseded by the California Supreme Court's subsequent determination that "likely" as used in section 273a(a) means "the probability of serious injury is great." *Sargent*, 19 Cal. 4th at 1216; *see also Valdez*, 27 Cal. 4th at 788. The California Supreme Court recently confirmed this interpretation of the word "likely," holding that it must be construed according to its ordinary meaning as "having a high probability of occurring or being true" and "very probable." *In re B.M.*, 6 Cal. 5th 528, 533 (2018).

because he took "it upon himself to control [her] environment and safety." *People v. Morales*, 168 Cal. App. 4th 1075, 1084 (2008).

In addition to these elements, the California Supreme Court has determined that the fourth branch of section 273a(a) must be committed with a mens rea of at least criminal negligence. *See Sargent*, 19 Cal. 4th at 1219; *Valdez*, 27 Cal. 4th at 781. *Valdez* reasoned that "criminal negligence is the appropriate standard when the act is intrinsically lawful, such as leaving an infant with a babysitter, but warrants criminal liability because the surrounding circumstances present a high risk of serious injury." 27 Cal. 4th at 789. The criminal negligence requirement in section 273a(a) "sets forth a standard of conduct that is rigorous," *id.* at 788, and requires "aggravated, culpable, gross, or reckless" conduct, "that is, the conduct of the accused must be such a departure from what would be the conduct of an ordinarily prudent or careful person under the same circumstances as to be incompatible with a proper regard for human life or an indifference to consequences," *id*. (cleaned up). "Criminal negligence involves more than ordinary negligence, inattention, or mistake in judgment." *Chaffin*, 173 Cal. App. 4th at 1352. Thus, the statute does not cover a parent's "poor housekeeping" or everyday parenting decisions; rather, it punishes conduct "which even the most ignorant and insensitive parent should recognize as hazardous to children." *People*

12

*v. Harris*, 239 Cal. App. 2d 393, 398 (1966). For example, section 273a(a) was violated when a parent shook an infant with the force equivalent to dropping him out of a second story window, *see Sargent*, 19 Cal. 4th at 1222; where the conditions in defendant's home gave his nine- and seven-year-old children access to chemicals used to manufacture methamphetamine, exposed electrical wire, and 12 weapons, three of which were loaded, *see People v. Odom*, 226 Cal. App. 3d 1028, 1033–34 (1991); and where a mother confined her daughter in a closet without proper emotional or medical attention for months at a time, beginning when the child was only six months old, *see People v. Hernandez*, 111 Cal. App. 3d 888, 894–96 (1980).

Amici California Public Defenders argue that section 273a(a) punishes ordinary parenting mistakes and list examples "from recent memory" where a parent was charged under section 273a(a) for such mistakes. The amici provide no citation to any court proceedings reflecting charges or convictions on such basis, and we therefore do not consider these examples when analyzing the statute for purposes of the categorical approach. *See Duenas-Alvarez*, 549 U.S. at 193 (holding that a party arguing that "a state statute creates a crime outside the generic definition of a listed crime in a federal statute . . . must at least point to his own case or other cases in which the state courts in fact did apply the statute in the

13

special (nongeneric) manner for which he argues"). Echoing amici's argument, the dissent cites two federal district court cases that it claims show that section 273a(a) criminalizes poor parenting decisions. Dissent at 16 (citing *Andres-Lucas v. Mayorkas*, No. 3:21-cv-01121, 2021 WL 3929686, at *1 n.1 (S.D. Cal. Sept. 2, 2021); *Sky N. v. Becerra*, No. 2:21-cv-507, 2021 WL 3744383, at *3 (C.D. Cal. June 22, 2021). Neither of these opinions is apposite. First, we are bound by state court determinations of the elements of a state offense, not by district court cases. *See Johnson v. United States*, 559 U.S. 133, 138 (2010). Moreover, none of the federal cases cited by the dissent upheld a conviction under section 273a(a) based on a poor parenting decision or ratified a defendant's version of the conduct underlying the conviction.[4]

---

[4] In *Andres-Lucas*, the court merely recited a habeas petitioner's version of the events that led to his guilty plea under section 273a(a) "solely for purposes of setting a briefing schedule." *Andres-Lucas*, 2021 WL 3929686, at *1 n.1 (noting that the habeas petitioner claimed his four-year-old son threw a temper tantrum, and when the petitioner "intervened to try to calm his son *and discipline him*," the child "fell and was injured" (emphasis added)). And in *Sky N.*, the defendant father was convicted of misdemeanor child abuse under section 273a(b), not felony child abuse under 273a(a). *Sky N.*, 2021 WL 3744383, at *3 (noting that the father in that case had left a crying seven-day-old newborn in a locked car parked in an underground parking lot, returned to the restaurant where he had been eating dinner with his wife and the baby, "so he could resume eating," and finally "left the restaurant because he observed a police officer standing outside holding his baby").

Under California courts' construction of section 273a(a), therefore, the least of the acts criminalized by the fourth branch of the statute requires proof that a defendant (1) had care of custody of a child, whether or not a parent or legal guardian; and (2) with criminal negligence, meaning in a manner that a reasonable person would have known creates a high risk of death or great bodily injury; (3) purposely put the child into an abusive situation in which the probability of serious injury was great. *See Sargent*, 19 Cal. 4th at 1219–21; *Valdez*, 27 Cal. 4th at 783–86.

B

Having determined the least act criminalized by section 273a(a), our next task is to define the federal generic crimes encompassed by the phrase "child abuse, child neglect, or child abandonment" under § 1227(a)(2)(E)(i). We begin by "using the normal tools of statutory interpretation." *Esquivel-Quintana v. Sessions*, 137 S. Ct. 1562, 1569 (2017). In some cases, this task is straightforward, as when Congress provides a definition of the offense in the statute itself. *See, e.g.*, 18 U.S.C. § 924(e)(2)(B) (defining "violent felony" as "any crime punishable by imprisonment for a term exceeding one year . . . that . . . has as an element the use, attempted use, or threatened use of physical force against the person of another"). In other statutes, Congress establishes the elements of a generic offense by cross-

15

referencing another federal statute. *See, e.g.*, 8 U.S.C. § 1101(a)(43)(B) (incorporating the definition of "drug trafficking crime" contained in section 924(c) of Title 18).

Where, as here, Congress takes neither approach, we apply other tools of statutory construction. First, we consider "[t]he everyday understanding of" the terms, including the ordinary definitions of those words at the time the relevant provision was enacted. *Esquivel-Quintana*, 137 S. Ct. at 1569; *see also Perrin v. United States*, 444 U.S. 37, 42 (1979) ("A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning."). This textual analysis typically begins by consulting contemporaneous dictionaries, because we are "bound to assume that the legislative purpose is expressed by the ordinary meaning of the words used." *INS v. Cardoza-Fonesca*, 480 U.S. 421, 431 (1987) (cleaned up). Where the dictionary definitions point clearly in a single direction, they carry great weight in interpreting the scope of a generic offense. *See Esquivel-Quintana*, 137 S. Ct. at 1569; *Kawashima v. Holder*, 565 U.S. 478, 484 (2012); *Lopez v. Gonzales*, 549 U.S. 47, 53–54 (2006). But when the dictionary definitions point in conflicting directions, we look to other sources to determine the meaning of the statute. *See Torres*, 578 U.S. at 458–60.

16

We also consider "the structure of the INA," including "surrounding provisions" of the terms at issue. *Esquivel-Quintana*, 137 S. Ct. at 1570; *see also Carachuri-Rosendo v. Holder*, 560 U.S. 563, 578 (2010). Additionally, a court may consult relevant contemporaneous federal statutes that use the same language or relate to the same type of offenses. *See Esquivel-Quintana*, 137 S. Ct. at 1570–71; *Carachuri-Rosendo*, 560 U.S. at 574–75.

Finally, a court may consider "evidence from state criminal codes" to examine relevant state criminal laws in place at the time the relevant federal statute was enacted. *See Esquivel-Quintana*, 137 S. Ct. at 1571; *Duenas-Alvarez*, 549 U.S. at 190. While an analysis of contemporaneous state laws may shed light on what Congress meant in using specific terms, the Supreme Court has made clear that such an analysis is not required by the categorical approach. *See Esquivel-Quintana*, 137 S. Ct. at 1571 n.3.

If "Congress has supplied a clear and unambiguous answer to the interpretive question at hand," we do not defer to the BIA's interpretation of the text at issue. *Pereira v. Sessions*, 138 S. Ct. 2105, 2113 (2018) (discussing deference under *Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984)); *see also Johnson v. Guzman Chavez*, 141 S. Ct. 2271, 2291 n.9 (2021).

17

Diaz-Rodriguez does not argue that the offenses "child abuse, child neglect, or child abandonment" under § 1227(a)(2)(E)(i) have clear and unambiguous meanings. Rather, he argues that his section 273a(a) conviction is not a categorical match for such offenses for two reasons. First, he claims that in 1996, a crime of "child abuse" required the perpetrator to have a mens rea of at least recklessness, not mere criminal negligence, and to have engaged in conduct that caused harm to a child, not merely put a child at risk of harm. Second, Diaz-Rodriguez argues that in 1996, an act of "child neglect" or "child abandonment" could be committed only by a parent or legal guardian. The dissent raises a different argument. It claims that section 273a(a) constitutes a crime of child endangerment, Dissent at 12, and Congress unambiguously excluded the crime of child endangerment from § 1227(a)(2)(E)(i), Dissent at 21. The dissent defines the offense "commonly referred to as a child endangerment offense" as having the elements of: (1) "causing or permitting a child 'to be placed in a situation where his or her person or health is endangered,'" (2) "committed with a mens rea of criminal negligence," and (3) "involving serious risk of harm to the child but no resulting injury." Dissent at 12.

Applying *Esquivel-Quintana*, we frame our inquiry by determining whether it is unambiguous that the generic federal offenses of "child abuse, child neglect, or

18

child abandonment" in § 1227(a)(2)(E)(i) do not match the least offense criminalized by section 273a(a): a mens rea of criminal negligence, an actus reus of placing a child in a situation where the child's person or health is endangered under circumstances or conditions likely to produce great bodily harm or death, and a perpetrator who is merely a caretaker of the child. *See Esquivel-Quintana*, 137 S. Ct. at 1568 (determining that the generic federal offense of "sexual abuse of a minor" was unambiguous in including the element that the victim was younger than 16, and therefore it was unambiguous that the generic federal offense was not a match to section 261.5(c) of the California Penal Code, which criminalized consensual intercourse between a victim who is almost 18 and a perpetrator who just turned 21).

1

We begin with the text of § 1227(a)(2)(E)(i). Because the INA does not define the crimes of "child abuse, child neglect, or child abandonment," or cross-reference a federal criminal statute containing a definition, we start with dictionary definitions of these terms that were current at the time Congress added the language to the INA in 1996. We review these definitions to see if they shed any light on the question whether Congress meant the offenses listed in § 1227(a)(2)(E)(i) to cover (or not cover) crimes against children that require only

19

a mens rea of criminal negligence, do not require injury to the victim, and do not require the perpetrator to be a parent or legal guardian, but could include persons temporarily responsible for a child.

Turning first to the term "child abuse," the contemporaneous dictionaries do not clearly support Diaz-Rodriguez's claim that this term requires a mens rea of at least recklessness and an actual injury to the child. His best support for this claim comes from a 1990 edition of Black's Law Dictionary, which defined the term "child abuse" to mean an intentional injury to a child. Specifically, it stated that "child abuse" means "[a]ny form of cruelty to a child's physical, moral or mental well-being," Black's Law Dictionary at 239 (6th ed. 1990), with "cruelty" defined as "[t]he intentional and malicious infliction of physical or mental suffering," *id.* at 377. However, other dictionaries defined the term to mean injury to a child that could be inflicted intentionally *or* negligently, or did not specify the perpetrator's intent. Thus, a 1999 edition of Black's Law Dictionary defined the term "child abuse" to mean "an intentional or neglectful physical or emotional injury imposed on a child, including sexual molestation," Black's Law Dictionary at 10 (7th ed. 1999), and the 1989 edition of the Oxford English Dictionary defined "child abuse" as the "maltreatment of a child, esp. by beating, sexual interference, or neglect," Oxford English Dictionary at 114 (2d ed. 1989). A contemporaneous

20

edition of Merriam-Webster's Dictionary of Law defined the term "child abuse" to mean "the infliction of physical or emotional injury; also: the crime of inflicting such injury," but was silent as to whether the injury could be inflicted negligently. Merriam-Webster's Dictionary of Law at 4, 76 (1996). Some contemporaneous dictionaries defined "child abuse" without specifying the role of either injury or intent. Ballentine's Legal Dictionary and Thesaurus defined child abuse as: "[t]he physical, sexual, verbal, or emotional abuse of a young person. Child abuse includes the neglect of a child." Ballentine's Legal Dictionary and Thesaurus at 96 (1995). Finally, Webster's II New College Dictionary defined the term as including "toleration of and complicity in conditions injurious to the child's health." Webster's II New College Dictionary at 194 (1995). Based on these contemporaneous definitions, we do not see a clear consensus that the term "child abuse" meant injury to the child that was inflicted intentionally or recklessly.[5] The dictionary thus does not provide an unambiguous meaning of the term "child

_____

[5] On this score, the dissent agrees that contemporaneous dictionaries defined child abuse as being committed with "neglect" or "negligence," and that "the *mens rea* elements" for child abuse "may not have been defined clearly." Dissent at 23 & n.7. Likewise, despite the dissent's characterization of "child abuse" as requiring the infliction of injury upon the child, the dictionary definitions of "child abuse" cited by the dissent do not unanimously require such injury. Dissent at 22–23 (citing *Child Abuse*, Black's Law Dictionary at 239, 377 (6th ed. 1990); *Child Abuse*, Oxford English Dictionary at 114 (2d ed. 1989)).

21

abuse" with respect to these elements.  Therefore, we reject Diaz-Rodriguez's

argument that contemporaneous dictionary definitions of "child abuse" require

actual harm to a child and do not include negligent acts that merely put a child at

risk of harm.

We next turn to the term "child neglect." The dictionaries generally define

the term "child neglect" as failure by a responsible party to provide requisite care

for a child, but they do not address whether the defendant's mental state must be

criminally negligent, knowing, or intentional, whether the targeted conduct must

actually injure the child, or whether the perpetrator must be a child's parent or

legal guardian.  Webster's II New College Dictionary defines the term "child

neglect" as "failure on the part of a parent or parental substitute to supervise a child

and provide requisite care and protection," Webster's II New College Dictionary at

194 (1995), but does not indicate whether a "parental substitute" must be a legal

guardian or could be a temporary caretaker.  Nor does it indicate the requisite

mental state of the parent or parental substitute or whether the child must be

harmed by that person's failure to provide care.  Other dictionaries are no more

helpful.  For instance, the relevant entry in Merriam-Webster's Dictionary of Law

defines the term "neglect" as "a disregard of duty resulting from carelessness,

indifference, or willfulness; *esp*: a failure to provide a child under one's care with

22

proper food, clothing, shelter, supervision, medical care, or emotional stability."

Merriam-Webster's Dictionary of Law at 324 (1996). Ballentine's Legal

Dictionary and Thesaurus defines the term "child neglect" with a cross reference to

the term "child abuse," which is defined as "[t]he physical, sexual, verbal, or

emotional abuse of a young person." Ballentine's Legal Dictionary and Thesaurus

at 96 (1995). Finally, the 1999 edition of Black's Law Dictionary defines the term

"child neglect" as the "failure of a person responsible for a minor to care for the

minor's emotional or physical needs." Black's Law Dictionary at 199 (7th ed.

1999). Because none of these definitions specify whether the person committing

child neglect must be a parent, legal custodian, or temporary caretaker, we reject

Diaz-Rodriguez's argument that the term "child neglect" cannot be a match to

section 273a(a).[6]  By the same token, however, because the dictionary definitions do not identify the mental state or the degree of harm caused by the person committing child neglect, the definitions also do not support the concurrence's view that the term "child neglect" is unambiguous and a categorical match to section 273a(a).  Concur. at 6.

By contrast, contemporaneous dictionaries support the conclusion that the term "child abandonment" means that a parent or legal guardian has failed to discharge a parent's legal duty.  Merriam-Webster's Dictionary of Law defines "abandonment" with respect to children as "failure to communicate with or provide financial support for one's child over a period of time that shows a purpose to forgo parental duties and rights."  Merriam-Webster's Dictionary of Law at 1 (1996).  Likewise, Ballentine's Legal Dictionary and Thesaurus defines

---

[6] The dissent argues that the dictionary definition of "child neglect" includes "a sustained failure to meet a child's needs."  Dissent at 25.  Therefore, the dissent contends, the term "child neglect" cannot be a match to section 273a(a), which allows a conviction to rest on a one-time parenting mistake.  This argument fails for several reasons.  First, evidence that a defendant engaged in conduct amounting to ordinary negligence (such as the failure to pack a child's school lunch, Dissent at 26–27) would not satisfy the requirements for a conviction under section 273a(a).  *Supra* 12–13.  Moreover, none of the dictionary entries cited by the dissent clearly state that child neglect requires a pattern of negligence over time.  Although the dissent infers that the failure to provide "food, clothing, shelter, supervision, medical care," *see* Merriam-Webster's Dictionary of Law at 324 (1996), "*implies* a sustained failure" of care, Dissent at 26 (emphasis added), that definition could also cover a one-time act that threatens to cause serious harm.

24

"abandonment of child" to occur when "a parent deserts [a child] with the intention of casting off all parental obligations," Ballentine's Legal Dictionary and Thesaurus at 2 (1995), and the 1990 edition of Black's Law Dictionary defines the term as "foregoing parental duties," Black's Law Dictionary at 2 (6th ed. 1990); *see also* Dictionary of Modern Legal Usage at 3 (2d ed. 1995) (defining "abandon" in the context of family law as leaving "children or a spouse willfully"). We have found no dictionary definitions to the contrary.

Based on our review of common usage, we conclude that a "crime of . . . child abandonment" in § 1227(a)(2)(E)(i) includes, as an element, the fact that the crime was committed by a parent or legal guardian of a child. Therefore, section 273a(a), which can be committed by a person who is not a parent or legal guardian, *supra* Section II.A, does not match the offense of "child abandonment." This does not end our categorical analysis, however, because so long as the least offense criminalized by section 273a(a) can qualify as "child abuse" or "child neglect," it remains a removable offense under § 1227(a)(2)(E)(i).

Because the dictionaries do not point in one direction with respect to the terms "child abuse" and "child neglect," we must look to other tools of statutory construction to determine whether Congress meant for the term "child abuse" to cover crimes that require only a mens rea of criminal negligence and do not require

25

injury to the victim, and for the term "child neglect" to cover crimes that do not require the perpetrator to be a parent or legal guardian.

2

We next turn to the "[s]urrounding provisions of the INA," *Esquivel-Quintana*, 137 S. Ct. at 1570, to guide our interpretation. The terms "child abuse," "child neglect," and "child abandonment" in § 1227(a)(2)(E)(i) are listed in a section referencing "crimes of domestic violence, stalking, or violation of protection order, crimes against children," and in a subsection referring to "domestic violence, stalking, and child abuse." Under a well-established canon of statutory construction, where "several items in a list share an attribute," we interpret "the other items as possessing that attribute as well." *Beecham v. United States*, 511 U.S. 368, 371 (1994) (collecting cases). *Esquivel-Quintana* applied this canon in interpreting the term "sexual abuse of a minor" in 8 U.S.C. § 1101(a)(43)(A). *See* 137 S. Ct. at 1570. In that case, the Court noted that "sexual abuse of a minor" was "listed in the INA as an '*aggravated* felony,'" and was in "the same subparagraph as 'murder' and 'rape,'" which therefore "suggests that sexual abuse of a minor encompasses only especially egregious felonies." *Id.* Applying the same interpretive method here, we first note that the term "child abandonment," the third in the trio of terms in § 1227(a)(2)(E)(i), does not

necessarily involve an injury to the child, which undercuts the argument that "child abuse" and "child neglect" necessarily requires an injury. Moreover, the inclusion of "stalking" and "violation of protection order"—crimes that do not necessarily include violence or injury—in § 1227(a)(2)(E)(i) indicates that Congress did not mean that a crime of child abuse or child neglect would encompass only egregious felonies requiring injury to the victim.

Taking a broader view of the INA, Diaz-Rodriguez argues that the structure and purpose of the INA preclude interpreting § 1227(a)(2)(E)(i) as applying to crimes requiring only criminal negligence. Such an application is wrong, he contends, because it makes a parent who has a single lapse in judgment removable and ineligible for cancellation of removal. *See* 8 U.S.C. § 1229b(b)(2)(A)(iv). According to Diaz-Rodriguez, such a result is "decidedly at odds with the otherwise child-protective aim of" the INA. We disagree. First, the mens rea of "criminal negligence" is "a degree of culpability higher than ordinary negligence," *United States v. Gomez-Leon*, 545 F.3d 777, 791 (9th Cir. 2008), and it typically requires a "'substantial risk' and/or that the failure to perceive such a risk constitutes 'a gross deviation from the standard of care that a reasonable person would observe in the actor's situation,'" *id.* (quoting Model Penal Code § 2.02(d)). As we have explained, California courts define the criminal negligence required for

27

a violation of section 273a(a) in this manner. *Supra* Section II.A. Under a criminal negligence standard, therefore, "a state would not punish conduct that amounts to only ordinary negligence," *id.*, such as the parenting mistakes envisioned by Diaz-Rodriguez.

Second, in interpreting the INA, we are mindful that "providing relief to aliens with strong ties to the United States" and "promoting family unity" "are not the INA's only goals, and Congress did not pursue them to the *n* th degree." *Holder v. Martinez Gutierrez*, 566 U.S. 583, 594 (2012). The Supreme Court provided one example of this principle: the INA makes certain lawful permanent residents who are "convicted of aggravated felonies ineligible for cancellation of removal, regardless of the strength of their family ties." *Id.* (citing § 1229b(a)(3)). More generally, the Court has declined to "read a silent statute as requiring (not merely allowing)" a rule that promotes family unity "just because that rule would be family-friendly." *Id.* Therefore, the structure and purpose of the INA do not

preclude interpreting § 1227(a)(2)(E)(i) as including crimes against children

committed with criminal negligence.[7]

3

We next consider other federal statutes that use similar terms, especially

when those statutes are "closely related" to the statute at issue. *Esquivel-Quintana*,

137 S. Ct. at 1570. As a general rule, "statutes addressing the same subject matter"

should be interpreted consistently with each other. *Wachovia Bank v. Schmidt*, 546

U.S. 303, 316 (2006); *see also United States v. Stewart*, 311 U.S. 60, 64 (1940)

("[A]ll acts *in pari materia* are to be taken together, as if they were one law."

(emphasis added)). For example, *Esquivel-Quintana* identified a "closely related"

federal statute that criminalized "[s]exual abuse of a minor or ward," which is

similar to the term "sexual abuse of a minor" in the INA, 137 S. Ct. at 1570

---

[7] The dissent argues that nonpermanent residents have a better argument than the lawful permanent residents discussed in *Martinez-Gutierrez* for a family-friendly reading of § 1227(a)(2)(E)(i), because to obtain cancellation of removal, they must demonstrate that removal would result in "exceptional and extremely unusual hardship" to their United States citizen or legal permanent resident family members. Dissent at 39–40. Therefore, the dissent argues, the BIA's reading of § 1227(a)(2)(E)(i) would cause "'exceptional and extremely unusual hardship' based on parenting mistakes," which would be inconsistent with Congress's intent to "preserve family unity." Dissent at 40. But as indicated in *Martinez Gutierrez*, courts do not interpret the INA with the presumption that Congress intended an interpretation "that would be family-friendly," 566 U.S. at 594, and the framework for cancellation of removal does not guide our interpretation of § 1227(a)(2)(E)(i).

29

(quoting 18 U.S.C. § 2243), and relied on that related federal statute "for evidence of the meaning of sexual abuse of a minor," even while recognizing the statute did not provide "the complete or exclusive definition" of the offense, *id.* at 1571.

Because the federal criminal code does not include a crime of "child abuse" or "child neglect," we look to other parts of the federal code for evidence of Congress's meaning. The most relevant evidence comes from the National Child Protection Act of 1993 (NCPA), Pub. Law 103-209, 107 Stat. 2490 (Dec. 20, 1993), which was enacted "to establish procedures for national criminal background checks for child care providers." Under the NCPA, states are required to provide records of convictions for child abuse crimes and to develop a system for ongoing reporting of such convictions through a "national criminal history background check system." 42 U.S.C. § 5119(a) (1996). The federal background check system enables a state to determine whether a childcare provider had been convicted of the sort of crime against children "that bears upon [an] . . . individual's fitness to have responsibility for the safety and well-being of children." *Id.* § 5119a(a)(1). The NCPA defines the term "child abuse crime" to mean "a crime committed under any law of a State that involves the physical or mental injury, sexual abuse or exploitation, negligent treatment, or maltreatment of a child by any person." *Id.* § 5119c(3). This definition demonstrates that just three

30

years before Congress amended the INA to include a "crime of child abuse" as a removable offense, Congress understood such a crime to include the "negligent treatment" of a child "by any person."[8]

Diaz-Rodriguez contends that we may not rely on federal civil statutes like the NCPA to interpret generic criminal offenses under the INA. According to Diaz-Rodriguez, civil statutes have a different purpose, such as determining "when social services may intervene" to help victims of child abuse, *Ibarra v. Holder*, 736 F.3d 903, 911 (10th Cir. 2013), and so are not a reliable indicator of how Congress would have understood the terms in the context of defining conduct subject to criminal penalties.[9]

---

[8] Contrary to the dissent's contention that the NCPA's definition of "child abuse crime" renders two of the three crimes listed in § 1127(a)(2)(E)(ii), child neglect and child abandonment, superfluous, Dissent at 42, the NCPA's definition supports our conclusion that Congress intentionally used overlapping terms to encompass a wide range of crimes, *infra* 53.

[9] The dissent similarly argues that we should not look to civil statutes. Dissent at 43–44. According to the dissent, *Esquivel-Quintana* "implicitly rejected" "[t]he use of civil statutes to define criminal offenses" by declining to rely on the interpretation of "sexual abuse of a minor" in 18 U.S.C. § 3509, a criminal procedure statute on which the BIA had relied. Dissent at 43. *See Esquivel-Quintana v. Lynch*, 810 F.3d 1019, 1025 (6th Cir. 2016), *rev'd*, 137 S. Ct. 1562. This argument is groundless, given that the Supreme Court did not even mention § 3509 in *Esquivel-Quintana*, or give any indication that a civil statute cannot constitute a "related federal statute" for purposes of interpreting a generic federal offense. 137 S. Ct. at 1570.

We disagree. The NCPA defined the term "child abuse crimes" to describe convictions for a category of crimes against children, *see* 42 U.S.C. § 5119c(3) (1996), and the INA used the term "crime of child abuse" in 8 U.S.C. § 1227(a)(2)(E)(i) for exactly the same purpose. In both statutes, Congress focused on this category of convictions for civil purposes: determining whether a prospective childcare provider had committed a potentially disqualifying offense (for the NCPA) or determining whether an alien had committed a removable crime (for the INA). Accordingly, the NCPA's definition of "child abuse crime" is a reliable indicator of how Congress would have understood the materially identical terminology ("crime of child abuse") in the INA.

Other federal civil code sections defining "child abuse" in 1996 are also relevant. Two provisions, 18 U.S.C. § 3509(a)(3) (1996) and 42 U.S.C. § 13031(c)(1) (1996), defined the term "child abuse" to mean "the physical or mental injury, sexual abuse or exploitation, or negligent treatment of a child."[10] Likewise, 42 U.S.C. § 3796aa-8(2) (1996) defined the term "abuse" to mean "the physical or mental injury, sexual abuse or exploitation, or negligent treatment of a

---

[10] 18 U.S.C. § 3509(a)(3) (1996) refers to victims of child abuse in the context of defining the rights of such victims in court proceedings. 42 U.S.C. § 13031(c)(1) (1996) defines the term in the context of a statute requiring child abuse reporting for certain covered professionals in federal jurisdictions.

child," and 42 U.S.C. § 13001a(5) (1996) defined the term "child abuse" to mean the "physical or sexual abuse or neglect of a child."[11]  Finally, 42 U.S.C. § 5106g(4) (1996) (enacted under the Child Abuse Prevention and Treatment Act (CAPTA)) defined the term "child abuse and neglect" to mean "physical or mental injury, sexual abuse or exploitation, negligent treatment, or maltreatment of a child by a person who is responsible for the child's welfare, under circumstances which indicate that the child's health or welfare is harmed or threatened thereby, as determined in accordance with regulations prescribed by the Secretary."  Although these statutes did not define the term "child abuse" in the context of describing conduct subject to criminal penalties, they provide some evidence that this term was commonly understood as encompassing neglectful conduct.

We also consider federal code provisions referencing "child neglect" as evidence of the ordinary meaning of that term.  The handful of federal definitions of this term provide some support for the proposition that it was commonly understood that child neglect could be committed by someone other than a parent or legal guardian.  As noted above, CAPTA defined the term "child abuse and

---

[11] 42 U.S.C. § 3796aa-8(2) (1996), *transferred to* 34 U.S.C. § 10337, defined the term "abuse" in connection with awarding federal grants for closed-circuit televising of testimony of child abuse victims.  42 U.S.C. § 13001a(5) (1996), *transferred to* 34 U.S.C. § 20302, defined the term "child abuse" in connection with improving the states's investigation and prosecution of child abuse.

33

neglect" to include the "negligent treatment, or maltreatment of a child by a person who is responsible for the child's welfare."  42 U.S.C. § 5106g(4) (1996). Regulations implementing CAPTA further defined the term "negligent treatment or maltreatment" to "include[] failure to provide adequate food, clothing, shelter, or medical care," 45 C.F.R. § 1340.2(d)(2)(i), without limiting liability to a parent or legal guardian. The only other federal statute to define the term "child neglect" is 25 U.S.C. § 3202(4) (1996) (relating to child abuse in Indian country, including requiring reporting and establishing a database), which defined the term as "includ[ing] but . . . not limited to, negligent treatment or maltreatment of a child by a person, including a person responsible for the child's welfare, under circumstances which indicate that the child's health or welfare is harmed or threatened thereby."  None of these statutes or regulations establishes that the person responsible for child neglect must be a parent or legal guardian, indicating

that the ordinary meaning of "child neglect" in 1996 did not necessarily include that element.[12]  *See Esquivel-Quintana*, 137 S. Ct. at 1570.

4

Finally, we may "look to state criminal codes for additional evidence about the generic meaning" of "child abuse, child neglect, or child abandonment," although this step "is not required by the categorical approach."  *Id.* at 1571 & n.3.

In determining the meaning of a generic federal offense, the Supreme Court has used multistate surveys in different ways.  *Id.*  In the decision first establishing the categorical approach to define federal generic offenses, the Supreme Court defined the generic federal crime of "burglary" in the Armed Career Criminal Act by reference to state law.  *Taylor*, 495 U.S. at 598–99.  The Court acknowledged that burglary was a crime at common law, and that "[w]hatever else the Members of Congress might have been thinking of, they presumably had in mind at least the

---

[12] The concurrence claims that the definitions of child neglect in these contemporary federal civil statutes conclusively establish that the person responsible for child neglect need not be a parent or guardian, and therefore our determination that these statutes do not resolve this issue is "inexplicabl[e]." Concur. at 13–14 & n.7.  We disagree.  As explained above, *see supra* 30–35, these federal civil statutes provide little guidance for interpreting a crime of child neglect.  Moreover, a review of contemporaneous federal statutes is only one of the tools of statutory construction.  As explained below, *see infra* 48 n. 22, numerous state statutes criminalize "child neglect" only when the perpetrator is a parent or legal guardian.

35

'classic' common-law definition." *Id.* at 592–93. Nevertheless, the Court recognized that states had "expanded this definition to include entry without a 'breaking,' structures other than dwellings, offenses committed in the daytime, entry with intent to commit a crime other than a felony, etc." *Id.* at 593. The Court therefore considered the "generic, contemporary meaning of burglary," as the term was used "in the criminal codes of most States," and identified a consensus set of elements from the state survey. *Id.* at 598 (stating that "the generic, contemporary meaning of burglary contains at least the following elements: an unlawful or unprivileged entry into, or remaining in a building or other structure, with intent to commit a crime." (citing Wayne R. LaFave & Austin W. Scott, *Substantive Crim. L.*, § 8.13(a) (2d ed. 1986); Model Penal Code § 221.1 (1980))).

In its subsequent interpretation of a generic federal offense, the crime of "sexual abuse of a minor," which is not a traditional common-law crime, the Court placed far less emphasis on a state survey. *Esquivel-Quintana*, 137 S. Ct. at 1569. Rather than distilling the elements of the generic offense by surveying state criminal codes as *Taylor* did, *Esquivel-Quintana* used the "normal tools of statutory interpretation" to discern those elements, *id.*, and looked to state criminal codes only "for additional evidence about the generic meaning of sexual abuse of a minor," *id.* at 1571. This makes sense, because as our sister circuits have noted, in

36

interpreting a federal generic offense that is not a traditional common-law crime,

but "could encompass multiple, divergent offenses in any given state," it may be

more difficult or impossible "to sift through the multitudes of qualifying state

offenses and identify a consensus set of the minimum elements necessary to define

the category." *United States v. Alfaro*, 835 F.3d 470, 473 (4th Cir. 2016); *see also*

*United States v. Ramirez-Garcia*, 646 F.3d 778, 782–83 (11th Cir. 2011).

In our case, *Esquivel-Quintana* provides more relevant guidance than *Taylor*

for interpreting the federal generic crimes encompassed by the phrase "child abuse,

child neglect, or child abandonment" under § 1227(a)(2)(E)(i). Unlike the offense

of "burglary," *see Taylor*, 495 U.S. at 998, crimes against children, including the

crimes of child abuse, child neglect, child abandonment, and child endangerment,

were not crimes at common law, *see* Wayne LaFave, *Subst. Crim. L.* § 2.1(b) (3d

ed. 2022) (listing common law crimes).[13]

And there is no "prevailing view" among the states—much less any

generally shared elements—of what constitutes child abuse, child neglect, or child

abandonment offenses. *Taylor*, 495 U.S. at 998. Rather, states have developed

such divergent and overlapping definitions of these offenses as to preclude

---

[13] Indeed, in 1874, abusers of an eight-year-old girl "were prosecuted under the law for prevention of cruelty to animals, since no law protecting children then existed." *See Child Abuse*, Black's Law Dictionary at 12 (11th ed. 2019).

identifying consensus elements.  *See Alfaro*, 835 F.3d at 473.  In 1996, states took a wide variety of approaches to labeling, categorizing, and defining crimes against children.  For instance, although many states described crimes against children using the terms "abuse" and "neglect," at least 16 states used other terms, such as "criminal nonsupport," Alaska Stat. § 11.51.120 (Alaska), "cruelty to children," Ga. Code Ann. § 16-5-70 (Georgia), and "endangering the welfare of children," Mont. Code Ann. § 45-5-622 (Montana).

Even states that used the term "abuse" in describing crimes against children required different offense elements and did not agree on the combination of elements that constituted the crime of abuse.  For instance, state offenses labeled "abuse" sometimes could be committed with a lesser standard of culpability than recklessness, but nevertheless required that the offense conduct result in actual injury to a child.[14]  By contrast, other state offenses labeled "abuse" required proof of a mens rea of recklessness or a higher standard of culpability, but did not require an actual injury.[15]

---

[14] *See, e.g.*, Md. Code Ann. § 35C; *Fisher v. State*, 786 A.2d 706, 737 (2001) (Maryland); Tenn. Code Ann. § 39-15-401; *State v. Ducker*, 27 S.W.3d 889, 896 (2000) (Tennessee).

[15] *See, e.g.*, N.D. Cent. Code §§ 14-09-22, 12.1-02-02 (North Dakota); Okla. Stat. tit. x, § 7115; *Johnson v. State*, 751 P.2d 1094, 1096 (1988) (Oklahoma).

Likewise, state statutes labeled "neglect" included different combinations of elements. A "neglect" crime could be committed with a mens rea of criminal negligence, recklessness, or intent.[16] And regardless of the mens rea, some neglect crimes required an injury to the child while others did not,[17] and some "neglect" crimes required the defendant to have custody of the child while others did not.[18]

In light of these overlapping definitions, we review all relevant state statutes, even if they did not define the conduct at issue using the same terminology as

---

[16] For a mens rea of criminal negligence, see, e.g., Or. Rev. Stat. § 163.545 (Oregon); S.C. Code Ann. § 20-7-50 (South Carolina); Va. Code Ann. § 18.2-371.1 (Virginia); for a mens rea of recklessness, see, e.g., Ind. Code § 35-46-1-4 (Indiana); for a mens rea of intent, see e.g., La. Stat. Ann. § 14:74 (Louisiana); Minn. Stat. § 609-378(a) (Minnesota); Wis. Stat. § 948.21 (Wisconsin).

[17] For "neglect" crimes with a mens rea of recklessness or greater with an injury requirement, see, e.g., 11 R.I. Gen. Laws § 11-9-5 (Rhode Island); Tenn. Code Ann. § 39-15-401 (Tennessee), and with no injury requirement, see, e.g., Ind. Code § 35-46-1-4 (Indiana); Iowa Code Ann. § 726.3 (Iowa); La. Stat. Ann. § 14:74 (Louisiana); Minn. Stat. § 609-378(a) (Minnesota); N.J. Stat. Ann. § 9:6-3 (New Jersey); Okla. Stat. tit. x, § 7115 (Oklahoma); Wis. Stat. § 948.21 (Wisconsin). For "neglect" crimes with a mens rea of criminal negligence and an injury requirement, see, e.g., W. Va. Code Ann. § 61-8D-4(b) (West Virginia), and with no injury requirement, see, e.g., Or. Rev. Stat. § 163.545 (Oregon); S.C. Code Ann. § 20-7-50 (South Carolina); Va. Code Ann. § 18.2-371 (Virginia); W. Va. Code Ann. § 61-8D-4(e) (West Virginia).

[18] For "neglect" crimes requiring custody of the child, see, e.g., Ariz. Rev. Stat. Ann. § 13-3619 (Arizona); 720 Ill. Comp. Stat. 130/2 (Illinois); Iowa Code Ann. § 726.3 (Iowa); for "neglect" crimes not requiring custody, see, e.g., Miss. Code Ann. § 97-5-39 (Mississippi); Nev. Rev. Stat. § 200.508 (Nevada); Okla. Stat. tit. x, § 7115 (Oklahoma); S.D. Codified Laws § 26-8A-2(6) (South Dakota); W. Va. Code Ann. §§ 61-8D-3, 61-8D-4(e) (West Virginia).

§ 1227(a)(2)(E)(i).  *See Esquivel-Quintana*, 137 S. Ct. at 1571–72 (interpreting

"sexual abuse of a minor" by reference to statutory rape offenses in 51

jurisdictions, where only two states had offenses labeled "sexual abuse of a

minor").  Applying this approach, our survey indicates that in 1996 some 15 states

criminalized crimes against children that involved a mens rea of criminal

negligence, did not require any injury to the child, and did not require the

perpetrator to be a parent or legal guardian.[19]  *See* Appendix:  1996 State Statutes

Analogous to Section 273a(a) of the California Penal Code.  These 15 states

---

[19] Because of the difficulty of delineating the scope of state criminal statutes, which are modified by and evolve based on judicial interpretations, we must be cautious in our conclusions regarding the specific elements of state crimes against children.  *See* Appendix: 1996 State Statutes Analogous to Section 273a(a) of the California Penal Code (explaining our reasoning for including each of the 15 states); *infra* 70–71 (identifying certain errors in the Tenth Circuit's multi-state survey).  The difficulty in drawing definitive conclusions regarding the elements of these offenses further supports our approach of giving only limited weight to a multijurisdictional analysis for determining what Congress meant when using terms such as child abuse, neglect, and abandonment.

comprised more than 45 percent of the United States population in 1996,[20] a factor indicating that there was a common understanding that such elements could be included as part of crimes against children. *See Taylor*, 495 U.S. at 594; *Esquivel-Quintana*, 137 S. Ct. at 1571. That a crime against children analogous to the least offense criminalized by section 273a(a) was in force in the most populous regions of our nation supports the conclusion that Congress could have understood "crimes of child abuse, child neglect, or child abandonment" in § 1227(a)(2)(E)(i) to include such offenses. Because of the states' varied approaches to categorizing and defining crimes against children, we infer that "Congress purposefully employed the overlapping concepts of child abuse, neglect, and abandonment [in § 1227(a)(2)(E)(i)] to denote a broad array of crimes," and to "assure coverage of such crimes, however denominated by the States." *Martinez-Cedillo v. Sessions*, 896 F.3d 979, 990 (9th Cir. 2018) (emphasis omitted), *vacated*, 923 F.3d 1162 (9th Cir. 2019).

---

[20] U.S. Bureau of the Census, 1990 Census of Population and Housing, Population and Housing Unit Counts (CPH-2) (available at https://www.census.gov/data/tables/1993/dec/cph-2-1-1.html); U.S. Bureau of the Census, Current Population Reports, P25-1106, State Population Estimates by Age and Sex: 1980 to 1992 (available at https://www.census.gov/library/publications/1990/demo/p25-1990s.html); U.S. Bureau of the Census, Compendia, Population Report at 28 (available at https://www2.census.gov/library/publications/1997/compendia/statab/117ed/tables/pop.pdf)

The dissent argues that a multi-state survey undermines our conclusion. Dissent at 46–49. While the dissent acknowledges that "the definitions of child abuse, child neglect, and child abandonment admit some overlap and ambiguity as to the elements of each offense," it argues, based on an "inference" drawn from *Esquivel-Quintana*, that the multi-state survey provided in the vacated panel opinion shows that a majority of states "*excluded* negligent endangerment in the large majority of jurisdictions." Dissent at 47–48. But *Esquivel-Quintana* provides no support for this conclusion. In *Esquivel-Quintana*, the Supreme Court's multi-state survey identified specific statutory language to the effect that "[w]hen 'sexual abuse of a minor' was added to the INA in 1996, thirty-one States and the District of Columbia set the age of consent at 16 for statutory rape offenses that hinged solely on the age of the participants." 137 S. Ct. 1571. The Court held that the express adoption of this age of consent in the statutes of a significant majority of states, which "point[ed] in the same generic direction as dictionaries and federal law," was "additional evidence" supporting its interpretation of the federal offense. *Id.* at 1571–72.

Of course, there is no similar statutory evidence in the multi-state survey here to support the dissent's conclusion that the states intended to exclude the offense of "negligent endangerment" from its definitions of child abuse, child

42

neglect, and child abandonment. Rather, the survey shows that the three elements

of what the dissent terms the offense of child endangerment, *see* Dissent at 12;

*supra* 19, are present in a range of state crimes against children, and all three

elements are present in the criminal statutes of 15 states.[21] Far from undermining

our conclusion, our survey shows that the laws of 15 states, applying to nearly half

of the United States population, criminalized section 273a(a)-type offenses,

supporting the view that Congress did not intend to exclude such crimes in

§ 1227(a)(2)(E)(i). And contrary to the dissent's conclusion, Dissent at 50, our

survey demonstrates that a substantial number of states—home to more than 45

percent of the United States population—did criminalize what the dissent refers to

as child endangerment.

C

---

[21] The dissent states that we are "shoehorn[ing] . . . an 'express adoption' requirement" into the consideration of evidence from state criminal codes. Dissent at 49 n.18. This is incorrect. In defining a federal generic offense, a court may use all "the normal tools of statutory interpretation," *Esquivel-Quintana*, 137 S. Ct. at 1569, which includes considering whether state codes include or exclude specified elements, *see id.* at 1571. Here we merely point out that the overlapping state offenses, with their mix and match of the various elements included in section 273a(a), do not provide any "additional evidence" supporting the dissent's interpretation of section 273a(a), and stand in contrast to the strong evidence in *Esquivel-Quintana* that "thirty-one States and the District of Columbia set the age of consent at 16 for statutory rape offenses that hinged solely on the age of the participants." *Id.* at 1571.

43

Having applied all the "traditional tools of statutory construction," *Chevron*, 467 U.S. at 843 n.9, we conclude that the generic offenses of "child abuse" and "child neglect" in § 1227(a)(2)(E)(i) remain susceptible to multiple reasonable interpretations and therefore are ambiguous. The statute is susceptible to an interpretation of "child abuse" and "child neglect" as requiring no more than a mental state of criminal negligence and conduct that puts a child at risk of serious harm by someone who may have only temporary responsibility for a child's care. But the statute is also susceptible to an interpretation of "child abuse" as being limited to offenses where the perpetrator has a mens rea of at least recklessness and engages in conduct that actually injures a child, and to an interpretation of "child neglect" as an offense that can be committed only by a parent or legal guardian.

As discussed in our review of dictionaries contemporaneous with the enactment of § 1227(a)(2)(E)(i), some dictionary definitions of "child abuse" allowed the inclusion of offenses that do not injure the child and are committed with negligence, while other definitions contemplated intentional conduct and injury. Similarly, the dictionaries do not limit the definition of "child neglect" to conduct committed by a person who is a parent or legal guardian.

The surrounding provisions of the INA, and definitions of the terms "child abuse" and "child neglect" in other federal statutes, are likewise inconclusive as to the elements of those offenses and do not clearly foreclose either interpretation.

Congress did not reference a federal criminal statute to supply the meaning of the terms in § 1227(a)(2)(E)(i) more definitively. *See Moncrieffe*, 569 U.S. at 193–94; *Lopez*, 549 U.S. at 53. And while Congress's contemporaneous definition of a "child abuse crime" in the NCPA as including "negligent treatment" of a child "by any person" provides strong support for defining the crime of child abuse as not requiring intent or injury (and is consistent with other federal civil statutes), there is no "closely related federal statute" governing an analogous criminal offense. *Esquivel-Quintana* 137 S. Ct. at 1570–71. Thus, this tool of statutory construction provides weaker evidence than it did in *Esquivel-Quintana*. *See id.*

Moreover, our survey of state statutes relating to crimes against children does not reveal a uniform approach to criminalizing the relevant conduct. *See id.* at 1571–72; *Duenas-Alvarez*, 549 U.S. at 189. Only a minority of states in 1996 defined crimes against children as including offenses with a mens rea of criminal negligence and conduct that merely put a child at risk of harm, which supports Diaz-Rodriguez's argument. But it is significant that this minority of states included some 45 percent of the nation's population. This fact demonstrates that

45

state statutes criminalizing this category of conduct were neither extraordinary nor rare, which bolsters the conclusion that Congress meant its phrase "crime of child abuse, child neglect, or child abandonment" to include such offenses. Further, the overlapping state offenses can be analyzed in many different ways, and therefore do not foreclose Diaz-Rodriguez's interpretation.

In sum, the normal tools of statutory construction do not lead to a single interpretation of the language that "unambiguously forecloses" all others. *Esquivel-Quintana*, 137 S. Ct. at 1572. We therefore agree with our sister circuits that have considered this issue, and conclude that the phrase "crime of  child abuse, child neglect, or child abandonment" is ambiguous because it is susceptible to multiple, plausible interpretations. *See, e.g.*, *Bastias v. U.S. Att'y Gen.*, 42 F.4th 1266, 1272 (11th Cir. 2022); *Zarate-Alvarez v. Garland*, 994 F.3d 1158, 1164 (10th Cir. 2021); *Garcia v. Barr*, 969 F.3d 129, 134 (5th Cir. 2020); *Mondragon-Gonzalez v. U.S. Att'y Gen*, 884 F.3d 155, 158–59 (3d Cir. 2018); *Florez v. Holder*, 779 F.3d 207, 211 (2d Cir. 2015).

## D

Both the concurrence and dissent disagree with our conclusion that the phrase "child abuse, child neglect, or child abandonment" is ambiguous, but reach opposite conclusions. The concurrence concludes that the phrase "crime of child

46

neglect" is unambiguous and a categorical match to section 273a(a) while the dissent concludes that the phrase "crime of child abuse, child neglect, or child abandonment" is unambiguous and not a categorical match for section 273a(a). Neither the concurrence nor dissent's view is persuasive.

1

The concurrence claims that the term "child neglect" is unambiguous and "§ 273a(a) is a categorical match for the [term] . . . crime . . . of child neglect." Concur. at 6. This claim is based on the following interpretative steps. First, the concurrence adopts a definition of "neglect" as failure to perform a duty, and determines that "neglect" of a "child" means "the failure to perform one's legal duty towards a child." Concur. at 6–7. The concurrence then infers that because § 1227(a)(2)(E)(i) refers to a "crime . . . of child neglect," Congress intended to define the crime as including a mens rea of criminal negligence (rather than requiring knowing or intentional acts). Concur. at 7–8. Further, the concurrence reasons, because there is a mens rea of criminal negligence, the conduct must cause "a substantial risk of serious physical or emotional harm *to the child*," and the defendant "should have been aware that his or her conduct" presented such a risk. Concur. at 9.

While the concurrence's interpretation of the phrase "crime . . . of child neglect" is reasonable, it is not required by the normal tools of statutory construction to the exclusion of all others. The concurrence has selected elements of a child neglect offense based on its own legal reasoning and argumentation but none of these elements is required by the statutory text, the dictionary definitions, or any federal statute. *Cf. Esquivel-Quintana*, 137 S. Ct. at 1569 (requiring use of the "normal tools of statutory interpretation"). Nor have the states uniformly adopted the concurrence's choice of elements. Rather, they have enacted crimes labeled "child neglect" that require the perpetrator to be a parent or legal guardian (not just a person who fails to discharge a duty), a mens rea of reckless or knowing (not just criminal negligence), and an injury to the child (not merely a risk of such harm).[22] In short, the concurrence's effort to derive the elements of a child neglect

_____

[22] For statutes labeled "child neglect" crimes that require the perpetrator to be a parent or legal guardian, see, e.g., Ariz. Rev. Stat. Ann. § 13-3619 (Arizona); 11 Del. C. § 1103 (Delaware); 720 Ill. Comp. Stat. 130/2 (Illinois); Iowa Code § 726.3 (Iowa); La. Stat. Ann. § 14:74 (Louisiana); 11 R.I. Gen. Laws § 11-9-5 (Rhode Island); S.C. Code Ann. § 20-7-50 (South Carolina); D.C. Code § 22-902 (Washington, D.C.); Wis. Stat. §§ 948.21, 948.01(3) (Wisconsin); that require a mens rea of reckless or knowing, see, e.g., Ariz. Rev. Stat. Ann. § 13-3619 (Arizona); Ind. Code § 35-46-1-4 (Indiana); Iowa Code § 726.3 (Iowa); N.J. Stat. Ann § 9:6-3 (New Jersey); Okla. Stat. tit. x, § 7115 (Oklahoma); Or. Rev. Stat. § 163-547 (Oregon); that require an injury to the child, see e.g.,11 R.I. Gen. Laws § 11-9-5 (Rhode Island); Tenn. Code Ann. § 39-15-401 (Tennessee); W. Va. Code Ann. §§ 61-8D-3, 61-8D-4(b) (West Virginia).

48

crime through a process of legal reasoning does not preclude other reasonable interpretations that discern different elements, and therefore does not make the term "child neglect" unambiguous.

The concurrence also relies on CAPTA, to support its interpretation of "child neglect." Concur. at 13–14. We agree that federal civil statutes are relevant in showing the common understanding of terms in the INA. *Supra* 32. But because "the unique interests at stake in a criminal action do not parallel the duties and interests at stake in a civil . . . proceeding," *Costanich v. Dep't of Soc. & Health Servs.*, 627 F.3d 1101, 1115 (9th Cir. 2010), the definition of "child neglect" in a federal civil statute such as CAPTA does not remove ambiguity from the term "crime of child neglect." Civil offenses do not impose criminal penalties or define criminal conduct, so the definition of a purely civil offense is merely suggestive of the elements of a criminal offense. *Supra* 31. In short, the term "crime of child neglect" is susceptible to more than one reasonable interpretation, and is therefore ambiguous. *Kisor v. Wilkie*, 139 S. Ct. 2400, 2410 (2019) (stating that a regulation "susceptible to more than one reasonable reading" is "genuinely ambiguous").

49

By contrast, the dissent claims that the statutory phrase "crime of child abuse, child neglect, or child abandonment" establishes Congress's unambiguous intent not to criminalize a crime of "child endangerment." The dissent starts from the premise that child abuse, child neglect, child abandonment, and child endangerment each have "distinct" meanings, Dissent at 33–34, 50, and "discrete definitions," Dissent at 21, which make them "separate," Dissent at 34, 42, and "discrete crimes," Dissent at 19, 21.[23] The dissent claims that "child endangerment" is commonly understood to refer to the discrete crime of "causing or permitting a child 'to be placed in a situation where his or her person or health is endangered,' committed with a mens rea of criminal negligence . . . . [and] involving serious risk of harm to the child but no resulting injury." Dissent at 12. In choosing the three terms of child abuse, child neglect, and child abandonment in § 1227(a)(2)(E)(i), the dissent reasons, Congress intentionally "chose to separately identify each criminal offense," Dissent at 34, and omit "the independent offense of child endangerment," Dissent at 1; *see also* Dissent at 35. Because section 273a(a) meets the definition of child endangerment, the dissent concludes,

_____

[23] Nonetheless, the dissent concedes that there is "overlap between the elements of such offenses" and that their definitions cross-reference each other. Dissent at 34.

§ 1227(a)(2)(E)(i) is not a categorical match to the crime for which Diaz-Rodriguez was convicted. Dissent at 1.

This analysis fails because its premise is incorrect. As explained above, the common law did not include categories of crimes against children with generally recognized elements. There was no common-law "child endangerment" offense. *Supra* 37. When states enacted modern laws criminalizing crimes against children, they developed multiple divergent offenses incorporating different conduct, mental states, and defendants. *Supra* 37–40. Based on our review of offenses against children in the 50 states, the elements the dissent claims are specific to a "child endangerment" can be found only in the crimes listed in the Appendix. These crimes are referred to by a range of labels, including child abuse, cruelty to

persons, abandonment, and child neglect, as well as child endangerment.[24]

Otherwise, states mix and match the elements identified by the dissent.[25] Nor are

state crimes labeled "child endangerment" limited to the three elements identified

by the dissent. State statutes criminalizing "child endangerment" include strict

---

[24] Crimes with the elements of "causing or permitting a child 'to be placed in a situation where his or her person or health is endangered,' committed with a mens rea of criminal negligence . . . . [and] involving serious risk of harm to the child but no resulting injury," Dissent at 12, are labeled "child abuse," *see* Ariz. Rev. Stat. Ann. § 13-3623(B) (Arizona); Colo. Rev. Stat. § 18-6-401(1) (Colorado); Fla. Stat. § 827.04(1) (Florida); Neb. Rev. Stat. Ann. § 28-707(1) (Nebraska); Utah Code Ann. § 76-5-109(3) (Utah), "cruelty to persons," Conn. Gen. Stat. § 53-20 (Connecticut), "abuse, neglect or endangerment of child," Nev. Rev. Stat. Ann. § 200.508(1)(a) (Nevada), "abandonment or abuse of a child," N.M. Stat. Ann. § 30-6-1(C) (New Mexico), "child neglect in the second degree, and cruelty and injuries to children," Or. Rev. Stat. § 163.545 (Oregon), as well as "child endangerment," Kan. Stat. Ann. § 21-3608(a) (Kansas); Mo. Rev. Stat. § 568.050(1) (Missouri); N.Y. Penal Law § 260.10(2) (New York).

[25] Some states require a mens rea of criminal negligence but also require an injury to the child. *See, e.g.*, Del. Code Ann. tit. xi, § 1103 (Delaware); La. Stat. Ann. § 14:93 (Louisiana); W. Va. Code Ann. § 61-8D-4(b) (West Virginia). Other states do not require an injury to the child, but require a higher mens rea, ranging from recklessness, *see, e.g.*, N.D. Cent. Code § 14-09-22 (North Dakota), S.D. Codified Laws § 26-10-1 (South Dakota), to knowingly, *see, e.g.*, N.C. Gen. Stat. § 14-316.1 (North Carolina), to intent, *see, e.g.*, La. Stat. Ann. § 14:74 (Louisiana); Wis. Stat. § 948.20 (Wisconsin). States with different mens rea and injury requirements may not specify a relationship between the defendant and the child. *See, e.g.*, N.C. Gen. Stat. § 14-316.1 (North Carolina); S.D. Codified Laws § 26-10-1 (South Dakota); Wis. Stat. § 948.20 (Wisconsin).

liability, ordinary negligence, intent, and knowledge, not just criminal negligence.[26]

The conduct that constitutes "endangerment" may include conduct that merely

contributes to the delinquency of a minor, rather than creating a substantial risk of

serious harm.[27] And some statutes hold that any person can be liable for child

endangerment, not just parents or those with custody of the child.[28]

Because there was no discrete, well-understood offense of "child

endangerment," just as there were no discrete offenses of "child abuse, child

neglect, or child abandonment," in 1996, it is not possible to infer that Congress's

failure to use the phrase "child endangerment" meant that Congress did not intend

---

[26] As to the mens rea element of a child endangerment offense, states required purpose, *see* Kan. Stat. Ann. § 21-3608 (Kansas), intent, *see* Alaska Stat. § 11.51.100 (Alaska), knowledge, *see, e.g.*, Del. Code Ann. tit. xi, § 1102 (Delaware); Haw. Rev. Stat. § 709-904 (Hawaii); 720 Ill. Comp. Stat. Ann. 5/12-216 (Illinois); Iowa Code Ann. § 726.6 (Iowa); Mont. Code Ann. § 45-5-622 (Montana); N.H. Rev. Stat. Ann. § 639:3 (New Hampshire), and ordinary negligence, Ala. Code § 13A-13-6 (Alaska). New York imposed a strict liability regime for child endangerment, N.Y. Penal Law § 260.10.

[27] For child endangerment statutes criminalizing conduct that contributes to delinquency of a minor, see, e.g., Alaska Stat. 13A-13-6 (Alaska); N.Y. Penal Law § 260.10 (New York).

[28] For child endangerment statutes imposing liability on persons who neither were parents nor had custody of a child, see, e.g.. Ark. Code Ann. § 5-27-204 (Arkansas); Ga. Code Ann. § 40-6-391 (Georgia); 720 Ill. Comp. Stat. 5/12-21.6 (Illinois); Kan. Stat. Ann. § 21-3608 (Kansas); Me. Stat. tit. xvii, § 554 (Maine); Mo. Rev. Stat. § 568.050 (Missouri); N.Y. Penal Law § 260.10 (New York); Ohio Rev. Code Ann. § 2912.22(B), (C) (Ohio).

its overlapping definitions to cover crimes involving the elements of the least

offense criminalized by section 273a(a).

## III

In light of our conclusion that the statutory language is ambiguous, we next

turn to the question whether the BIA's interpretation of the statute is permissible,

and therefore compels our deference under the principles described in *Chevron*,

467 U.S. 837.[29]

---

[29] Before applying *Chevron*, we briefly address Diaz-Rodriguez's argument in his supplemental brief that a principle of "immigration lenity" identified in *INS v. St. Cyr*, 533 U.S. 289, 320 (2001) should first be used to construe § 1227(a)(2)(E)(i), and only then can we consider whether the BIA's interpretation is entitled to deference under *Chevron*. Diaz-Rodriguez did not raise this argument in his opening brief. Instead, he raised it for the first time in his supplemental brief to the en banc court. We have long held that an issue is deemed forfeited in such circumstances. *See United States v. Briones*, 35 F.4th 1150, 1158 (9th Cir. 2021) (issue raised for the first time in a supplemental brief to the en banc court after remand from the Supreme Court is forfeited); *Devereaux v. Abbey*, 263 F.3d 1070, 1079 (2001) (issue raised for the first time in a supplemental brief to the en banc court is forfeited). We therefore deem this argument to be forfeited. Moreover, Diaz-Rodriguez "has made no attempt to establish 'good cause' for his failure to raise such arguments in his Opening Brief," *Briones*, 35 F.4th at 1159, and because his brief was submitted in response to an order for simultaneous briefing, "the Government has not had an opportunity to respond to them" and "surely would be prejudiced if we were to consider" them, *id.* (cleaned up). Contrary to the dissent's argument, Dissent at 53–55, it is not clear that the rule of lenity applies in this context. Since deciding *Chevron* in 1984, the Supreme Court has never applied the principle of lenity to determine if the BIA's interpretation of an ambiguous statutory provision is entitled to deference. *See Valenzuela Gallardo v. Barr*, 968 F.3d 1053, 1060 (9th Cir. 2020) ("[T]he rule of lenity and *Chevron* deference are

(continued...)

A

The deference accorded the BIA's interpretation of ambiguous provisions is based on a view of congressional intent. We presume "that Congress, when it left ambiguity in a statute meant for implementation by an agency, understood that the ambiguity would be resolved, first and foremost, by the agency, and desired the agency (rather than the courts) to possess whatever degree of discretion the ambiguity allows." *Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 740–41 (1996). "The power of an administrative agency to administer a congressionally created program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress." *Chevron*, 467 U.S. at 843 (alteration omitted). Here, Congress charged the BIA with administering the INA, and the Supreme Court has repeatedly "recognized that judicial deference to the Executive Branch is especially appropriate in the immigration context where officials 'exercise especially sensitive political functions that implicate questions of foreign relations.'" *INS v. Aguirre-Aguirre*, 526 U.S. 415, 425 (quoting *INS v.*

(...continued)
typically mutually exclusive."). Indeed, in *Esquivel-Quintana*, the Supreme Court expressly declined to address the issue. 137 S. Ct. at 1572. Because the application of *Chevron* would obviate the need to apply the rule of lenity, the dissent errs in suggesting that the "'long standing' immigration rule of lenity" would necessarily apply in this case—even assuming Diaz-Rodriguez had not forfeited the argument. Dissent at 55.

55

*Abudu*, 485 U.S. 94, 110 (1988)); *see also Scialabba v. Cuellar de Osorio*, 573 U.S. 41, 75 (2014) (plurality opinion) (deferring to the BIA's "textually reasonable construction [of the INA] consonant with its view of the purposes and policies underlying immigration law"); *Martinez Gutierrez*, 566 U.S. at 586 (deferring to the BIA's "permissible construction of the [INA]").

Accordingly, "where a statute's plain terms admit of two or more reasonable ordinary usages," *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 989 (2005), we "may not substitute [our] own construction of [that] statutory provision for a reasonable interpretation made by" the BIA, *Chevron*, 467 U.S. at 844. We must defer to the BIA if its "answer is based on a permissible construction of the statute." *Aguirre-Aguirre*, 526 U.S. at 424. To be sure, the agency's construction must be reasonable: we do not accept an agency's interpretation that is foreclosed by any fair reading of the statute, or that "departs so sharply from the statute's text and history that it cannot be considered a permissible reading." *Mellouli*, 575 U.S. at 813. Nor do we defer to "an agency interpretation that is inconsistent with the design and structure of the statute as a whole." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 321 (2014) (alterations omitted). Nevertheless, if the agency's construction is reasonable, then the agency's "position prevails . . . whether or not it is the only possible interpretation

or even the one a court might think best." *Martinez Gutierrez*, 566 U.S. at 591 (unanimously reversing the Ninth Circuit's determination that the BIA's construction of the INA was not permissible).[30]

B

In applying these principles of deference, our first step is to discern how the BIA has interpreted the relevant phrase in § 1227(a)(2)(E)(i). In *Matter of Velazquez-Herrera*, the BIA interpreted the term "child abuse" in § 1227(a)(2)(E)(i) to mean "any offense involving an intentional, knowing, reckless, or criminally negligent act or omission that constitutes maltreatment of a child or that impairs a child's physical or mental well-being, including sexual abuse or exploitation." 24 I. & N. Dec. at 512.

In reaching this conclusion, the BIA considered the "ordinary, contemporary and common meaning of the term 'child abuse'" as well as "the term's established

---

[30] We recognize the future of the *Chevron* deference doctrine has been called into question. In recent years, several justices have called for the Court to reexamine *Chevron* deference or proposed narrowing its scope. *See Michigan v. EPA*, 576 U.S. 743, 762–63 (2015) (Thomas, J., concurring); *Pereira*, 138 S. Ct. at 2120 (Kennedy, J., concurring); *see also SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1364 (2018) (Breyer, J., dissenting). Further, the Court has sometimes reversed an agency's interpretation of a statute without citing *Chevron*. *See, e.g.*, *Am. Hosp. Ass'n v. Becerra*, 142 S. Ct. 1896 (2022); *West Virginia v. EPA*, 142 S. Ct. 2587 (2022). But we remain bound by past decisions of the Supreme Court until it overrules those decisions, *see Agostini v. Felton*, 521 U.S. 203, 217 (1997), so we must apply *Chevron* where relevant.

legal usage." *Id.* at 508. The BIA also considered the federal policies underlying § 1227(a)(2)(E)(i), noting that the provision was enacted "as part of an aggressive legislative movement to expand the criminal grounds of deportability in general and to create a 'comprehensive statutory scheme to cover crimes against children' in particular." *Id.* at 508–09 (citation omitted). In light of these policies, the BIA determined that "the term 'crime of child abuse' should be interpreted broadly." *Id.* at 509. The BIA next considered seven federal statutes defining "child abuse" and related concepts in effect in 1996, and concluded that "the weight of Federal authority when [§ 1227(a)(2)(E)(i)] was enacted reflected an understanding that 'child abuse' encompassed the physical and mental injury, sexual abuse or exploitation, maltreatment, and negligent or neglectful treatment of a child." *Id.* at 511. Finally, the BIA considered state statutes, and determined that "there was a growing acceptance by 1996 that the concept of 'child abuse' included not just intentional infliction of physical injury, but also acts of sexual abuse or exploitation, criminally negligent acts, or acts causing mental or emotional harm." *Id.* Although the BIA acknowledged that some state statutes, and one federal statute, "limited the definition of 'child abuse' to acts committed by a parent, custodian, or other person responsible for the child's care," the BIA determined this was not material. *Id.* at 512. Applying this definition, the BIA determined that the crime of "assault in the

58

fourth degree," under section 9A.36.041 of the Washington Revised Code, did not qualify categorically as a "crime of child abuse" under § 1227(a)(2)(E)(i). *Id.* at 517.

*Matter of Velazquez-Herrera* left a number of open questions. First (as noted by a concurring board member in the opinion), "broad though the definition is, it is unclear whether it extends to crimes in which a child is merely placed or allowed to remain in a dangerous situation, without any element in the statute requiring ensuing harm, e.g., a general child endangerment statute, or selling liquor to an underage minor, or failing to secure a child with a seatbelt." *Id.* at 518 n.2 (Pauley, Board Member, concurring). Second, the BIA refrained from applying its definition "to encompass the entire statutory phrase 'crime of child abuse, child neglect, or child abandonment.'" *Id.* at 512 n.14. Rather, it stated that while the "definition is comprehensive enough to subsume most, if not all, crimes of 'child neglect,' it is not as evident to us that crimes of 'child abandonment' would be so encompassed," and therefore left that question open. *Id.*

We subsequently interpreted *Matter of Velazquez-Herrerra* as holding "that, although 'child abuse' is not limited to the infliction of physical harm, the perpetrator's actions, either intentional or criminally negligent, must actually inflict *some* form of injury on a child." *Fregozo v. Holder*, 576 F.3d 1030, 1037 (9th Cir.

59

2009). *Fregozo*, however, noted the existence of a different definition of "child abuse"—"[a]n act or failure to act that presents an imminent risk of serious harm to a child"—which could include "[n]egligent or intentional conduct that places a child in situations in which serious harm is imminently likely." *Id.* at 1038 (emphasis omitted).

Two years later, the BIA answered the open question recognized by the concurrence in *Velazquez-Herrera*, and clarified that the term "child abuse" in § 1227(a)(2)(E)(i) had the second meaning suggested by *Fregozo*. *See Matter of Soram,* 25 I. & N. Dec. at 380. In *Matter of Soram*, the BIA addressed the question whether section 18-6-401(1)(A) of the Colorado Revised Statutes, which punished a person who "knowingly or recklessly permit[s] a child to be unreasonably placed in a situation that poses a threat of injury to the child's life or health," was categorically a crime of child abuse. *Id.* at 383. The alien argued that the Colorado statute was not a categorical match for the offense of "child abuse" as defined in *Matter of Velazquez-Herrera* because "that clause does not require, at a minimum, physical harm, mental or emotional harm, acts injurious to morals, sexual abuse, or child exploitation." *Id.* at 379.

The BIA held that the term "crime of child abuse," as defined in *Matter of Velazquez-Herrera*, "is not limited to offenses requiring proof of injury to the

60

child." *Id.* at 381. The BIA reasoned that its definition of child abuse in *Matter of Velazquez-Herrera* included the phrase "an act or omission that constitutes maltreatment of a child," and that phrase "encompasse[s] endangerment-type crimes," *id.* at 383, that is, "acts or circumstances that threaten a child with harm or create a substantial risk of harm to a child's health or welfare," *id.* at 382. The BIA declined to specify the level of threat required for such an offense to qualify as child abuse, because many states had overlapping definitions of crimes against children and adopted terminology relating to the degree of risk that "could be subject to different interpretations by courts in each state." *Id.* at 383. Therefore, the BIA chose instead to make a case-by-case analysis "to determine whether the risk of harm required by the endangerment-type language in any given State statute is sufficient to bring an offense within the definition of 'child abuse' under the Act." *Id.*

In connection with this analysis, the BIA also addressed the second question left open in *Matter of Velazquez-Herrera*, and concluded that the definition of the term "crime of child abuse" applied to the entire phrase of "crime of child abuse, child neglect, or child abandonment." *See id.* at 381. The BIA took this approach because of the overlapping nature of those definitions. *See id.* It noted that an endangerment-type offense of putting a child in dangerous circumstances "can

61

reasonably be viewed as either abuse or neglect, and that some States include child endangerment in their definition of 'child abuse,' while a number of others consider it 'child abuse or neglect.'" *Id.*

Applying its interpretation to the Colorado statute, the BIA concluded that the Colorado offense was encompassed by the generic federal offense of "child abuse, child neglect, or child abandonment." *See id.* at 383. In this regard, the BIA determined, that the Colorado statute had a mens rea of "knowingly or recklessly," and an actus reus of permitting a child to be unreasonably placed in a situation that posed a threat of injury to the life or health of the child. *See id.* In addition, based on its reading of a Colorado Supreme Court opinion and Colorado legislative history, the BIA determined that the statute punished such an offense only if there

was a "reasonable probability that the child's life or health will be endangered." *Id.* at 384 (emphasis omitted).[31]

In sum, under the BIA's interpretation, the term "child abuse," or the unitary phrase "crime of child abuse, child neglect, or child abandonment," means any offense involving an intentional, knowing, reckless, or criminally negligent act or omission that constitutes maltreatment of a child or impairs a child's physical or mental well-being, including sexual abuse or exploitation. An "act or omission that

---

[31] The dissent suggests that the BIA's interpretation of "a crime of child abuse, child neglect, or child abandonment" in *Matter of Soram* is not entitled to deference because the BIA has changed its interpretation of the phrase over the years. Dissent at 4–9, 53–54 n.20. We disagree. *Matter of Soram* did not change the interpretation of this phrase; it merely addressed the open issues left in *Matter of Velazquez-Herrera*, 25 I. & N. Dec. at 380–81. But even if *Matter of Soram* had modified the agency's views, such a change "is not invalidating, since the whole point of *Chevron* is to leave the discretion provided by the ambiguities of a statute with the implementing agency." *Smiley*, 517 U.S. at 742; *see also Brand X*, 545 U.S. at 981 ("Agency inconsistency is not a basis for declining to analyze the agency's interpretation under the *Chevron* framework."); *id.* at 982 ("[I]n *Chevron* itself, this Court deferred to an agency interpretation that was a recent reversal of agency policy.").

constitutes maltreatment of a child" includes acts or circumstances that create a substantial risk of harm to a child's health or welfare.[32] *See id.* at 380–82.

## C

Our next step is to determine whether the BIA's interpretation is permissible, and therefore owed deference under *Chevron*. This step involves two main inquiries.

First, we consider whether the BIA's interpretation of the statute is consistent with the statute's text. Our review of dictionaries, statutory context, other provisions in federal civil codes, and state criminal statutes showed that crimes of child abuse and child neglect can include offenses that may be committed with criminal negligence, where a child is not injured but placed at a substantial risk of harm, and where the perpetrator may be someone other than a parent or legal guardian. Therefore, the BIA's interpretation does not sharply depart from the relevant federal and state laws in place in 1996, or from other established sources of

---

[32] In his supplemental brief to the en banc court, Diaz-Rodriguez argues for the first time that the BIA's definition of § 1227(a)(2)(E)(i) from *Matter of Soram* should not apply retroactively to his 2009 conviction. Diaz-Rodriguez forfeited this argument because he raised it for the first time in his supplemental brief to the en banc court. *See Briones*, 35 F.4th at 1158; *Devereaux*, 263 F.3d at 1079. *Supra* 54 n.29.

statutory meaning. *Supra* Section II.B.[33] In particular, Congress's

contemporaneous definition of "child abuse crime" in the NCPA provides strong

support for the BIA's definition. *Supra* Section II.B.3.

Second, we consider whether the BIA's interpretation is consistent with the

authority granted to it by Congress and with a reasonable understanding of

Congress's policy goals. *See Util. Air Regul. Grp.*, 573 U.S. at 321, 325. As the

BIA explained in *Matter of Velazquez-Herrera*, § 1227(a)(2)(E)(i) "was enacted . . .

as part of an aggressive legislative movement to expand the criminal grounds of

deportability in general and to create a 'comprehensive statutory scheme to cover

crimes against children' in particular." 24 I. & N. Dec. at 508–09 (quoting *Matter*

*of Rodriguez-Rodriguez*, 22 I. & N. Dec. 991, 994 (BIA 1999)). Therefore, the

BIA's interpretation furthers the purpose of the 1996 addition of "child abuse" to

§ 1227. In addition, adjudicating and applying congressional criteria for

determining which aliens are removable is a core function of the BIA. Therefore,

we cannot say that the BIA's interpretation "flouted a congressional command," or

---

[33]Although the BIA did not specifically address the term "child abandonment" in its opinions, the BIA's treatment of the phrase in § 1227(a)(2)(E)(i) as a unitary concept that covers a broad category of crimes against children, regardless of how they are labeled in each state, *see Matter of Soram*, 25 I. & N. Dec. at 381, would encompass the elements of child abandonment crimes as well.

that "the INA's purposes demand" a contrary result. *Martinez Gutierrez*, 566 U.S. at 594.

Because the BIA's interpretation of § 1227(a)(2)(E)(i) in *Matter of Soram* and *Matter of Velazquez-Herrera* is consistent with the "text, nature, and purpose of the statute," *Cuozzo Speed Techs., LLC v. Lee*, 579 U.S. 261, 277 (2016), it is "within the bounds of reasonable interpretation," *City of Arlington v. FCC*, 569 U.S. 290, 296 (2013), and therefore is entitled to deference, *see Brand X*, 545 U.S. at 980.[34]

In reaching this conclusion, we join the Eleventh Circuit, which likewise deferred to the BIA's interpretation of § 1227(a)(2)(E)(i) as including crimes that required a mens rea of criminal negligence and did not result in injury to the child. *See Bastias*, 42 F.4th at 1273. In *Bastias*, a petitioner was convicted of a crime under a Florida statute which criminalized, among other offenses, "the third-degree felony of 'willfully or by culpable negligence neglect[ing] a child without causing great bodily harm, permanent disability, or permanent disfigurement.'" *Id.* at

---

[34] *Fregozo*'s statement that *Matter of Velazquez-Herrerra* held that the crime of child abuse in § 1227(a)(2)(E)(i) requires actual injury to a child, 576 F.3d at 1037, is therefore superseded by *Matter of Soram*'s holding to the contrary. *See Brand X*, 545 U.S. at 982 (holding that a court must follow an agency construction that is entitled to *Chevron* deference rather than a prior judicial interpretation of that statute).

1268–69 (quoting Fla. Stat. § 827.03(2)(d)).[35]  Based on the "ordinary meaning of the statutory text," *id.* at 1275, and a review of contemporaneous federal statutes, including the NCPA, *see id.*, *Bastias* held that "the BIA's interpretation of the INA's phrase 'crime of child abuse, child neglect, or child abandonment' to include culpably negligent conduct likely to result in harm is a reasonable interpretation of the statute that is entitled to Chevron deference," *id.* at 1273.

We also join the conclusion of the Second, Third,  Fifth, and Tenth Circuits that the BIA was reasonable in interpreting § 1227(a)(2)(E)(i) as including crimes that do not result in injury to the child.  *See Zarate-Alvarez*, 994 F.3d at 1164; *Garcia*, 969 F.3d at 133–34; *Mondragon-Gonzalez*, 884 F.3d at 159; *Florez*, 779 F.3d at 212.

Despite this weight of authority, Diaz-Rodriguez urges us to follow the Tenth Circuit, which has declined to defer to the BIA's interpretation of "crime of child abuse, child neglect, or child abandonment" as including criminally negligent

---

[35] The Eleventh Circuit assumed without deciding that "culpable negligence" was "equivalent to traditional criminal negligence." *Bastias*, 42 F.4th at 1273.

conduct that does not result in injury. *See Ibarra*, 736 F.3d at 905.[36] In *Ibarra*, the

Tenth Circuit held that § 1227(a)(2)(E)(i) does not cover such conduct. *See id.* at

918. The petitioner in *Ibarra* was convicted of a child abuse offense under

Colorado law, although her offense conduct was minor. *See id.* at 905. The IJ

denied the petitioner's application for cancellation of removal because she had been

convicted of an offense that qualifies as a "crime of child abuse, neglect, or

abandonment" under § 1227(a)(2)(E)(i), which made her ineligible for relief. *See*

*id.* at 905–06 (citing 8 U.S.C. § 1229b(b)(1)).

The Tenth Circuit determined that the statutory text of § 1227(a)(2)(E)(i) was

ambiguous, but declined to defer to the BIA's interpretation under *Chevron*. *See id.*

at 910 ("[W]hile the statutory text at issue here does contain some ambiguity,

Congress's intent is not so opaque as to grant the BIA the sweeping interpretive

license it has taken." (emphasis omitted)). The Tenth Circuit first noted that the

BIA had primarily relied on definitions of "child abuse" and "child neglect" in civil

statutes, and concluded such definitions were not applicable to interpreting the

elements of a crime. *See id.* at 911–12. The Tenth Circuit did not discuss the

---

[36] As noted above, the Tenth Circuit has since held that the BIA's interpretation of this provision as including knowing and reckless conduct that did not result in injury is entitled to *Chevron* deference. *Zarate-Alvarez*, 994 F.3d at 1164.

68

NCPA, although it was referenced in *Matter of Velazquez-Herrera*. *See* 24 I. & N. Dec. at 518 n.9. Second, because the INA did not provide textual clues for interpreting a "crime of child abuse, child neglect, or child abandonment," and because there was no relevant legislative history or federal crime of child abuse or neglect, *see id.* at 912, *Ibarra* looked almost exclusively to a survey of state criminal codes, *see id.* at 914–16. Based on its survey, the Tenth Circuit determined that "the majority of states in 1996, at least thirty-three, did not criminalize endangering children or exposing them to a risk of harm absent injury if there was only a culpable mental state of criminal negligence." *Id.* at 915. Primarily based on this survey, the Tenth Circuit concluded that, "contrary to what the BIA has held, criminally negligent conduct with no resulting injury to a child cannot serve as the generic federal definition for the 'crime of child abuse, child neglect, or child abandonment.'" *Id*. at 915–16. Accordingly, the Tenth Circuit concluded that the petitioner had not been convicted of a "crime of child abuse, child neglect, or child abandonment" under 8 U.S.C. § 1227(a)(2)(E)(i). *See id.* at 918.

We disagree with the Tenth Circuit because it applied the wrong standard. Once a court has determined that the statutory phrase "crime of child abuse, child neglect, or child abandonment" is ambiguous, the court must defer to the BIA's reasonable interpretation. *See Aguirre-Aguirre*, 526 U.S. at 424. As stated in

69

*Martinez-Cedillo*, "there is no requirement that the BIA interpret a generic offense in the INA to conform to how the majority of the states might have interpreted that term at the time of amendment." 896 F.3d at 989; *see also Bastias*, 42 F.4th at 1274 (stating that "it would likely contravene *Chevron* and its progeny to hold that when states have varying formulations of a crime, the only permissible interpretation open to an agency at *Chevron* step two is that adopted by the majority of jurisdictions"). An agency's deviation from interpretations of a majority of states—or even from the interpretation "a court might think best," *Martinez Gutierrez*, 566 U.S. at 591—does not make the agency's construction unreasonable or relieve us of the obligation to defer, *see Brand X*, 545 U.S. at 980.

But even if the Tenth Circuit's preference for its own interpretation of § 1227(a)(2)(E)(i) were relevant, the Tenth Circuit erred by giving undue weight to its state survey. First, as our prior analysis indicates, the state survey is only one of multiple tools of statutory construction, and as stated in *Esquivel-Quintana*, we are not required to use this tool when determining the elements of a generic federal offense. *See* 137 S. Ct. at 1571 n.3. The Tenth Circuit failed to recognize that other tools of statutory construction yield inconclusive results or weigh in favor of the BIA's interpretation, including the definition of "child abuse crime" provided by the NCPA. Further, the Tenth Circuit's state survey contains errors that reduce its

70

persuasive value.  For example, we previously recognized that *Ibarra* erred in stating that California's section 273a(a) required knowingness or intent for crimes not requiring injury, given that a mens rea of criminal negligence is sufficient, *see Martinez-Cedillo*, 896 F.3d at 991, and we have identified numerous other errors.[37] Therefore, we reject the Tenth Circuit's conclusion that the BIA's interpretation of § 1227(a)(2)(E)(i) as including crimes where the mens rea was criminal negligence was unreasonable.

We also reject Diaz-Rodriguez's additional arguments as to why we should not defer to the BIA's reasoning and conclusion in *Matter of Velazquez-Herrera* and *Matter of Soram*.  First, Diaz-Rodriguez argues that the BIA unreasonably relied on dictionary definitions and state laws that post-dated the enactment of

---

[37] For instance, *Ibarra* stated that Utah "did not appear to criminalize child abuse, endangerment, abandonment, or neglect in 1996 unless the child was injured."  736 F.3d at 921.  But *Ibarra* failed to recognize that the relevant statute defines "physical injury" to include "any other condition which imperils the child's health or welfare," Utah Code. Ann. § 76-5-109(1)(e)(iv) (1996), a definition that can be satisfied "without an actual physical impact on the child," *Provo City v. Cannon*, 994 P.2d 206, 210 (Utah Ct. App. 1999).  As another example, *Ibarra* stated that Virginia required knowingness or intent for crimes not requiring injury, 736 F.3d at 919, but failed to recognize the crime of "cruelty and injuries to children," which makes it a crime to negligently permit the life of a child to be endangered, Va. Code Ann. § 40.1-103.

§ 1227(a)(2)(E)(i).[38]  Our review of state statutes and dictionary definitions from 1996 generated the same conclusion as the BIA reached:  there was no clear consensus among these sources that would preclude the BIA's definition.  *Supra* Sections II.B.1, 4, II.D.  Therefore, any error in relying on post-enactment dictionaries is harmless and does not make the BIA's decision unreasonable.

We also reject Diaz-Rodriguez's argument that the BIA's treatment of the phrase "crime of child abuse, child neglect, or child abandonment" as a unitary concept makes its decision unreasonable.  As our analysis showed, *supra* Sections II.B.4, II.D, states in 1996 took a varied approach in criminalizing similar conduct, using a variety of terminology and elements.  Given the lack of uniformity and clarity among contemporary definitions*, supra* Section II.B.1, the INA's structure, *supra* Section II.B.2, other federal civil statutes, *supra* Section II.B.3, and the states' criminal law, *supra* Sections II.B.4, II.D, the BIA's decision not to divide the generic removable offense in § 1227(a)(2)(E)(i) into three distinct sub-parts was reasonable.

---

[38] Specifically, Diaz-Rodriguez notes that *Matter of Soram* relied in part on a summary of state laws provided by the Department of Health and Human Services, published in 2009.  *See* 25 I. & N. Dec. at 382 (citing Child Welfare Information Gateway, U.S. Department of Health and Human Services, Definitions of Child Abuse and Neglect: Summary of State Laws 2–3 (2009)).

72

Finally, Diaz-Rodriguez argues that the BIA's interpretation of § 1227(a)(2)(E)(i) as requiring a "sufficient" risk of harm is unreasonable because it gives aliens insufficient guidance regarding the immigration consequences of a guilty plea to many state endangerment offenses. But this complexity is a result of the states' varied approaches to defining the relevant culpable conduct and mens rea requirements, and the BIA's definition of the generic federal offense in light of this complexity was reasonable.

Accordingly, we defer to the BIA's interpretation of the unitary phrase "crime of child abuse, child neglect, or child abandonment" to mean any offense involving an intentional, knowing, reckless, or criminally negligent act or omission (including acts or circumstances that create a substantial risk of harm to a child's health or welfare) that constitutes maltreatment of a child or that impairs a child's physical or mental well-being, including sexual abuse or exploitation.

IV

We now turn to the question whether the BIA erred in determining that Diaz-Rodriguez's statute of conviction, section 273a(a), is a categorical match to the crime of "child abuse, child neglect, or child abandonment" in § 1227(a)(2)(E)(i).

In considering Diaz-Rodriguez's petition, the BIA stated that section 273a(a), as construed by the California Supreme Court in *Sargent*, protected "a child from an

73

abusive situation in which the probability of serious injury is great."[39]  The BIA also

recited the definition of "crime of child abuse" in *Matter of Soram* and *Matter of*

*Velazquez-Herrera*.  Based on this analysis, the BIA ruled that Diaz-Rodriguez's

offense qualified categorically as a "crime of child abuse" under § 1227(a)(2)(E)(i),

and sustained the charge of removability.

The BIA's reasoning and conclusion were correct.  To obtain a conviction

under section 273a(a), the state must prove that a defendant (1) who has care or

custody of a child, but need not be a parent or legal guardian, and (2) with criminal

negligence, meaning in a reckless manner that a reasonable person would have

known creates a high risk of death or great bodily injury, (3) purposely put the child

into an abusive situation in which the probability of serious injury was great.  *Supra*

Section II.A.  The BIA defines the generic federal offense of "child abuse, child

neglect, or child abandonment" to include the element of a mens rea of criminal

negligence (a match to the second element of a section 273a(a) conviction), and the

element of allowing a child to be placed in a situation that create a substantial risk

of harm to a child's health or welfare (a match to the third element of a section

273a(a) conviction).  *Supra* Section III.B.  Because the state offense requires proof

_____

[39] Thus, Diaz-Rodriguez's argument that remand is required because the BIA's "decision in this case was not specific to the California statute" is belied by the record.

of care or custody, it is narrower than the generic federal offense of "child abuse" or "child neglect," which does not require such proof. We thus agree with the BIA's reasoning and conclusion that all violations of section 273a(a) are encompassed by the BIA's definition of a crime of "child abuse, child neglect, or child abandonment" in § 1227(a)(2)(E)(i). Therefore, the BIA did not err in concluding that Diaz-Rodriguez was removable under § 1227(a)(2)(E)(i).

**PETITION DENIED.**

# APPENDIX

### 1996 State Statutes Analogous to Section 273a(a) of the California Penal Code

**1. Arizona:** Ariz. Rev. Stat. Ann. § 13-3623(B) ("Child or vulnerable adult abuse; emotional abuse") states: "Under circumstances likely to produce death or serious physical injury, any person . . . who causes or permits [a] child or vulnerable adult to be placed in a situation where its person or health is endangered . . . [i]f done with criminal negligence [is guilty of] a class 4 felony."


**2. California:** The current version of Cal. Penal Code § 273a(a) ("Willful harm or injury to a child; endangering person or health"), discussed *supra* Section II.A, is the same as the version effective in 1996, and so meets the relevant criteria.


**3. Colorado:** Colo. Rev. Stat. § 18-6-401(1) ("Child abuse") states: "A person commits child abuse if such person . . . permits a child to be unreasonably placed in a situation which poses a threat of injury to the child's life or health . . . ." "Where no death or injury results, . . . [a]n act of child abuse when a person acts with criminal negligence is a class 3 misdemeanor." Colo. Rev. Stat. § 18-6-401(7)(b).

**4. Connecticut:** Conn. Gen. Stat. § 53-20 ("Cruelty to persons") covers "[a]ny person who, having the control and custody of any child under the age of sixteen years, and in any capacity whatsoever, maltreats, tortures, overworks, cruelly or unlawfully punishes or willfully or negligently deprives such child of necessary food, clothing, or shelter." The requirement of "control and custody" is comparable to California Penal Code section 273a(a)'s "care or custody requirement," and it has been applied to defendants who were not the victim's parent. *See State v. Patterson*, 308 Conn. 835, 838 (2013); *State v. Smith*, 37 Conn. Supp. 664, 665 (1981). The Connecticut Supreme Court has held that "negligently" in this statute refers to criminal negligence. *See State v. Clark*, 5 Conn. Cir. Ct. 699, 706–07, 709 (1969).

**5. Florida:** Fla. Stat. § 827.04(1) ("Child abuse") states "[w]hoever, willfully or by culpable negligence, deprives a child of, or allows a child to be deprived of, necessary food, clothing, shelter, or medical treatment . . . shall be guilty of a felony of the third degree."

**6. Kansas:** Kan. Stat. Ann. § 21-3608(a) ("Endangering a child") states: "Endangering a child is intentionally and unreasonably causing or permitting a child

under the age of 18 years to be placed in a situation in which the child's life, body or health may be injured or endangered." The Kansas Supreme Court interpreted the term "unreasonably" to mean "the doing or omitting of some action contrary to reason, the doing of or omitting to do something that the average person, possessing ordinary mental faculties, would not have done or would not have omitted under all of the attendant and known circumstances." *State v. Fisher*, 230 Kan. 192, 194 (1981) (interpreting an earlier version of the statute). In interpreting the current version of the statute, an appellate court in Kansas held that the term "intentionally" makes this offense "a general intent crime," so "all that is required is proof that the person acted intentionally in the sense that he [or she] was aware of what he [or she] was doing." *State v. Cummings*, 45 Kan. App. 2d. 15, 18 (2010), *rev'd on other grounds*, 297 Kan. 716 (2013).

**7. Missouri:** Mo. Rev. Stat. § 568.050(1) ("Endangering the welfare of a child in the second degree") covers any person who "with criminal negligence acts in a manner that creates a substantial risk to the life, body or health of a child less than seventeen years old . . ."

**8. Nebraska:** Neb. Rev. Stat. Ann. § 28-707(1) ("Child abuse") states: "A person commits child abuse if he or she knowingly, intentionally, or negligently causes or permits a child to be . . . [p]laced in a situation that endangers his or her life or physical or mental health . . ."

**9. Nevada:** Nev. Rev. Stat. Ann. § 200.508(1)(a) ("Abuse, neglect or endangerment of child") covers "[a] person who . . . [w]illfully causes a child who is less than 18 years of age . . . to be placed in a situation where the child may suffer physical pain or mental suffering as the result of abuse or neglect." In *Childers v. State*, the Nevada Supreme Court clarified that the term "willfully" "implies simply a purpose or willingness to commit the act or to make the omission in question," and "does not require in its meaning any intent to violate the law, or to injure another, or to acquire any advantage." 100 Nev. 280, 283 (1984). The court further stated that this offense "is a general intent crime." *Id.*

**10. New Mexico:** N.M. Stat. § 30-6-1(C) ("Abandonment or abuse of a child") states: "Abuse of a child consists of a person knowingly, intentionally or negligently, and without justifiable cause, causing or permitting a child to be . . . placed in a situation that may endanger the child's life or health." The New Mexico

Supreme Court has held that this statute "is a strict liability offense." *State v. Lucero*, 98 N.M. 204, 206 (1982).

**11. New York:** N.Y. Penal Law § 260.10(2) ("Endangering the welfare of a child") states: "A person is guilty of endangering the welfare of a child" when "being a parent, guardian, or other person legally charged with the care or custody of a child less than eighteen years old, he fails or refuses to exercise reasonable diligence in the control of such child to prevent him from becoming an 'abused child,' a 'neglected child,' a 'juvenile delinquent,' or a 'person in need of supervision,' as those terms are defined in articles ten, three and seven of the family court act." A person is "legally charged" with a child's care if the person is "legally responsible" for a child under article ten of the Family Court Act, which includes "the child's custodian, guardian [or] any other person responsible for the child's care at the relevant time." *People v. Carroll*, 93 N.Y.2d 564, 568 (1999) (quoting Family Ct. Act § 1012(g)). This crime is a "strict liability" offense. *People v. Scully*, 134 Misc. 2d 906, 908 (1987).

**12. Oregon:** Or. Rev. Stat. § 163.545 ("Child neglect in the second degree") states: "A person having custody or control of a child under 10 years of age commits the

crime of child neglect in the second degree if, with criminal negligence, the person leaves the child unattended in or at any place for such period of time as may be likely to endanger the health or welfare of the child." The phrase "having control of a child" as used in § 163.545 refers to "temporary custodian[s]," including individuals who are not parents or guardians, such as a "baby-sitter, relative, [or] teacher." *State v. Sparks*, 267 Or. App. 181, 203 (2014).

**13. Texas:** Tex. Penal Code Ann. § 22.041(c) ("Abandoning or Endangering Child") states: "A person commits an offense if he intentionally, knowingly, recklessly, or with criminal negligence, by act or omission, engages in conduct that places a child younger than 15 years in imminent danger of death, bodily injury, or physical or mental impairment."

**14. Utah:** Utah Code Ann. § 76-5-109(3) ("Child abuse") covers "[a]ny person who inflicts upon a child physical injury." The term "physical injury" includes "any other condition which imperils the child's health or welfare." Utah Code Ann. § 76-5-109(1)(b)(iv). The Utah Supreme Court has confirmed that for purposes of this section, "physical injury can include acts that imperil or threaten a child's health or welfare without an actual physical impact on the child." *Provo City v.*

*Cannon*, 994 P.2d 206, 2010 (Utah 1999). "[I]f done with criminal negligence, the offense is a class C misdemeanor." Utah Code Ann. § 76-5-109(3)(c).

**15. Virginia:** Va. Code Ann. § 40.1-103 ("Cruelty and injuries to children") states: "It shall be unlawful for any person employing or having the custody of any child willfully or negligently to cause or permit the life of such child to be endangered . . ." The Virginia Supreme Court has interpreted "custody," in a materially identical version of the statute, as "not restricted in application to those having legal custody of children." *Lovisi v. Commonwealth*, 212 Va. 848, 850 (1972). For example, the court stated that "teachers, athletic instructors and baby-sitters" would qualify. *Id.*

*Diaz-Rodriguez v. Garland*, 13-73719

COLLINS, Circuit Judge, with whom BUMATAY, Circuit Judge, joins, concurring in part and concurring in the judgment:

I agree that Diaz-Rodriguez's conviction under California Penal Code § 273a(a) qualifies as a conviction for "a crime of child abuse, child neglect, or child abandonment" within the meaning of § 237(a)(2)(E)(i) of the Immigration and Nationality Act ("INA") and that the Board of Immigration Appeals ("BIA") therefore properly held that Diaz-Rodriguez is removable under that section. Accordingly, I join Part I, Part II(A) (except for footnote 2), and Part IV of Judge Ikuta's opinion and concur in the court's judgment denying Diaz-Rodriguez's petition for review. However, my reasoning differs from the plurality's analysis, and I therefore do not join Parts II(B) and III of the plurality opinion.

**I**

Under the relevant language of § 237(a)(2)(E)(i) of the INA, "[a]ny alien who at any time after admission is convicted of . . . a crime of child abuse, child neglect, or child abandonment is deportable." 8 U.S.C. § 1227(a)(2)(E)(i). "Because Congress predicated deportation 'on convictions, not conduct,'" the applicability of this statute turns, not on "the particulars of [the] alien's behavior" underlying the conviction, but rather on whether "the statutory definition of the offense of conviction" falls within the federally defined category of crimes.

*Mellouli v. Lynch*, 575 U.S. 798, 805 (2015) (citation omitted); *see also Esquivel-Quintana v. Sessions*, 137 S. Ct. 1562, 1567 (2017) (explaining that the provisions of INA § 237(a)(2) "make[] aliens removable based on the nature of their convictions, not based on their actual conduct").  Under this "categorical approach," we must ask "whether 'the state statute defining the crime of conviction' categorically fits within the 'generic' federal definition."  *Esquivel-Quintana*, 137 S. Ct. at 1568 (quoting *Moncrieffe v. Holder*, 569 U.S. 184, 190 (2013)).  A "state offense is a categorical match with a generic federal offense only if a conviction of the state offense *necessarily* involved facts equating to the generic federal offense."  *Moncrieffe*, 569 U.S. at 190 (simplified) (emphasis added).

Where a state statute's language covers a range of different conduct in a single indivisible offense, the inquiry focuses on whether "the *least* of the acts criminalized by the state statute falls within the generic federal definition."  *Esquivel-Quintana*, 137 S. Ct. at 1568 (emphasis added).  The apparent theory behind this lesser-includes-the-greater approach is that, when there is a broad general area of overlap between the state offense and the generic federal definition, a disqualifying mismatch will be found, if at all, at the outer limits of the state offense rather than at its more serious core.  But this consideration of "the minimum conduct criminalized by the state statute is not an invitation to apply

2

'legal imagination' to the state offense; there must be 'a realistic probability, not a theoretical possibility, that the State would apply its statute to conduct that falls outside the generic definition of a crime.'" *Moncrieffe*, 569 U.S. at 191 (quoting *Gonzales v. Duenas–Alvarez*, 549 U.S. 183, 193 (2007)).

Here, all members of the en banc court agree that the least of the conduct covered by California Penal Code § 273a(a) is reflected in the fourth and final clause of that provision, which imposes criminal punishment on "[a]ny person who, under circumstances likely to produce great bodily harm or death, . . . having the care or custody of any child, . . . willfully causes or permits that child to be placed in a situation where his or her person or health is endangered." CAL. PENAL CODE § 273a(a).[1] As the majority explains, the elements of the offense described

---

[1] Although we have said that § 273a(a) is not a divisible statute, that conclusion rested on caselaw involving prosecutions under § 273a(a) based on multiple "specific acts" within a "single course of conduct." *Ramirez v. Lynch*, 810 F.3d 1127, 1136 (9th Cir. 2016). We noted that the California courts had held that, "[i]n the context of section 273a(a), a prosecutor can allege a *pattern* of abuse, and, in such a case, the jury need not agree unanimously as to which specific acts the defendant committed within that pattern." *Id*. at 1136 (emphasis added) (citing *People v. Ewing*, 140 Cal. Rptr. 299, 301 (Ct. App. 1977)). The California courts have also held, however, that "[w]hen the jury is permitted to convict for a *specific act*"—rather than "a continuous course of conduct"—and "more of such acts are proved than charged," then the jury must unanimously agree "on the specific act or omission found unlawful" under § 273a(a). *People v. Napoles*, 127 Cal. Rptr. 2d 777, 785–86 (Ct. App. 2002) (emphasis added). It may well be that, in a case in which the relevant case documents make clear that a § 273a(a) prosecution was based on a specific act or omission under only one of the four branches of conduct, the modified categorical approach would apply, and only the relevant clause of

3

in this clause are that (1) while the defendant "had care or custody of a child"; (2) the defendant "purposely put the child into an abusive situation in which the probability of serious [physical] injury was great"; and (3) the defendant acted "with criminal negligence." *See* Opin. at 15; *see also* Cal. Jud. Council, Criminal Jury Instructions No. 821 (2022 ed.). "The terms 'care or custody' do not imply a familial relationship but only a willingness to assume duties correspondent to the role of a caregiver." *People v. Toney*, 90 Cal. Rptr. 2d 578, 580 (Ct. App. 1999). The requisite criminal negligence exists when the defendant acted "in a reckless way" that a "reasonable person would have known" "creates a high risk of death or great bodily injury" and that reflects a "disregard for human life, or indifference to the consequences" of the defendant's acts. *People v. Chafin*, 93 Cal. Rptr. 3d 531, 534 (Ct. App. 2009).

The remaining question, then, is whether the offense defined by these elements categorically constitutes a "crime of child abuse, child neglect, or child abandonment" within the meaning of INA § 237(a)(2)(E)(i). 8 U.S.C.

---

§ 273a(a) would need to be considered. But I need not address this possibility further to resolve this case. As the plurality notes, the modified categorical approach is of no help here, because the records of Diaz-Rodriguez's conviction "do not reveal which prong of section 273a(a) [he] was convicted of violating." *See* Opin. at 9 n.2. And even assuming that the statute is not divisible, all members of the court agree that, because the fourth clause of § 273a(a) is the least of the conduct criminalized, we may for *that* reason limit our focus, in the first instance, to that clause.

4

§ 1227(a)(2)(E)(i).  As explained in the next section, I think the answer to that question is clearly yes.

## II

As with all cases of statutory construction, we must "begin by analyzing the statutory language, assuming that the ordinary meaning of that language accurately expresses the legislative purpose." *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 251 (2010) (simplified).  And if, after "'exhaust[ing] all the traditional tools of construction,'" the "intent of Congress is clear from the terms of the statute," then we proceed no further and afford no deference to the agency's reading of that language under *Chevron, U.S.A. Inc. v. Natural Res. Def. Council*, 467 U.S. 837 (1984).  *Medina Tovar v. Zuchowski*, 982 F.3d 631, 634 (9th Cir. 2020) (en banc) (quoting *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019)); *see also id.* at 639 (Collins, J., concurring in the judgment).  In my view, the traditional tools of statutory construction suffice to confirm that the federal statutory phrase "crime of child abuse, child neglect, or child abandonment" categorically embraces the above-described "least" offense covered by § 273a(a).

The relevant sentence of INA § 237(a)(2)(E)(i) provides, in full: "Any alien who at any time after admission is convicted of a crime of domestic violence, a crime of stalking, or a crime of child abuse, child neglect, or child abandonment is deportable."  8 U.S.C. § 1227(a)(2)(E)(i).  The text notably uses the phrase "a

5

crime of" three separate times to delineate three general categories of crimes. But the category we are asked to apply here—the third category—is itself comprised of three sub-categories of crimes against children: "child abuse, child neglect, or child abandonment." *Id*. That suggests that a state statutory offense would be a categorical match if, *collectively*, all of the conduct covered by that statute falls within one or more of those three categories. In other words, there does not need to be a categorical match to one sub-category exclusively. But that interpretive issue ultimately does not matter here, because I conclude that § 273a(a) is a categorical match for the sub-category of a "crime of . . . child neglect."[2]

## A

The INA does not define the term "child neglect," but the ordinary meaning of this term is readily discernible. "Child neglect" is, of course, the neglect of a child. At the time that this phrase was added to the INA in 1996, *see* Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), Pub. L. No. 104-208, Div. C, § 350(a), 110 Stat. 3009-639–3009-640 (1996), the term "neglect" was understood to denote—as it does today—"[a]n omission to do or

---

[2] I note parenthetically, however, my disagreement with the BIA's suggestion that the three sub-categories constitute a "unitary" category of crimes with a single meaning. *Matter of Soram*, 25 I. & N. Dec. 378, 381 (BIA 2010). To be sure, the three sub-categories may overlap considerably, but I think it is clear that the three phrases do not have the same meaning and cannot be reduced to a unitary formula. But I need not consider this issue further here, given my conclusion that there is a categorical match to the sub-category of the crime of "child neglect."

perform some work, duty, or act." *Neglect*, BLACK'S LAW DICTIONARY (6th ed. 1990); *see also Neglect*, BRYAN GARNER, A DICTIONARY OF MODERN LEGAL USAGE 535 (2d ed. 1995) ("the act or condition of disregarding"; "*Neglect* indicates, as a purely objective fact, that a person has not performed a duty"); *Neglect*, BALLANTINE'S LEGAL DICTIONARY AND THESAURUS (1995) ("The failure to do or perform some work, act, or duty, required by one's status or by law"); *Neglect*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1513 (1981 ed.) (defining the verb as "to carelessly omit doing (something that should be done)" and the noun as "the action of neglecting something"). Accordingly, "neglect" of a "child" refers, in the broadest sense, to the failure to perform one's legal duty towards a child. *Child Neglect*, WEBSTER'S II NEW COLLEGE DICTIONARY (1995) ("Failure on the part of a parent or parental substitute to supervise a child and provide requisite care and protection"); *Neglect*, MERRIAM-WEBSTER'S DICTIONARY OF LAW 324 (1996) ("a failure to provide a child under one's care with proper food, clothing, shelter, supervision, medical care, or emotional stability").

From this core concept of the "neglect" of a "child," two key elements thus emerge: (1) the person must have a "duty" or "responsibility" owed to the child; and (2) the person failed to perform that duty toward the child. But the statute requires more than "child neglect"; it requires the "*crime* of . . . child neglect."

Requiring that the breach of the duty toward the child rise to the level of a "crime" indicates that, with respect to both the *actus reus* and the *mens rea*, there must be a sufficient level of culpability to implicate criminal responsibility.

Where a statutory phrase is silent as to *mens rea*,[3] the Court has "often" read into the statute a *mens rea* of "knowledge or intent." *Ruan v. United States*, 142 S. Ct. 2370, 2377 (2022). But there is a compelling textual reason not to construe "crime . . . of child neglect" as requiring either knowledge or intent. The operative term, after all, is "neglect," and the relevant offense is the "*crime* of . . . child neglect*." "Nothing" in that language "indicates that [it] applies exclusively to knowing or intentional" acts or omissions. *Voisine v. United States*, 579 U.S. 686, 692 (2016). On the contrary, the very concept of criminal neglect clearly indicates that criminal negligence is sufficient.

Criminal negligence is present when a person "'should be aware' of such a 'substantial and unjustifiable risk'" that "attache[s] to his [or her] conduct" but the person acts in "'gross deviation' from accepted standards." *Borden v. United States*, 141 S. Ct. 1817, 1824 (2021) (citation omitted). But in the context of

---

[3] Because such silence is the starting point for my analysis of *mens rea*, the plurality and the dissent achieve nothing in noting that the dictionary definitions of "child neglect" "do not address whether the defendant's mental state must be criminally negligent, knowing, or intentional," *see* Opin. at 22, and that such definitions "are silent as to the requisite *mens rea*," *see* Dissent at 29. *See infra* at 11–12.

8

"child neglect," not just any "substantial and unjustifiable risk" is sufficient; rather, to qualify as the "crime . . . of *child* neglect," the relevant "substantial and unjustifiable risk" that must be occasioned by the person's criminal neglect is a substantial risk of serious physical or emotional harm *to the child*.[4]

Accordingly, consideration of the relevant words in the phrase "crime of . . . child neglect" leads to the conclusion that this category embraces crimes that include the following minimum elements: (1) the person had a duty towards a child; (2) the person breached that duty in a manner that constitutes a gross deviation from accepted standards; and (3) the person should have been aware that his or her conduct presented a substantial and unjustifiable risk of serious physical or emotional harm to the child.

**B**

Neither the plurality opinion nor the dissenting opinion provides any persuasive basis for reading the phrase "crime of . . . child neglect" differently.

---

[4] Given that my analysis places critical weight on the entirety of the phrase "crime of . . . child neglect," the dissent is simply wrong in contending that I have "analyz[ed] the word 'neglect' in isolation." *See* Dissent at 28. The dissent is equally wrong in asserting that the composite phrase "child neglect" had a settled phrase-of-art meaning that is somehow *narrower* than the ordinary meaning of the combined "constituent words," *viz*., "neglect" of a "child." *See id*. at 28–29. Sometimes two words in combination have a very different meaning from the simple sum of the two constituent words in isolation (*e.g.*, "cold turkey"), but this is not such a case. "Child neglect" is simply "neglect of a child."

9

The plurality's finding of textual ambiguity rests largely on the premise that the phrase is "susceptible" to Diaz-Rodriguez's "interpretation of 'child neglect'" as requiring the violation of the special duty a "*parent or legal guardian*" owes to a child in his or her care. *See* Opin. at 45 (emphasis added). But the plurality itself ably debunks this textual argument. As the plurality explains, only one of the major contemporaneous dictionaries even mentions "parents" in defining "child neglect," and it refers to a "failure on the part of a *parent or parental substitute*." *Id*. at 22–23 (emphasis added) (quoting *Child Neglect*, WEBSTER'S II NEW COLLEGE DICTIONARY (1995)). And as the plurality correctly notes, a "parental substitute" could readily refer to either a "legal custodian" or a "temporary caretaker." *See id* at 23.

Indeed, there is no reason to think that a breach of duty toward a child by a "parental substitute" constitutes "child neglect" only if the person acting in place of the parents is a formal *legal guardian*. Lots of persons act, on occasion, as "parental substitutes" without being legal guardians in the formal sense, such as babysitters, daycare workers, and teachers. *Cf. Vernonia Sch. Dist. v. Acton*, 515 U.S. 646, 654 (1995) ("When parents place minor children in private schools for their education, the teachers and administrators of those schools stand *in loco parentis* over the children entrusted to them."); MODEL PENAL CODE § 3.08(1), (2) (AM. L. INST. 1985 ed.) (including, within the class of persons who may exercise

10

force in the discipline of children, "the parent or guardian or other person similarly responsible for the general care and supervision of a minor or a person acting at the request of such parent, guardian or other responsible person" and "a teacher or a person otherwise entrusted with the care or supervision for a special purpose of a minor"). There is thus no basis for concluding that this particular dictionary even used "parental substitute" in the narrow sense of formal legal guardians. And even if it did, that view finds no support (as the plurality notes) in any of the other available major dictionaries of the time, *see* Opin. at 23, and one variant dictionary is not enough to displace an otherwise clear meaning, or even to create a sufficient ambiguity warranting *Chevron* deference. *See MCI Telecomms. Corp. v. AT&T Co.*, 512 U.S. 218, 226–28 (1994).

As I noted earlier, *see supra* note 3, the plurality also makes the irrelevant observation that the definitions of "child neglect" in contemporaneous dictionaries do not "address whether the mental state must be criminally negligent, knowing, or intentional" or "whether the targeted conduct must actually injure the child." *See* Opin. at 22. The dissent makes a similar claim as well, noting that the relevant dictionary definitions of child neglect "are silent as to the requisite *mens rea*." *See* Dissent at 29. But as I have explained, the mental-state and degree-of-risk-of-harm elements arise, not from the concept of "child neglect" *simpliciter*, but from the composite notion of "*crime* of . . . child *neglect*." *See supra* at 8–9. To say that a

11

"crime" involving "neglect" denotes *criminal negligence* seems almost tautological and can hardly be considered to be ambiguous or uncertain. It is that latter concept of criminal negligence that supplies the additional minimum elements of "crime of . . . child neglect" that the plurality and the dissent, with their unduly narrow focus, think are missing from "child neglect" considered in isolation.

The dissent, by contrast, agrees that the phrase "crime of . . . child neglect" is not ambiguous, but it insists that it has at least one additional element—namely, the neglect must be "sustained" rather than a "one-time" action. *See* Dissent at 25–31.[5] The dissent says that this follows from dictionary definitions describing "child neglect" as "a failure to provide a child under one's care with proper food, clothing, shelter, supervision, medical care, or emotional stability," *Neglect*, MERRIAM-WEBSTER'S DICTIONARY OF LAW 324 (1996), or as a "[f]ailure on the part of a parent or parental substitute to supervise a child and provide requisite care and protection," *Child Neglect*, WEBSTER'S II NEW COLLEGE DICTIONARY (1995). *See* Dissent at 25–31. I have read the same definitions, and I do not see where they suggest that the failure must be "sustained" to count as child neglect. A babysitter who observes that a child is running a 105-degree fever and is convulsing, but who then simply goes back to binge-watching Netflix while the child suffers has

---

[5] The dissent also argues that the phrase unambiguously applies only to "parents and legal guardians," *see* Dissent at 29–31, but that is wrong for the reasons explained earlier.

certainly committed "a failure to provide a child under one's care with proper . . . supervision, [or] medical care" in the most literal sense of those terms. The dissent asserts that the mere reference to a "'proper' or 'necessary' standard of care" denotes "a relationship of care persisting beyond a one-time instance of minor neglectful conduct." *See* Dissent at 26–27 n.8. But that is obviously wrong, as any perusal of mine-run tort cases makes clear. The dissent also relies on the definition of "neglected child," which does indeed carry a connotation of a *condition* that is ongoing. *See* Dissent at 25–26. But that, of course, is not the phrase used in the statute, and so the additional connotation that is distinctively associated with that phrase is irrelevant here.

The additional materials discussed by the plurality and the dissent do not warrant any different conclusions from what I have set forth above. In particular, to the extent that contemporaneous federal statutes provide any guidance as to Congress's understanding of the term "child neglect," that consideration reinforces my reading of § 237(a)(2)(E)(i). On September 27, 1996—just three days before Congress gave final approval to IIRIRA (which added INA § 237(a)(2)(E)(i)—Congress gave final approval to the "Child Abuse Prevention and Treatment Act Amendments of 1996" ("CAPTA Amendments Act"). *See* Pub. L. No. 104–235,

110 Stat. 3063.[6]  Section 110 of the CAPTA Amendments Act added the following

definition of the composite phrase "child abuse and neglect" to § 113 of CAPTA

(42 U.S.C. § 5106h):

> [T]he term 'child abuse and neglect' means, at a minimum,
> any recent act or failure to act on the part of a parent or
> caretaker, which results in death, serious physical or emotional
> harm, sexual abuse or exploitation, or an act or failure to act
> which presents an imminent risk of serious harm.

*See* 110 Stat. at 3078.  Every aspect of that definition coheres with what I have set

forth earlier: it applies to a single "act or failure to act," and not just a pattern of

behavior; it extends to a "caretaker" (who has obvious duties towards the child),

and not merely to a parent or legal guardian; and it applies if the conduct entails an

"imminent risk of serious harm."  As the nearest contemporaneous expression of

Congress's understanding of the terminology in this area, the CAPTA

Amendments Act strongly reinforces the correctness of the understanding of

"crime . . . of child neglect" that I described above.  *See Erlenbaugh v. United*

*States*, 409 U.S. 239, 243–44 (1972) (noting that, when statutes on the same

subject are "enacted by the same legislative body at the same time," one act can

assist in "ascertaining the meaning of the words as used in their contemporary

---

[6] Although passed by Congress first, the CAPTA Amendments Act was signed by the President on October 3, 1996, *see* Pub. L. No. 104–235, 110 Stat. 3063, whereas IIRIRA was signed by the President on the same day Congress passed it (September 30, 1996), *see* Pub. L. No. 104–208, 110 Stat. 3009.

14

setting" in the other act).[7]

Both the plurality and the dissent also rely on surveys of state legislation, but the Supreme Court has made clear that such a multi-state survey "is not required by the categorical approach." *Esquivel-Quintana*, 137 S. Ct. at 1571 n.3. The Court recognized that such a survey might nonetheless be useful if it meaningfully "helps shed light on the common understanding and meaning of the *federal* provision being interpreted," *id*. (emphasis added) (citations and internal quotation marks omitted), but that is not the case here. As the plurality's and the dissent's surveys show, the various state approaches are too disparate to support any inference that, in deploying the phrase "crime of . . . child neglect," Congress intended to adopt any particular variant of these approaches. *Cf. id*. at 1571 (noting that, in *Taylor v. United States*, 495 U.S. 575 (1990), the Court had

---

[7] The plurality agrees that *none* of the federal statutes defining "child neglect" or a related composite term "establishes that the person responsible for child neglect must be a parent or guardian," but it then inexplicably goes on to state that these statutes are "inconclusive" and "do not clearly foreclose" Diaz-Rodriguez's contrary view. *See* Opin. at 34–35, 45. But the fact that these definitions may not be controlling does not mean that they are ambiguous or "inconclusive" on this point. A statement that a "parent *or caretaker*" can commit "child . . . neglect" cannot be reconciled with the view that *only* parents or legal guardians can do so. The plurality and dissent also suggest that the distinction between criminal and civil offenses is relevant here, *see* Opin. at 49–50; Dissent at 43 n.12, but I do not see how that is so. As I have explained, the fact that the INA requires a "crime of . . . child neglect" rather than just "child neglect" may bear on the requisite level of scienter or of risk of harm, *see supra* at 7–9, but I do not see how it plausibly suggests that daycare workers or one-time babysitters get a pass.

15

"interpret[ed] 'burglary' under the Armed Career Criminal Act of 1984 according to the generic sense in which the term is now used in the criminal codes of most States" (quoting *Taylor*, 495 U.S. at 598) (further quotation marks omitted)). If anything, the wide disparity among States simply reinforces the view that, as the plurality aptly notes, Congress "purposefully employed" a series of overlapping terms in § 237(a)(2)(E)(i) so as to "assure coverage of such crimes, however denominated by the States." *See* Opin. at 42 (citation omitted).

The dissent argues that construing § 237(a)(2)(E)(i) of the INA to reach single acts of criminal child neglect would make no sense, because that would render the alien ineligible for the discretionary relief of cancellation of removal, which turns on whether the alien's removal would cause "exceptional and extremely unusual hardship" to the alien's child. 8 U.S.C. § 1229b(b)(1)(D). According to the dissent, it would be "absurd[]" to say that an alien convicted of a single instance of criminal child neglect should be "categorically ineligible for cancellation of removal," even if the alien can otherwise show "'exceptional and extremely unusual hardship' to that same child." *See* Dissent at 37 (citations and further quotation marks omitted). I disagree. There is nothing inconsistent, much less absurd, in saying that an alien who is slated for removal for having engaged in criminal child neglect should not then be allowed to invoke his or her caregiving

16

responsibilities towards that very child as a shield against deportation.[8]

The dissent also argues that, because the composite phrase "crime of child abuse, child neglect, or child abandonment" is paired together in the same statutory provision with "crime of domestic violence" and "crime of stalking," elements assertedly common to the latter two (such as intent) must be read into the third. *See* Dissent at 29 n.9. But the principle invoked by the dissent—*i.e.*, "[t]hat several items in a list share an attribute counsels in favor of interpreting the other items as possessing that attribute as well"—"is by no means a hard and fast rule," *Beecham v. United States*, 511 U.S. 368, 371 (1994), and there are good reasons not to apply it here. The three "crime of" phrases in § 237(a)(2)(E)(i) are all plainly distinct in critical respects and, as I have noted, the particular phrase at issue here—"crime of child abuse, child neglect, or child abandonment"—is *itself* composed of three overlapping but dissimilar items. *See supra* at 6. This canon cannot be invoked to efface the obvious differences among those categories, and that is especially true here, given that "*crime* of . . . child *neglect*" affirmatively

---

[8] The dissent also relies heavily on an amicus brief's vague descriptions of charges assertedly brought under § 273a(a) in various California counties, which the dissent says shows that the statute is being applied to trivial "parenting mistakes." *See* Dissent at 38–39. But as the plurality correctly notes, *see* Opin. at 13–14, the cited amicus brief does not even say whether any of these charges resulted in convictions, *see* Dissent at 38–39, and even if it did, the limited information that is selectively presented in the brief is so devoid of foundation that we cannot take judicial notice of the claims made in it.

denotes criminal *negligence* rather than intent.

Finally, one might be tempted to think that the phrase "child neglect" must be deemed to be ambiguous simply because so many judges in multiple cases have disagreed as to its meaning. But such a show-of-hands approach to statutory interpretation and to the applicability of *Chevron* would be wrong. The requisite ambiguity exists only if, *after* "exhaust[ing] all the 'traditional tools' of construction," the matter remains sufficiently unclear that the court must then "wave the ambiguity flag." *Medina Tovar*, 982 F.3d at 634 (quoting *Kisor*, 139 S. Ct. at 2415). "[H]ard interpretive conundrums . . . can often be solved," *Kisor*, 139 S. Ct. at 2415, and the fact that some courts may have applied the "'traditional tools' of construction" incorrectly is not enough to establish ambiguity. The Sixth Circuit put the point well:

> [D]isagreements between judges at most *suggest* ambiguity. They do not prove it. If they did, the agency would win every circuit split about whether a federal law authorizes its regulation, *but see*, *e.g.*, *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81 (2002) (agency loses); the State would win every circuit split about whether a federal law preempts its statute, *but see*, *e.g.*, *Northwest, Inc. v. Ginsberg*, 572 U.S. 273 (2014) (State loses); and the criminal defendant would win every circuit split about whether a federal law punishes his conduct, *but see*, *e.g.*, *United States v. Castleman*, 572 U.S. 157 (2014) (criminal defendant loses).

*Sexton v. Panel Processing, Inc.*, 754 F.3d 332, 341 (6th Cir. 2014) (emphasis added) (parallel citations omitted).

# C

Accordingly, ordinary principles of statutory construction lead to the conclusion that a "crime of . . . child neglect," within the meaning of INA § 237(a)(2)(E)(i), is one that contains, at a minimum, the following elements: (1) the person had a duty towards a child; (2) the person breached that duty in a manner that constitutes a gross deviation from accepted standards; and (3) the person should have been aware that his or her conduct presented a substantial and unjustifiable risk of serious physical or emotional harm to the child. *See supra* at 8–9. Applying that definition, I think it is clear that California Penal Code § 273a(a) is a categorical match. Section 273a(a) requires proof that the defendant "had care or custody of a child," *see* Opin. at 15, and the duties attendant to that care or custody satisfy the element of duty towards the child. Section 273a(a)'s requirement to show that the child was placed "into an abusive situation in which the probability of serious [physical] injury was great," *see* Opin. at 15, is, if anything, more demanding than a showing of a gross deviation from accepted standards. And § 273a(a)'s requirement to show criminal negligence plainly satisfies the federal generic definition's similar requirement. Put simply, § 273a(a) categorically fits within INA § 237(a)(2)(E)(i) because all of its elements are equal to or narrower than the elements of the federal definition as set forth above.

19

**III**

For the foregoing reasons, I agree with the ultimate conclusion in Part IV of Judge Ikuta's opinion that "the BIA did not err in concluding that Diaz-Rodriguez was removable" under § 237(a)(2)(E)(i). See Opin. at 75. On that understanding, I join Part I, Part II(A) (except for footnote 2), and Part IV of Judge Ikuta's opinion and concur in the judgment denying Diaz-Rodriguez's petition for review.

*Diaz-Rodriguez v. Garland*, No. 13-73719

WARDLAW, Circuit Judge, with whom MURGUIA, Chief Circuit Judge,

McKEOWN, KOH, and SANCHEZ Circuit Judges, join, dissenting:

I respectfully dissent.  Congress "supplied a clear and unambiguous answer"

to the question before us.  *Pereira v. Sessions*, 138 S. Ct. 2105, 2113 (2018).

Section 1227(a)(2)(E)(i) renders noncitizens removable if they are convicted of

one of three discrete criminal offenses: child abuse, child neglect, or child

abandonment.  Congress did not inadvertently omit the independent offense of

child endangerment for which Diaz-Rodriguez was convicted under section

273a(a) of the California Penal Code.  Because the statute unambiguously excludes

child endangerment, we do not defer to the BIA's contrary construction under

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837

(1984).  Accordingly, the petition should be granted.

**I.**

Rafael Diaz-Rodriguez has lived in the United States for more than thirty

years.  He has been a lawful permanent resident since 1990.  He and his partner

have two children together.  Both children are U.S. citizens.  Diaz-Rodriguez's

parents and eight siblings live in the United States; his mother is a United States

citizen, and his father is a lawful permanent resident.

In 2003 and 2009, Diaz-Rodriguez was stopped by police while driving under the influence of alcohol with one of his children in the car.  Each arrest resulted in convictions for felony child endangerment in violation of section 273a(a) of the California Penal Code.  Section 273a(a) sets forth punishment for anyone who, "having the care or custody of any child," and "under circumstances likely to produce great bodily harm or death," "willfully causes or permits that child to be placed in a situation where his or her person or health is endangered."[1]  Although the statute states that the defendant must act "willfully," the California Supreme Court has held that a *mens rea* of criminal negligence suffices, such that the state need not prove that the defendant was subjectively aware of the risk of

---

[1] Section 273a(a) of the California Penal Code provides in full:

> Any person who, under circumstances or conditions likely to produce great bodily harm or death, willfully causes or permits any child to suffer, or inflicts thereon unjustifiable physical pain or mental suffering, or having the care or custody of any child, willfully causes or permits the person or health of that child to be injured, or willfully causes or permits that child to be placed in a situation where his or her person or health is endangered, shall be punished by imprisonment in a county jail not exceeding one year, or in the state prison for two, four, or six years.

The statute contains a separate provision punishing as a misdemeanor the same acts when committed "under circumstances or conditions other than those likely to produce great bodily harm or death."  Cal. Penal Code § 273a(b); *see Fregozo v. Holder*, 576 F.3d 1030, 1037–38 (9th Cir. 2009).

harm involved to obtain a conviction. *People v. Valdez*, 27 Cal.4th 778, 790 (2002).

In 2012, the Department of Homeland Security (DHS) initiated removal proceedings against Diaz-Rodriguez based on his 2009 child endangerment conviction. The agency charged that the conviction rendered Diaz-Rodriguez removable under 8 U.S.C. § 1227(a)(2)(E)(i), a provision of the Immigration and Nationality Act (INA) that authorizes the removal of a noncitizen who "at any time after admission is convicted of a crime of domestic violence, a crime of stalking, or a crime of child abuse, child neglect, or child abandonment." The Immigration Judge (IJ) concluded that a conviction under section 273a(a) of the California Penal Code qualified as a conviction for "a crime of child abuse, child neglect, or child abandonment," and found Diaz-Rodriguez removable. The IJ also denied Diaz-Rodriguez's application for cancellation of removal as a matter of discretion. The Board of Immigration Appeals (BIA) affirmed the IJ's ruling. Diaz-Rodriguez petitions for review of the BIA's decision, challenging only the determination that he is removable based on his conviction under section 273a(a) of the California Penal Code.

## II.

The issue whether "a crime of child abuse, child neglect, or child abandonment" in 8 U.S.C. § 1227(a)(2)(E)(i) includes the separate crime of child

endangerment has a tortured history both before the BIA and our court. Since the passage of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), the BIA has adopted increasingly expansive and punitive interpretations of the statute, obscuring Congress's clear directive in § 1227(a)(2)(E)(i) and dramatically expanding the scope of this removability provision. We, and our sister circuits, have struggled to assess the agency's shape-shifting understanding of the crimes of child abuse, child neglect, and child abandonment.

A.

Over the last two decades, the BIA has haphazardly revised its interpretation of "a crime of child abuse, child neglect, or child abandonment." The agency began with the plain text of the statute and contemporaneous dictionaries. But it quickly pivoted to dubious sources of statutory meaning, consulting civil definitions of child abuse and relying on state-by-state risk assessments to expand the scope of 8 U.S.C. § 1227(a)(2)(E)(i).

In 1998, the BIA defined a crime of child abuse with reference to the Sixth Edition of Black's Law Dictionary as "any form of cruelty to a child's physical, moral[,] or mental well-being." *In re Rodriguez-Rodriguez*, 22 I. & N. Dec. 991, 996 (B.I.A. 1999) (citing Black's Law Dictionary 1375 (6th Ed. 1990)). That definition required the intentional infliction of injury on the child. *See id.* (holding

4

that child abuse refers to "physical or mental maltreatment" and "encompasses actions or inactions that also do not require physical contact").

In 2006, we concluded that the BIA's definition in *Rodriguez-Rodriguez* was dicta, not precedential, and not entitled to deference because it was announced in an appeal about the separate crime of child sexual abuse. *See Velazquez-Herrera v. Gonzales* (*Velazquez-Herrera I*), 466 F.3d 781, 782–83 (9th Cir. 2006). But, in the years between *Rodriguez-Rodriguez* and *Velazquez-Herrera I*, and even after, several circuit courts of appeal accepted *Rodriguez-Rodriguez* as a reasonable interpretation of § 1227(a)(2)(E)(i), *Ochieng v. Mukasey*, 520 F.3d 1110, 1114–15 (10th Cir. 2008); *Nguyen v. Chertoff*, 501 F.3d 107, 114 n.9 (2d Cir. 2007); *Loeza-Dominguez v. Gonzales*, 428 F.3d 1156, 1158–59 (8th Cir. 2005), and many lawful permanent residents had relied on the definition to make decisions about how to plead in criminal proceedings, *see INS v. St. Cyr*, 533 U.S. 289, 322 (2001) ("There can be little doubt that, as a general matter, [noncitizen] defendants considering whether to enter into a plea agreement are acutely aware of the immigration consequences of their convictions."). In *Velazquez-Herrera I*, we remanded the petition to the BIA with an invitation to issue a precedential decision. 466 F.3d at 782–83.

In response, the BIA held that the generic definition of a crime of child abuse now extended to crimes against children committed with a *mens rea* of

criminal negligence so long as the convictions involve "the infliction on a child of physical harm, even if slight" or "mental or emotional harm, including acts injurious to morals . . . ." *Matter of Velazquez-Herrera* (*Velasquez-Herrera II*), 24 I. & N. Dec. 503, 512 (BIA 2008). In *Velazquez-Herrera II*, the BIA recognized that its generic definition had to reflect a "flexible, uniform standard," applicable nationwide, and could not make "reference to legal classifications that vary from State to State." *Id.* at 508 (first quoting, then citing *Kahn v. INS*, 36 F.3d 1412, 1414–15 (9th Cir. 1994)).

At the time, a concurring BIA member, Roger Pauley, wrote separately to note that the BIA's definition was incomplete and confusing: it was "unclear" whether the Board's new definition extended to "crimes in which a child is merely placed or allowed to remain in a dangerous situation, without any element in the statute requiring ensuing harm." *Id.* at 518 n.2. Pauley cited the example of "failing to secure a child with a seatbelt." *Id.* Pauley further noted that the BIA's definition ignored the statutory text, defining only the "crime of child abuse" without acknowledging that the crimes Congress listed included the "crime of child abuse, child neglect, and child abandonment." *Id.* at 518 (Pauley, concurring). Nevertheless, the BIA issued its definition in *Velasquez-Herrera II* without adjusting or clarifying the meaning of the phrase.

After *Velazquez-Herrera II*, we granted a petition for review in *Fregozo v. Holder*, 576 F.3d 1030 (9th Cir. 2009). We held that the *Velazquez-Herrera II* definition requires injury to the child. *Id.* at 1037. There, Fregozo, a permanent resident, pleaded nolo contendere to child endangerment under section 273a(b) of the California Penal Code, after he drove drunk with his wife and two children in the car. *Id.* at 1033–34. We concluded that a conviction under section 273a(b) is not categorically a crime of child abuse under *Velazquez-Herrera II* because the BIA's interpretation required "*some* form of injury on a child" while section 273a(b) required only a potential harm to the child for a conviction, rendering the state statute broader than the generic federal crime. *Id.* at 1037.

After *Fregozo*, the BIA once again revisited its definition of the crime of child abuse. *See Matter of Soram*, 25 I. & N. Dec. 378, 380 (BIA 2010). Shifting from its conclusion that a crime of child abuse requires "infliction on a child of physical harm, even if slight," or "mental or emotional harm," *Velazquez-Herrera II*, 24 I. & N. Dec. at 512, the BIA now found "no convincing reason to limit [deportable] offenses under [§ 1227(a)(2)(E)(i)] to those requiring proof of actual harm or injury to the child," *Soram*, 25 I. & N. Dec. at 381. In *Soram*, the Board inexplicably looked to the civil child abuse statutes in force in 38 states as of 2009, not the criminal laws in effect in 1996 when Congress enacted IIRIRA. *Id.* at 382 (citing a 2009 Department of Health and Human Services compendium of civil

7

laws). A concurring board member, Lauri Steven Filppu, remarked on this methodological flaw, stating, "I find it most relevant to look to the criminal statutes of the various States in 1996, rather than the civil statutes." *Id.* at 386–87 (Filppu, concurring). The BIA then concluded that the phrase "a crime of child abuse, child neglect, or child abandonment" encompassed child endangerment offenses committed with a mens rea of at least criminal negligence. *Id.* at 383.

*Soram* broke from *Velasquez-Herrera II* in two other respects. First, where the BIA rejected a state-by-state analysis in *Velazquez-Herrera II*, it approved a state-by-state analysis in *Soram*. *Id.* at 383. After surveying state laws, the BIA noted that states use different terms, like "realistic," "serious," "reasonably foreseeable," "substantial," and "genuine" to describe the level of risk required to trigger a child endangerment offense, and "approximately half of the States that include endangerment-type offenses in their definitions of 'child abuse' or 'child abuse or child neglect' [did] not specify the degree of threat required." *See id.* at 382–83 (collecting terms). Eschewing its decision in *Velasquez-Herrera II* to adopt a uniform national standard, the BIA left it to courts to decide "whether the risk of harm required by the endangerment-type language in any given State statute is sufficient to bring an offense within the definition of 'child abuse' under the Act." *Id.* at 383. In recent years, the BIA has clarified that the state-by-state risk assessment under *Soram* requires "proof of a 'likelihood' or 'reasonable

8

probability' that a child will be harmed, not a mere possibility or potential for harm." *Matter of Rivera-Mendoza*, 28 I. & N. Dec. 184, 187 (BIA 2020).

Second, where the BIA in *Velazquez-Herrera II* decided to define only the "crime of child abuse," the BIA now confirmed that its new definition applied to the phrase "a crime of child abuse, child neglect, or child abandonment." *Soram*, 25 I. & N. Dec. at 381 (holding that the phrase "denotes a unitary concept"). In *Soram*, the BIA chose to read "child neglect" and "child abandonment" out of the statute, reasoning that the phrase as a whole referred to the various ways that states chose to criminalize crimes against children. *Id.*

B.

We have twice agreed to consider en banc the BIA's most recent refashioning of § 1227(a)(2)(E)(i): first, in *Martinez-Cedillo v. Sessions*, 896 F.3d 979 (9th Cir. 2018), *vacated sub nom. Martinez-Cedillo v. Barr*, 923 F.3d 1162 (9th Cir. 2019), and again in this appeal, *Diaz-Rodriguez v. Garland*, 12 F.4th 1126 (9th Cir. 2021), *reh'g en banc granted*, 29 F.4th 1018 (9th Cir. 2022). The original panels in both cases applied *Chevron*'s two step framework.[2] Those panels, however, arrived at opposing conclusions.

---

[2] In *Chevron*, the Supreme Court set forth a two-step inquiry to determine whether a reviewing court must defer to an agency's interpretation of a statute. 367 U.S. at 842–43. At step one, the court determines "whether Congress has directly spoken to the precise question at issue" by assessing whether "the statute is silent or ambiguous with respect to the specific issue." *Id.* If Congress has directly spoken

9

In *Martinez-Cedillo*, the panel unanimously held at step one that the phrase "a crime of child abuse, child neglect, and child abandonment" in § 1227(a)(2)(E)(i) is ambiguous as to whether it encompasses criminal offenses that punish negligent endangerment of a child. 896 F.3d at 987; *id.* at 998 (Wardlaw, J., dissenting). At step two, the panel concluded that the BIA's interpretation of that phrase in *Soram* was reasonable and deferred to the agency's interpretation. *Id.* at 988–89 (majority opinion).

When a majority of the active judges agreed to rehear the case en banc, we withdrew the panel opinion, rendering it non-precedential. *Martinez-Cedillo v. Barr*, 918 F.3d 601 (9th Cir. 2019). We subsequently vacated the panel's decision when the en banc court dismissed the appeal as moot. *Martinez-Cedillo*, 923 F.3d at 1162. Given these developments, *Martinez-Cedillo* is no longer binding precedent.[3]

---

to the question and the agency reached a different conclusion, the inquiry stops there: the court must reverse the agency and give effect to Congress's unambiguously expressed intent. If Congress has not directly spoken to the question, the court, at step two, determines whether the agency's answer is "reasonable." *Id.* at 843, 845.

[3] Shortly after *Martinez-Cedillo* issued but before we decided to rehear the case en banc, two other three-judge panels of our court issued published decisions that relied on *Martinez-Cedillo*'s holding that the BIA's decision in *Soram* is entitled to *Chevron* deference. *Menendez v. Whitaker*, 908 F.3d 467, 474 (9th Cir. 2018); *Alvarez-Cerriteno v. Sessions*, 899 F.3d 774, 781 (9th Cir. 2018). Those decisions have not been vacated. In both decisions, although the panel followed *Martinez-Cedillo* and applied *Soram*, the petitioners ultimately prevailed because the elements of their crimes were broader than the generic offense as defined by the

We now confront this issue again. *Diaz-Rodriguez*, 12 F.4th at 1132.

Contrary to the panel in *Martinez-Cedillo*, the panel majority in *Diaz-Rodriguez*

held at step one of *Chevron* that the phrase "a crime of child abuse, child neglect,

and child endangerment" does not encompass a crime of negligent child

endangerment. *Id.* at 1128. Guided by the Supreme Court's analysis in *Esquivel-*

*Quintana v. Sessions*, 137 S. Ct. 1562 (2017), the panel majority found that "three

of the four sources of statutory meaning the Court consulted in [that case]—

contemporary legal dictionaries, statutory structure, and contemporary state

criminal codes—support the conclusion that § 1227(a)(2)(E)(i) unambiguously

forecloses the BIA's interpretation of the statute in *Soram*." *Id.* at 1132; *but see id.*

at 1145 (Callahan, J., dissenting) ("To the extent that the majority asserts that

§ 1227(a)(2)(E)(i) is unambiguous, it is wrong."). The panel majority did not

reach the second step of *Chevron*. *Id.* at 1145.

**III.**

We apply the categorical approach to determine whether "the least of the

acts criminalized by the state statute," section 273a(a) of the California Penal

_____

BIA. Thus, they had no incentive to petition for rehearing by the panel or the en banc court. And although these decisions were not vacated, given the unusual circumstances surrounding their timing and actual holdings, the *Diaz-Rodriguez* three-judge panel majority did not view them as binding precedent on the *Soram* issue. As we now sit en banc, we are not bound by those decisions. *Miller v. Gammie*, 335 F.3d 889, 899–900 (9th Cir. 2003) (en banc) (stating that an en banc court may overrule three-judge panel decision).

11

Code, falls within the generic federal definition of the offense in 8 U.S.C. § 1227(a)(2)(E)(i). *Esquivel-Quintana*, 137 S. Ct. at 1568. If so, the two offenses are a categorical match and the state conviction may serve as a ground for removal. *Id.*

### A.

Determining the least of the acts criminalized under section 273a(a) of the California Penal Code is straightforward. It consists of causing or permitting a child "to be placed in a situation where his or her person or health is endangered," committed with a *mens rea* of criminal negligence. Cal. Penal Code § 273a(a). Such an offense, involving serious risk of harm to the child but no resulting injury, is commonly referred to as a child endangerment offense.

Section 273a(a) has three elements. First, a person must have "care or custody" of a child. *Id.* This does not require a familial relationship between the defendant and child; "a willingness to assume duties correspondent to the role of a caregiver" will suffice. *People v. Cochran*, 62 Cal. App. 4th 826, 832 (1998) (interpreting Cal. Penal Code § 273a(b)).

Second, that child must be placed "in a situation where his or her person or health is endangered." Cal. Penal Code § 273a(a). This conduct must occur "under circumstances or conditions likely to produce great bodily harm or death." *Id.*; *cf. id.* § 273a(b) (misdemeanor if conduct is under circumstances "other than

12

those likely" to produce such risk).  Conditions are "likely" to result in harm or

death if "the probability of serious injury is great."  *Valdez*, 27 Cal.4th at 784

(quoting *People v. Sargent*, 19 Cal.4th 1206, 1216 (1999)).  A defendant need not

be subjectively aware of the risk to the child.  *Valdez*, 27 Cal.4th at 790.

Third, the statute requires a defendant to act "willfully."  Cal. Penal Code

§ 273a(a).  The California Supreme Court has interpreted this to require a *mens rea*

of criminal negligence, reasoning that the standard is appropriate given that

negligent child endangerment can occur "when the act is intrinsically lawful, such

as leaving an infant with a babysitter, but warrants criminal liability because the

surrounding circumstances present a high risk of serious injury."  *Valdez*, 27

Cal.4th at 789.  *Valdez* uses extreme language to describe the degree of negligence

required, stating it

> must be aggravated, culpable, gross, or reckless, that is, the conduct of
> the accused must be such a departure from what would be the conduct
> of an ordinarily prudent or careful [person] under the same
> circumstances as to be incompatible with a proper regard for human life
> . . . or an indifference to consequences.

*Valdez*, 27 Cal.4th at 788 (citations omitted).

The plurality opinion waves off concerns that the criminal negligence

standard embraces "'poor housekeeping' or everyday parenting decisions."

Plurality 12 (citation omitted).  The plurality draws on lurid examples to argue that

the statute only extends to serious, aberrant conduct: a father "shaking a four-and-

a-half-month-old infant . . . with the force equivalent to dropping him out of a second story window," *Sargent*, 19 Cal. 4th, at 1222 (1999); a father storing dangerous chemicals, exposed electrical wires, and weapons at home and within reach of his children, *People v. Odom*, 226 Cal. App. 3d 1028, 1033–34 (1991); and a mother confining her eight-and-a-half-year-old daughter in the home since she was only six-months old, including keeping her in a closet for at least a six-month period. *People v. Hernandez*, 111 Cal. App. 3d 888, 894–95 (1980).

We acknowledge that section 273a(a) criminalizes extreme wrongdoing. But these examples merely show that such conduct is sufficient for liability under the statute. They tell us nothing about the lower-bound of liability embraced by the criminal negligence standard. As detailed in a brief submitted by California public defenders, prosecutors and law enforcement officers disagree with the plurality's exaggerated assessment of the *mens rea* requirement, and have found simple parenting mistakes—such as failing to restrain a child properly in a car seat or falling asleep while children were in one's care—criminally negligent. Br. of Cal. Pub. Defenders Ass'n et. al. at 9 (Cal. Defenders Br.); *see generally id.* at 9–11.

The concurrence and plurality opinion wrongly dismiss these examples—chiding amici for failing to provide citations to court proceedings, Plurality 13, and arguing that "the limited information that is selectively presented in the [amicus]

14

brief is so devoid of foundation that we cannot take judicial notice of the claims made in it.," Concurrence 17 n. 8. The plurality and concurrence disregard the reality that the cases, such as those the plurality cites, likely to result in a detailed disposition and necessitating a significant investment of prosecutorial and judicial resources are likely to involve complex, unsympathetic facts. Both the plurality and concurrence also disregard amici's caveat that its examples are "necessarily vague" due to confidentiality concerns. Cal. Defenders Br. at 8.

Moreover, regardless of how high the criminal negligence standard has been set by the California Supreme Court, there are numerous examples in our circuit of actors in the criminal justice system finding that poor parenting decisions satisfy the criminal negligence *mens rea* required for arrests, prosecutions, or convictions under section 273a(a). In order to fairly assess what the least of the acts criminalized by section 273a(a) is, it is important to understand how the statute is routinely applied in practice.

In *Andre-Lucas v. Mayorkas*, a father pleaded guilty to child endangerment allegedly for trying to calm down and discipline his four-year old son who was throwing a temper tantrum. No. 3:21-cv-01121, 2021 WL 3929686, at *1 (S.D. Cal. Sept. 2, 2021). His son was allegedly upset at receiving the wrong flavor of ice cream. *Id.*

15

In *Sky N. v. Becerra*, a father was charged with child endangerment after leaving a child in their family car for a short period while he returned to a restaurant. No. 2:21-cv-507, 2021 WL 3744383, at *2–3 (C.D. Cal. June 22, 2021). The father was charged with violating sections 273a(a) and (b) of the California Penal Code and convicted under section 273a(b). *Id.* at *1. *See Sargent*, 19 Cal. 4th at 1223 ("The scienter required for both [subsections (a) and (b)] is the same."); *see also Valdez*, 27 Cal.4th at 783 n.3 (noting that the "primary difference" between subdivisions (a) and (b) is unrelated to *mens rea* element). The car was parked in an underground garage which a passerby described as "a little bit warm." *Id.* at *3. The child was unharmed. *Id.*

Calming a child upset about his ice cream choice hardly seems "incompatible with a proper regard for human life or an indifference to consequences." *Valdez,* 27 Cal.4th at 788 (internal citations omitted). These examples suggest that, notwithstanding the harsh language California courts use in describing the criminal negligence standard, prosecutors, arresting officers, and juries have found parents criminally negligent and liable for child endangerment for ordinary parenting mistakes.

### B.

Congress enacted 8 U.S.C. § 1227(a)(2)(E)(i) as part of IIRIRA. Pub. L. No. 104-208, § 350(a). IIRIRA added "a crime of child abuse, child neglect, or

16

child abandonment" to the list of offenses that render noncitizens removable from the United States but did not further define the crimes of "child abuse," "child neglect," or "child abandonment." *Id.* When a federal statute specifies an offense by name without further defining its elements, we assume that Congress intended to rely on a uniform, generic version of the offense, drawn from the ordinary meaning of the term at the time Congress enacted the statute. *Esquivel-Quintana*, 137 S. Ct. at 1569; *see also Perrin v. United States*, 444 U.S. 37, 42 (1979) ("A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning.")

The BIA has repeatedly attempted to formulate a definition of the generic federal offense described by the terms "child abuse," "child neglect," and "child abandonment." The reason the agency has failed to formulate a definitive meaning likely is because its expertise is in immigration law—not criminal law—and it has failed to employ the requisite tools of statutory construction. The Supreme Court in *Esquivel-Quintana* instructs us on how to conduct the two-step inquiry *Chevron* requires under the circumstances presented here. In *Esquivel-Quintana*, the Court addressed another conviction-based removal provision enacted as part of IIRIRA, authorizing removal of noncitizens convicted of "sexual abuse of a minor." 137 S. Ct. at 1568–69; 8 U.S.C. §§ 1227(a)(2)(A)(iii) (authorizing removal of noncitizens

convicted of an aggravated felony), 1101(a)(43)(A) (defining sexual abuse of a minor as an aggravated felony). The Court considered whether the generic federal definition of this offense, "in the context of statutory rape offenses that criminalize sexual intercourse based solely on the age of the participants," requires that the victim be younger than sixteen. *Esquivel-Quintana*, 137 S. Ct. at 1568. The BIA had held that the generic federal definition included crimes in which the victim was sixteen or seventeen so long as there was "a meaningful age difference between the victim and the perpetrator." *Id.* at 1567 (quoting *Matter of Esquivel-Quintana*, 26 I. & N. Dec. 469, 477 (BIA 2015)). The Supreme Court rejected the BIA's analysis at step one of *Chevron*. *Id.* at 1572. The Court relied on "the normal tools of statutory interpretation," consulting contemporaneous dictionaries, the structure of the INA, state criminal codes, and a related federal criminal statute. *Id.* at 1569–72.

## C.

"Before we address whether in the statute Congress has spoken clearly, we must identify the precise question at issue." *Fournier v. Sebelius*, 718 F.3d 1110, 1118 (9th Cir. 2013) (quoting *Chevron*, 467 U.S. at 842–43). Once we identify that question, we use the normal tools of statutory construction to determine if Congress adopted language which unambiguously provides an answer, evincing Congress's intent to foreclose alternatives proposed by an agency. "If the intent of

18

Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Fournier*, 718 F.3d at 1118 (citations omitted).

The question at issue is what Congress meant when it said "a crime of child abuse, child neglect, or child abandonment." We must answer this question with reference to the contemporaneous, ordinary meaning of these three crimes. At step one, we independently evaluate what the statute means, whether it is ambiguous, and whether that ambiguity evinces an intent to leave an interpretive gap for the agency to fill. Here, we conclude that Congress meant what it said when it identified three discrete crimes in § 1227(a)(2)(E)(i). While the statute may admit some ambiguity as to the elements of each stated offense, this ambiguity did not explicitly or implicitly authorize the BIA to render removable a new category of noncitizens convicted of child endangerment offenses.

The plurality goes astray by beginning with the wrong question. It asks "whether Congress meant the offenses listed in § 1227(a)(2)(E)(i) to cover (or not cover) crimes against children that require only a mens rea of criminal negligence, do not require injury to the victim, and do not require the perpetrator to be a parent or legal guardian, but could include persons temporarily responsible for a child."

19

Plurality 19–20.[4]  But this elliptical phrasing implicitly adopts the BIA's

interpretation of the statute, conflating *Chevron* step two with step one.  For the

plurality, the question is not what Congress meant, but whether language Congress

happened to adopt admits enough ambiguity to support the BIA's interpretation.

This question guides the plurality's parsing of dictionary definitions, see *id.* at 20-

26, its reliance on inapposite federal civil statutes, mimicking the BIA's

methodology, *id.* at 29-35, and its attempts to obfuscate results of its multi-

jurisdictional analysis of crimes against children.[5]  *Id.* at 35-43.

## IV.

We conclude that the text of 8 U.S.C. § 1227(a)(2)(E)(i) unambiguously

forecloses the BIA's interpretation of "a crime of child abuse, child neglect, or

---

[4] The plurality alternatively "frame[s] [its] inquiry by determining whether it is unambiguous that the generic federal offenses of 'child abuse, child neglect, or child abandonment' in § 1227(a)(2)(E)(i) do not match the least of the offense criminalized by section 273a(a)[.]"  Plurality 18–19.

[5] By misconstruing the interpretive question in step one, the plurality goes looking for ambiguity on the BIA's behalf and, unsurprisingly, finds it.  *See Atlantic Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 433 (1932) ("Most words have different shades of meaning and consequently may be variously construed . . . .").  The plurality opinion takes the bare fact of ambiguity as conclusive evidence that Congress intended to adopt language in 8 U.S.C. § 1227(a)(2)(E)(i) that could encompass negligent child endangerment, Plurality 44–46 , and reflexively defers to the BIA's interpretation.  *Id*. 64, 73.  This order of operations befits an enterprising agency eager to expand its regulatory domain.  It is not befitting of a reviewing court "exhaust[ing] 'all the textual and structural clues' bearing on [the statute's] meaning" to "ensure the federal government does not exceed its statutory license."  *Niz-Chavez v. Garland*, 141 S. Ct. 1474, 1480, 1486 (2021) (citation omitted).

20

child abandonment" in *Soram*. 25 I. & N. Dec. at 380–81. Section

1227(a)(2)(E)(i) refers to three discrete crimes—child abuse, child neglect, and

child abandonment. The ordinary meaning of those terms excludes negligent child

endangerment offenses like section 273a(a) of the California Penal Code. [6]

## A.

"Our analysis begins with the language of the statute." *Leocal v. Ashcroft*,

543 U.S. 1, 8 (2004). In interpreting such language, a court references the

"ordinary meaning" of terms included in a statute "at the time Congress enacted

the statute." *Wis. Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2070 (2018)

(citation omitted). Reviewing dictionaries published shortly before and after

IIRIRA's enactment, we find that the crimes of child abuse, child neglect, and

---

[6] In light of the Supreme Court's recent admonitions that courts should engage in a searching statutory analysis, bringing to bear all standard tools of statutory construction before concluding that a statute in ambiguous, I have revised my view about the statute's ambiguity. *Kisor v. Wilkie*, 139 S. Ct. 2400, 2414 (2019) ("[T]he possibility of deference can arise only if a regulation is genuinely ambiguous . . . even after a court has resorted to all the standard tools of interpretation."); *see also Wooden v. United States*, 142 S. Ct. 1063, 1075 (2022) (Kavanaugh, J., concurring) ("[A] court must exhaust all the tools of statutory interpretation" before applying the rule of lenity in criminal cases.). At the time *Martinez-Cedillo* was decided, none of our sister circuits had applied a rigorous methodology to construe the phrase "a crime of child abuse, child neglect, and child abandonment." Having now engaged in that analysis—and evaluated the original panel majority's analysis— I now conclude that the list of crimes is not ambiguous as to the question we must ask here: did Congress intend to include negligent child endangerment offenses when it failed to list that crime against children along with the three it did list?

child abandonment had discrete definitions. These definitions suggest that the ordinary meaning of such terms did not encompass negligent child endangerment offenses.

1.

The ordinary meaning of "child abuse" in 1996 involved the infliction of some form of injury upon the child. One of the principal dictionaries consulted by the Court in *Esquivel-Quintana* defines "child abuse" as "the infliction of physical or emotional injury," including sexual abuse. *Child Abuse*, Merriam-Webster's Dictionary of Law, 4, 76 (1996); *Esquivel-Quintana*, 137 S. Ct. at 1569 (citing Merriam-Webster's Dictionary of Law (1996)). The two editions of Black's Law Dictionary published shortly before and after IIRIRA's enactment similarly define child abuse as requiring some infliction of injury: the Sixth Edition of Black's Law Dictionary defines "child abuse" as "[a]ny form of cruelty to a child's physical, moral, or mental well-being," and defines "cruelty" as "[t]he intentional and malicious infliction of physical or mental suffering." *Child Abuse*, Black's Law Dictionary 239, 377 (6th ed. 1990) (Black's Sixth Edition). The Seventh Edition defines "child abuse" as "[a]n intentional or neglectful physical or emotional injury imposed on a child, including sexual molestation." *Child Abuse*, Black's Law Dictionary 10, 233 (7th ed. 1999) (Black's Seventh Edition). And the 1989 edition of the Oxford English Dictionary defines "child abuse" as the

22

"maltreatment of a child, esp[ecially] by beating, sexual interference, or neglect."

*Child Abuse*, Oxford English Dictionary 114 (2d ed. 1989).

The plurality opinion asserts first, that these definitions are ambiguous as to the requisite *mens rea*, and, second, that "[s]ome contemporaneous dictionaries defined 'child abuse' without specifying the role of . . . injury." Plurality 21. Although the *mens rea* elements may not have been defined clearly[7], what is clear is that at the time IIRIRA was enacted, for an act to constitute child abuse, injury to the child was required.

The plurality opinion relies entirely on two dictionary definitions for its conclusion that injury was not commonly understood as an element of child abuse in 1996. Plurality 21–22. It cites the 1995 edition of Ballentine's Law Dictionary for a definition of child abuse as "[t]he physical, sexual, verbal, or emotional abuse of a young person," including neglect of a child. *Child Abuse*, Ballentine's Legal Dictionary 96 (1995). It also cites the 1995 edition of Webster's II New College Dictionary, which includes in the definition of child abuse "toleration and

---

[7] The Sixth Edition of Black's Law Dictionary, predating IIRIRA, suggests that child abuse must be "intentional and malicious." *Child Abuse*, Black's Sixth Edition 239, 377. However, other dictionaries are unclear on this point, and an alternate definition of "abuse" (in verb form) in Merriam-Webster's Dictionary of Law suggests that "physical or emotional mistreatment or injury on (as one's child)" can be done "purposely or through negligence or neglect and often on a regular basis." *Abuse*, Merriam-Webster's Dictionary of Law 4 (1996).

23

complicity in conditions injurious to the child's health." *Child Abuse*, Webster's II New College Dictionary 194 (1995). Plurality 21–22.

However, both definitions in fact require injury. As to Ballentine's, the modifiers "physical, sexual, verbal, or emotional" indicate that the abuse has an effect on the child. A child adversely affected in a "physical, sexual, verbal, or emotional" form experiences an injury. By contrast, children unaware of the fact that they are placed in a risky situation, unharmed as a result of being placed in such situation, experience no injury. For example, if a child lived in a home where dangerous items were present but inaccessible to the child, *see* Cal. Defenders Br. at 10, or was unknowingly driven by a parent who had "two or three beers," that child would suffer no "physical, sexual, verbal, or emotional" injury. *Child Abuse*, Ballentine's Legal Dictionary 96 (1995).

As to Webster's II, child abuse covers toleration of "conditions *injurious* to the child's health." *Child Abuse*, Webster's II New College Dictionary 194 (emphasis added). On its face, this definition requires that injury be present. The definition does not include situations in which a parent tolerates conditions that may, at some point in the future, become injurious to the child's health, such as failure to restrain a child properly in a car seat where no harm results. Cal. Defenders Br. at 9.

These definitions in fact support our conclusion that the ordinary meaning of child abuse in 1996 requires some form of injury. Section 273a(a) of the California Penal Code requires no injury to the child and is therefore not a categorical match for "child abuse" in § 1227(a)(2)(E)(i).

2.

The ordinary meaning of "child neglect" in 1996 required a sustained failure by a child's caregiver to provide for the child's basic needs based on a standard of proper care. Merriam-Webster's Dictionary of Law defines child "neglect" as "failure to provide a child under one's care with proper food, clothing, shelter, supervision, medical care, or emotional stability," cross-referencing the definition of "child abuse." *Neglect*, Merriam-Webster's Dictionary of Law 324. Black's Sixth Edition does not define "child neglect," but defines a "neglected child" as one whose

> parent or custodian, by reason of cruelty, mental incapacity, immorality, or depravity, is unfit properly to care for him, or neglects or refuses to provide necessary physical, affectional, medical, surgical, or institutional or hospital care for him, or he is in such condition of want or suffering, or is under such improper care or control as to endanger his morals or health.

*Neglected Child*, Black's Sixth Edition 1032.

The Seventh Edition defines "child neglect" as "[t]he failure of a person responsible for a minor to care for the minor's emotional or physical needs." *Child Neglect*, Black's Seventh Edition 233; *see also id.* (defining "neglected child" as:

25

"1. A child whose parents or legal custodians are unfit to care for him or her for reasons of cruelty, immorality, or incapacity. 2. A child whose parents or legal custodians refuse to provide the necessary care and medical services for the child.").

Based on these definitions, child neglect occurs when a parent or guardian fails to perform essential parental duties, assessed against a standard of proper care. This implies a sustained failure to meet a child's needs and would exclude situations in which an otherwise caring parent or guardian makes a mistake.[8] A busy parent who forgets to pack his child's school lunch does not commit child "neglect" by failing to provide "proper food." *Neglect*, Merriam-Webster's Dictionary of Law 324. Likewise, a parent running errands with his children, who

---

[8] Both the plurality and the concurrence disagree that child neglect involves a "sustained failure" to meet a child's needs. They argue first, that the dictionary definitions cited do not "clearly state" such a requirement, Plurality 24 n.6; *see also* Concurrence 12 , and second, that the ordinary meaning of child neglect could encompass one-time acts that cause serious harm, *id.* The concurrence poses a hypothetical involving a babysitter who "observes that a child is running a 105-degree fever and is convulsing," and fails to seek appropriate medical care, arguing that the babysitter would be liable for child neglect. Concurrence 12.

　　We disagree. A parent or custodian may violate a duty of care to a child through a one-time act resulting in serious harm, but that conduct—assuming it results in injury to a child—would constitute child abuse under the definitions discussed in Section IV.A.1. The definitions of child neglect emphasize that parents fall beneath a "proper" or "necessary" standard of care, suggesting a relationship of care persisting beyond a one-time instance of minor neglectful conduct. *See, e.g. Neglect*, Merriam-Webster's Dictionary of Law 324; *Neglected Child*, Black's Sixth Edition 1032.

accidentally and unknowingly leaves his children in a grocery store while "frantically" searching for them in the parking lot, does not fail to provide for his children's "mental and emotional needs." Cal. Defenders Br. at 9–10; *Child Neglect*, Black's Seventh Edition 233.

The concurrence agrees that "child neglect" is unambiguous but argues that the ordinary meaning of child neglect encompasses negligent child endangerment. Viewing the same set of definitions, the concurrence deduces three elements:

> (1) the person had a duty towards a child; (2) the person breached that duty in a manner that constitutes a gross deviation from accepted standards; and (3) the person should have been aware that his or her conduct presented a substantial and unjustifiable risk of serious physical or emotional harm to the child.

Concurrence 9.

The concurrence's first element is consistent with the definitions discussed above. Its second and third elements are not. The concurrence reasons that because § 1227(a)(2)(E)(i) refers to the "crime" of child neglect, the "very concept of criminal neglect clearly indicates that criminal negligence is sufficient." Concurrence 8. However, as the plurality opinion notes, this reasoning is fundamentally flawed. *See* Plurality at 47–49. The concurrence breaks the phrase "child neglect" into its two constituent words and derives a *mens rea* requirement of negligence by analyzing the word "neglect" in isolation. Concurrence 8 ("The operative term, after all, is "neglect" . . .). "The definition of words in isolation, however, is not necessarily

27

controlling in statutory construction." *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006) (holding that "negligent transmission" of postal matter "does not comprehend all negligence occurring in the course of mail delivery"). Here, the statutory phrase "child neglect" was widely defined in contemporaneous dictionaries and used in state criminal codes, which carry more interpretative weight than dictionary definitions of "neglect." *See Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1826–27 (2020) (Kavanaugh, J., dissenting) ("This Court has often emphasized the importance of sticking to the ordinary meaning of a phrase, rather than the meaning of words in the phrase."); *see also FCC v. AT&T Inc.*, 562 U.S. 397, 406 (2011) ("AT&T's argument treats the term 'personal privacy' as simply the sum of its two words: the privacy of a person. . . . But two words together may assume a more particular meaning than those words in isolation."). Those dictionaries and state criminal codes do not support the concurrence's assertion that criminal negligence is sufficient. In fact, the dictionary definitions the concurrence relies on are silent as to the requisite *mens rea*.[9] *Accord* Plurality 24.

---

[9] We note that the surrounding terms in the statute — "domestic violence" and "stalking" — both require intent. *See* 8 U.S.C. § 1227(a)(2)(E)(i) (defining "crime of domestic violence"); *Matter of Sanchez-Lopez*, 27 I. & N. Dec. 256, 258 (BIA 2018) (stalking requires "intent to cause [the victim] or a member of his or her immediate family to be placed in fear of bodily injury or death"). In *Esquivel-*

28

The plurality opinion, by contrast, focuses primarily on refuting Diaz-Rodriguez's argument that the term "child neglect" ordinarily refers to an offense that could be committed only by a parent or guardian rather than divining the ordinary meaning of the term in 1996. Plurality 23–24. The plurality opinion notes that only Webster's II New College Dictionary specifies that a parent or guardian can commit child neglect, defined as a "[f]ailure on the part of a parent or parental substitute to supervise a child and provide requisite care and protection." *Child Neglect*, Webster's II New College Dictionary 194 (1995). Other dictionary definitions, the plurality contends, are less clear. *See Neglect*, Merriam-Webster's Dictionary of Law 324 (not specifying who can commit child neglect); *Child Neglect*, Black's Seventh Edition 199 (same); *Child Neglect*, Ballentine's Legal Dictionary 96 (defining child neglect by cross referencing child abuse which does not specify relationship between abuser and abused); Plurality 22–23.

---

*Quintana*, the Court found the meaning of the surrounding crimes useful in defining sexual abuse of a minor. *See* 137 S. Ct. at 1570 ("[T]he INA lists sexual abuse of a minor in the same subparagraph as "murder" and "rape," § 1101(a)(43)(A)—among the most heinous crimes it defines as aggravated felonies. § 1227(a)(2)(A)(iii). The structure of the INA therefore suggests that sexual abuse of a minor encompasses only especially egregious felonies."). So, given the proximity of "domestic violence" and "stalking" to "child abuse, child neglect, or child abandonment," it would be consistent with *Esquivel-Quintana* to require intent for all three categories of crimes. Regardless, though, nothing in the definitions cited by the concurrence clearly establishes that the *mens rea* for child neglect is negligence.

29

We do not find these definitions ambiguous as to whether a non-parent or guardian can commit child neglect. The types of duties referenced—provision of proper food, water, medical care, emotional support, and shelter—are commonly associated with parents and legal guardians. *Neglect*, Merriam-Webster's Dictionary of Law 324; *Neglected Child*, Black's Sixth Edition 1032; *Child Neglect*, Black's Seventh Edition 233.

But even if the plurality reading is correct, this observation fails to buttress its conclusion that the ordinary meaning of "child neglect" is ambiguous enough to encompass negligent child endangerment offenses such as section 273a(a) of the California Penal Code. *See* Plurality 25 (noting that definitions of child abuse and child neglect "do not point in one direction"). Even if non-parents can be charged with child neglect, the ordinary meaning of that term does not extend to situations where non-parents commit one-time negligent acts or omissions that expose children to risk of harm. Yet, under section 273a(a), a grandfather can be charged for hiding firearms in a home where his grandson happens to be present, even if his grandson had no access to the firearm and was not harmed. Cal. Defenders Br. at 11. Unless the plurality intends at step one of *Chevron* to implicitly accept the BIA's conclusion in *Soram* that "child neglect" is one part of a "unitary concept" denoted by "a crime of child abuse, child neglect, and child abandonment," 25 I. & N. Dec. at 381, ambiguity regarding the parent-or-guardian element of "child

30

neglect" does not support the conclusion that this term encompasses negligent child endangerment.

3.

The ordinary meaning of "child abandonment" in 1996 is similar to that of child neglect. Both terms involve forsaking one's parental duties. Merriam-Webster's Dictionary of Law defines "abandonment" with respect to a child as "failure to communicate with or provide financial support for one's child over a period of time that shows a purpose to forgo parental duties and rights." *Abandonment*, Merriam-Webster's Dictionary of Law 1. Black's Sixth Edition defines abandonment with respect to children as "[d]esertion or willful forsaking" and "[f]oregoing parental duties." *Abandonment*, Black's Sixth Edition 2. The Seventh Edition simplifies this to "[t]he act of leaving a spouse or child willfully and without an intent to return." *Abandonment*, Black's Seventh Edition 2; *see also* Bryan A. Garner, A Dictionary of Modern Legal Usage 3 (2d ed. 1995) (abandon: "in family law, to leave children or a spouse willfully and without an intent to return"). Each definition references intent: child abandonment must be committed with a "purpose" to forgo such duties, *Abandonment*, Merriam-Webster's Dictionary of Law 1, or be done "willfully," *Abandonment*, Black's Seventh Edition 2; *Abandonment*, Black's Sixth Edition 2. While child neglect

31

occurs over a sustained period, child abandonment may be permanent, or committed with the intent to abandon permanently.

We conclude that the ordinary meaning of child abandonment requires not only that the crime be committed by a child's parent or legal guardian, but also involves the intentional forsaking of parental duties, over a long period of time or permanently. Negligent child endangerment offenses do not fit within this ordinary understanding of child abandonment. As such, section 273a(a) is not a categorical match. Neither Diaz-Rodriguez nor the government argues that one-time negligent acts or omissions exposing a child to the risk of harm fall within the ordinary meaning of child abandonment.

The plurality agrees that child abandonment is not a categorical match for section 273a(a) but on a different ground. Plurality 24–25. Intermixing a new dictionary definition, the plurality opinion concludes that child abandonment is not a categorical match for section 273a(a) because child abandonment may be committed only by a parent or legal guardian. *Abandonment of Child*, Ballentine's Legal Dictionary 2 (defining "abandonment of a child" as when "a parent deserts [a child] with the intention of casting off all parental obligations").

We take no issue with the plurality opinion's conclusion on this point but question its methodology. As with child neglect, the plurality opinion does not draw an explicit conclusion regarding the ordinary meaning of child abandonment,

32

merely finding a mismatch between one element of section 273a(a), which can be committed by a non-parent or guardian with "care or custody" of a child. Fair enough, but our inquiry at step one of *Chevron* is not so limited. The question is not whether "child abandonment" can be plausibly read to encompass negligent child endangerment. The question is what "child abandonment" means.

4.

The "reliable dictionaries" consulted by the Court in *Esquivel-Quintana* clarify the ordinary meanings of child abuse, child neglect, and child abandonment, and demonstrate that these distinct definitions do not encompass negligent child endangerment as criminalized under California law. 137 S. Ct. at 1569. Some overlap between the elements of such offenses exists. For example, injury to the child is required for all three offenses; a parental or guardianship relationship between the abuser and the child is required for child neglect and child abandonment. The dictionary definitions of such offenses are occasionally cross-referenced. *See Child Neglect*, Merriam-Webster's Dictionary of Law 324 (cross-referencing "child neglect" with the definition of abuse); *Child Abuse*, Black's Sixth Edition 239 (cross referencing "child abuse" with "[a]bused and neglected children"). But the ordinary meaning of each term is distinct, cutting against the inference that Congress intended to treat these terms as a "unitary concept." *Soram*, 25 I. & N. Dec. at 381; *accord* Concurrence 6 n.2

33

Notably, instead of adopting language that would embrace each of these offenses as one concept—"crimes against children" or, as the plurality opinion might suggest, "crimes against children that require only a mens rea of criminal negligence, do not require injury to the victim, and do not require the perpetrator to be a parent or legal guardian, but could include persons temporarily responsible for a child," Plurality 19–20, —Congress chose to separately identify each criminal offense. The canon of "*expressio unius est exclusio alterius* as applied to statutory interpretation creates a presumption that when a statute designates certain persons, things, or manners of operation, all omissions should be understood as exclusions." *See Silvers v. Sony Pictures Ent., Inc.*, 402 F.3d 881, 885 (9th Cir. 2005) (en banc) (internal quotation marks and citation omitted). This canon applies only where items in the list are "members of an 'associated group or series,' justifying the inference that items not mentioned were excluded by deliberate choice, not inadvertence," *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003) (quoting *United States v. Vonn*, 535 U.S. 55, 65 (2002)), and "can be overcome by 'contrary indications that adopting a particular rule or statute was probably not meant to signal any exclusion,'" *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 381 (2013) (quoting *Vonn*, 535 U.S. at 65).

Child abuse, child neglect, and child abandonment are members of an associated group of crimes against children. Even assuming the dictionary

34

definitions of child abuse and child neglect somewhat overlap, child endangerment was recognized as an independent offense in dictionaries bookending IIRIRA's enactment. *Endangerment*, Merriam-Webster's Dictionary of Law 160 (defining endangerment as "the crime or tort of exposing others to possible harm or danger"); *Child Endangerment*, Black's Seventh Edition 233 (defining "child endangerment" as "the placing of a child in a place or position that exposes him or her to danger to life or health"); *see also Child Endangerment*, Black's Law Dictionary (11th ed. 2019) (stating that earliest usage of the term "child endangerment" was in 1981, defined as "the placing of a child in a place or position that exposes him or her to danger to life or health"). The fact that Congress enumerated three related crimes against children and failed to enumerate a fourth independently defined crime justifies the inference that this omission was the product of deliberate choice, not mere inadvertence. There is no contrary textual indication that Congress did not intend to "signal any exclusion." For example, 8 U.S.C. § 1227(a)(2)(E)(i) does not cover "crimes against children, which may include" the "crime of child abuse, child neglect, and child abandonment." *See Chevron U.S.A., Inc. v. Echazabal*, 536 U.S. 73, 80 (2002) (declining to apply *expressio unius* canon where Congress used the "expansive phrasing of 'may include' [which] points directly away from the sort of exclusive specification" justifying application of the canon). We find that Congress meant

what it said when it rendered noncitizens convicted of the three enumerated crimes removable.

## B.

The structure of the INA provides further evidence that Congress's omission of child endangerment from the list of crimes against children in § 1227(a)(2)(E)(i) was the product of deliberate choice, not mere inadvertence.

## 1.

As part of IIRIRA, Congress created a discretionary form of relief intended to ameliorate the harshness of removal for noncitizen children and their families: cancellation of removal.[10]  Noncitizens who are not lawful permanent residents may seek cancellation of removal if they can show, among other things, that their removal would result in "exceptional and extremely unusual hardship" to their child, provided the child is a United States citizen or lawful permanent resident. 8 U.S.C. § 1229b(b)(1)(D).  However, a conviction for "a crime of child abuse, child neglect, or child abandonment" under 8 U.S.C. § 1227(a)(2)(E)(i) not only renders a noncitizen removable but also makes the noncitizen statutorily ineligible for this

---

[10] Cancellation of removal for legal permanent residents and non-citizens without such status replaced a different form of discretionary relief—suspension of deportation.  Suspension was added to the INA in 1952 and was available to a broader class of noncitizens.  *See* An Act to Revise the Laws Relating to Immigration, Naturalization, and Nationality; and For Other Purposes, title II, ch. 5, § 244, 82 Cong. Ch. 477, 66 Stat. 163, 214 (1952).

discretionary form of relief. *Id.* § 1229b(b)(1)(C). Under the BIA's reading of § 1227(a)(2)(E)(i) in *Soram*, a noncitizen convicted of a single instance of negligent child endangerment is categorically ineligible for cancellation of removal, even if the noncitizen can show that this would "cause 'exceptional and extremely unusual hardship' to that same child." *Matthews v. Barr*, 927 F.3d 606, 625 (2d Cir. 2019) (Carney, J., dissenting); *see also Diaz-Rodriguez*, 12 F.4th at 1134. The BIA's interpretation absurdly undermines Congress's purpose for creating cancellation as a form of relief.[11]

---

[11] The concurrence argues that "[t]here is nothing inconsistent, much less absurd, in saying that a [noncitizen] who is slated for removal for having engaged in criminal child neglect should not then be allowed to invoke his or her deficient caregiving responsibilities towards that very child as a shield against deportation." Concurrence 16. The concurrence appears to misunderstand the interaction of sections 1227(a)(2)(E)(i) and 1229b(b)(1)(D).

A noncitizen without lawful permanent resident status does not invoke "his or her deficient caregiving responsibility as a shield against deportation" when seeking cancellation of removal. Concurrence 16. Such noncitizens establish eligibility for relief from removal by demonstrating that their removal will result in "extreme and exceptional hardship" to their "spouse, parent, or child." 8 U.S.C. § 1229b(b)(1)(D). But even if such parents can make that showing, they are, under *Soram*, categorically ineligible for cancellation if convicted of section 273a(a) of the California Penal Code for a minor parenting infraction. 8 U.S.C. § 1229b(b)(1)(C).

The absurdity of this result is apparent in view of the otherwise consistent purposes of California's child endangerment statute and § 1229b(b)(1)(D). Both statutes are intended to protect children—the former in penalizing criminally negligent parents, the latter in preventing removal of qualifying noncitizens that would result in "extreme and exceptional hardship" to that child. But under the BIA's interpretation, an otherwise caring parent who makes a mistake will be unable to seek cancellation, even if he or she shows that removal will result in "extreme and exceptional hardship" to their child. "Paradoxically, it is children

37

The plurality falls back on its misleading characterization of the meaning of criminal negligence to argue that the BIA's reading of 8 U.S.C. § 1227(a)(2)(E)(i) to include child endangerment would not be at odds with the otherwise child-protective aim of § 1229b(b)(1)(C). Plurality 27–28. We, and amici, provide numerous examples of people arrested or prosecuted under section 273a(a) of the California Penal Code for parenting mistakes. Cal. Defenders Br. at 8-10. Each of these arrests or prosecutions could ripen into a conviction or guilty plea and expose noncitizen parents to immigration consequences on the basis of minor infractions, subverting Congress's statutory design. *See Ibarra v. Holder*, 736 F.3d 903, 905 & n.3 (10th Cir. 2013) (finding a noncitizen without legal permanent resident status ineligible for cancellation of removal because she left her children at home while at work).

But even if section 273a(a) may criminalize innocuous parenting mistakes and render parents ineligible for cancellation of removal, the plurality reminds us that "'providing relief to aliens with strong ties to the United States" and "'promoting family unity' 'are not the INA's only goals, and Congress did not pursue them to the *n* th degree.'" Plurality 28 (citing *Holder v. Martinez Gutierrez*, 566 U.S. 583, 594 (2012)). Analogizing to a Supreme Court case analyzing

---

who will suffer harm under the agency's interpretation of [section 273a(a)]—a law intended for their protection." *Matthews*, 927 F.3d at 636 (Carney, J., dissenting).

38

cancellation of removal for legal permanent residents, the plurality concludes that the INA can promote both family unity and interior enforcement even if those values may occasionally be at odds. *See* 8 U.S.C. § 1229b(a)(3); Plurality 28–29.

However, the plurality misses a key difference between cancellation of removal for legal permanent residents and noncitizens lacking such status. These are two distinct forms of relief under the INA. Cancellation of removal for legal permanent residents may incidentally promote family unity by allowing long-term legal permanent residents to remain with their family members, provided such noncitizens have lived in the United States continuously for at least seven years, remained in legal permanent resident status for five years, and have not committed an aggravated felony. *See* 8 U.S.C. § 1229b(a)(1)–(3). Cancellation of removal for non-legal permanent residents requires an explicit showing that removal would endanger family unity and sets a significantly higher eligibility threshold. Noncitizens who are not legal permanent residents who seek cancellation must have lived in the United States continuously for at least ten years, show that they have been a person of good moral character, not be convicted of certain offenses including aggravated felonies, and demonstrate that removal would result in "exceptional and extremely unusual hardship" to their United States citizen or legal permanent resident family members. 8 U.S.C. § 1229b(b)(1)(A)–(D).

The exceptional hardship requirement strongly suggests that Congress designed cancellation for noncitizens who lack legal permanent resident status as a form of relief intended to preserve family unity. The BIA's reading of § 1227(a)(2)(E)(i) in *Soram* runs directly counter to this statutory design, authorizing summary removals that will cause "exceptional and extremely unusual hardship" based on parenting mistakes.

2.

The plurality's efforts to find helpful meaning in the structure of the INA is fruitless. Plurality 26. Following its cursory assessment of surrounding provisions of the INA, the plurality looks to other civil statutes enacted around the time of IIRIRA to discern the phrase's meaning, finding a handful of statutes and civil code provisions generally related to conduct of court proceedings involving victims of such crimes, *see generally* 42 U.S.C. § 3796aa-8(2) (1996) (federal grants for televising of testimony of child abuse victims); 18 U.S.C. § 3509(a)(3) (1996) (defining rights of victims in court proceedings), and provision of federal resources to improve prosecution and research of crimes against children, 42 U.S.C. § 5106g(4) (defining "child abuse and neglect" in the context of the Child Abuse Prevention and Treatment Act). Plurality 30–34. None of these civil provisions supports the plurality's ultimate determination that the phrase "a crime

of child abuse, child neglect, or child abandonment" in 8 U.S.C. § 1227(a)(2)(E)(i) is ambiguous. Plurality 44.

The plurality opinion homes in on the National Child Protection Act of 1993 (NCPA), a statute enacted "to establish procedures for national criminal background checks for child care providers." 42 U.S.C. § 5119a (1996); Plurality 30 ("The most relevant evidence comes from the National Child Protection Act of 1993.") (citation omitted). The NCPA defines "child abuse crime" as "a crime committed under any law of a State that involves the physical or mental injury, sexual abuse or exploitation, negligent treatment, or maltreatment of a child by any person." *Id.* § 5119c(3) (1996). This expansive definition of child abuse, the plurality concludes, is a "reliable indicator of how Congress would have understood the materially identical terminology ('crime of child abuse') in the INA." Plurality 32.

"Child abuse" as defined in NCPA encompasses a bevy of crimes against children—"any" state criminal law targeting "maltreatment" of "a child by any person." *Id.* This definition certainly encompasses the crimes of child neglect and abandonment. If we take the plurality opinion at its word, we must conclude that Congress intentionally rendered two of three crimes it listed in § 1227(a)(2)(E)(i) superfluous. "[W]e must normally seek to construe Congress's work 'so that effect is given to all provisions, so that no part will be inoperative or superfluous, void or

41

insignificant.'" *Ysleta Del Sur Pueblo v. Texas*, 142 S. Ct. 1929, 1939 (2022) (quoting *Corley v. United States*, 556 U.S. 303, 314 (2009)). This canon has limited force where any interpretation of a statute will create redundancy. *See Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 106 (2011). But where a "competing interpretation gives effect to every clause and word of a statute," the canon controls. *Id.* (internal quotation marks omitted). Our review of contemporaneous dictionaries allows us to easily distinguish between the ordinary meanings of these three separate crimes. Therefore, the plurality opinion's reference to an inapposite civil statute—concerning maintenance of a national criminal history background check system—is of little interpretive value here. 42 U.S.C. §§ 5119(a), 5119c(3) (1996); Plurality 30–31. Indeed, it cuts the other way because it demonstrates that Congress in 1996 knew how to draft expansive language to broadly encompass maltreatment of children, and chose not to do so in IIRIRA.

These civil definitions do not illuminate how Congress intended to punish individuals convicted of such offenses, including through removal—a sanction "intimately related to the criminal process." *Padilla v. Kentucky*, 559 U.S. 356, 365 (2010).[12] The use of civil statutes to define criminal offenses was implicitly

---

[12] The concurrence's analysis suffers from the same flaws as the plurality's—it references a definition that swallows up all three crimes listed in § 1227(a)(2)(E)(i), and it relies on a civil statute to define criminal elements

rejected by the Supreme Court in *Esquivel-Quintana.* In the Sixth Circuit,

the panel relied on a civil statute to interpret "sexual abuse of a minor." *See*

*Esquivel-Quintana v. Lynch*, 810 F.3d 1019, 1025 (6th Cir. 2016) (discussing

18 U.S.C. § 3509). But reviewing the Sixth Circuit's decision, the Supreme Court

declined to use that statute in its analysis, relying instead only on laws that

criminalize conduct. *See Esquivel-Quintana*, 137 S. Ct. at 1570-71 (discussing 18

U.S.C. § 2243). The plurality offers no support for its unprecedented use of civil

statutes to define the quasi-criminal statute at issue here. Given the manifestly

high stakes of removal proceedings, it is wrong to assume civil statutes can

illuminate congressional intent in describing criminal convictions.

The plurality opinion replicates the BIA's freewheeling analysis from

*Velasquez-Herrera II* to *Soram*, consulting a similar set of contemporaneous civil

statutes to illuminate the federal generic definition of a crime. *Velazquez-Herrera*

*II*, 24 I. & N. Dec. at 510 nn.5-6; *see also Soram*, 25 I. & N. Dec. at 382 n.3. But

looking to federal civil statutes unreasonably widens the net of crimes against

children that may expose a noncitizen to removability under 8 U.S.C.

§ 1227(a)(2)(E)(i). There are many reasons that civil statutes may broadly define

crimes against children: to ensure that federal protections extend to victims in

---

without citing any support for doing so, *see* Plurality 49 ("[T]he definition of a
purely civil offense is merely suggestive of the elements of a criminal offense").

43

court proceedings regardless of the severity of an offense, 18 U.S.C. § 3509(a)(3), or to improve public understanding of how the states define such offenses, given the variety of approaches states have taken, 42 U.S.C. § 5106g(4).

C.

In *Esquivel-Quintana*, the Supreme Court acknowledged that a multi-state survey of state criminal codes as they stood at the time Congress enacted the statute in question "helps shed light on the common understanding and meaning of the federal provision being interpreted."  138 S. Ct. at 1571 n.3 (internal quotation marks omitted).

The Court relied in part on its determination that "the general consensus from state criminal codes points to the same generic definition as dictionaries and federal law" to determine that the federal generic offense of "sexual abuse of a minor" in the INA included as an element that the victim was under sixteen years old.  *Id.* at 1572.

Relying on the original panel majority's survey of criminal codes including negligent child endangerment offenses irrespective of the label used, we conclude that the phrase "a crime of child abuse, child neglect, or child abandonment" does not encompass negligent child endangerment offenses.  In 1996, only fourteen states criminalized child endangerment committed with a *mens rea* of criminal negligence—the least of the acts criminalized under section 273a(a) of the

44

California Penal Code. Appendix A. The other 36 states did not criminalize such conduct. Appendix B. Of these 36 states, 23, along with the District of Columbia, criminalized child endangerment committed with a *mens rea* of at least recklessness. Appendix C. The remaining 13 states did not criminalize child endangerment at all.

In *Esquivel-Quintana*, the Supreme Court found that the consensus view of 31 states and the District of Columbia was sufficient to demonstrate that Congress unambiguously foreclosed the BIA's attempt to define the generic offense of sexual abuse of a minor to include an age of consent of 18, given that a majority of states maintained that sexual abuse of a minor must involve a victim younger than 18. *Id.* at 1571–72. Here, a consensus view of 36 states, including the District of Columbia, at the time of IIRIRA's enactment supports the view that "a crime of child abuse, child neglect or child abandonment" does not include the crime of negligent child endangerment, given that a majority of states did not criminalize this behavior.

The plurality conducts its own survey and arrives at a different number (15) and list of states that criminalized negligent child endangerment.[13] Plurality 40.

---

[13] The original panel majority found that Alabama, Arizona, California, Colorado, Missouri, Nebraska, New Mexico, New York, Oregon, South Carolina, South Dakota, Texas, Virginia, and Wyoming criminalized negligent child endangerment. By contrast, the plurality found that Arizona, California, Colorado,

45

Faced with the realization that a small minority of jurisdictions criminalized negligent child endangerment in 1996, the plurality pivots and obfuscates— arguing that its multijurisdictional analysis merely illustrates the "wide variety of approaches [states took] to labeling, categorizing, and defining crimes against children." Plurality 38. This in turn, the plurality claims, supports the inference that "'Congress purposefully employed the overlapping concepts of child abuse, neglect, and abandonment [in § 1227(a)(2)(E)(i)] to denote a broad array of crimes,' and to 'assure coverage of such crimes, however denominated by the States.'" Plurality 41 (quoting *Martinez-Cedillo*, 896 F.3d at 990); *see also* Concurrence 15.[14] The plurality also speculates that because negligent child endangerment was criminalized "in the most populous regions of our nation," "Congress could have understood 'crimes of child abuse, child neglect, and child abandonment' in § 1227(a)(2)(E)(i) to include such offenses." Plurality 41–42; *id.* 41 (noting that this is "a factor indicating that there was a common understanding

Connecticut, Florida, Kansas, Missouri, Nebraska, Nevada, New Mexico, New York, Oregon, Texas, Utah, and Virginia criminalized the same offense.

[14] The concurrence draws a similar conclusion, noting that the "various state approaches are too disparate to support any inference that, in deploying the phrase 'crime of . . . child neglect,' Congress intended to adopt any particular variant of these approaches." That said, the concurrence declines to conduct an independent multijurisdictional analysis, reiterating the Supreme Court's reminder that "such a multi-state survey 'is not required by the categorical approach.' *Esquivel-Quintana*, 137 S. Ct. at 1571 n.3." Concurrence 15.

that such elements [of section 273a(a) of the California Penal Code] could be included as part of crimes against children.").

We agree that states took a variety of approaches in defining crimes against children at the time of IIRIRA's enactment. Both our and the plurality's analysis of jurisdictions criminalizing negligent child endangerment reference statutes labeled abuse[15], neglect,[16] and abandonment.[17] We also agree that the definitions of child abuse, child neglect, and child abandonment admit some overlap and ambiguity as to the elements of each offense. *See supra* Section I.A.3. But the plurality's inference—that Congress could have intended "crimes of child abuse, child neglect, and child abandonment" in § 1227(a)(2)(E)(i) to encompass negligent child endangerment—does not follow from these observations. Even assuming Congress employed the phrase "a crime of child abuse, child neglect, and child abandonment" to denote a "broad array of crimes," our multijurisdictional analysis shows this array *excluded* negligent endangerment in the large majority of jurisdictions. Plurality 41.

---

[15] *See* Ariz Rev. State. Ann. § 13-3623(B) ("Child or vulnerable adult abuse; emotional abuse"); Colo. Rev. Stat. § 18-6-401(1) ("Child abuse"); Neb. Rev. Stat. Ann. § 28-7071(1) ("Child abuse"); Va. Code Ann. §

[16] *See* Or. Rev. Stat. § 163.545 ("Child neglect in the second degree").

[17] *See* N.M. Stat. § 30-6-1(C) ("Abandonment or abuse of a child"); Tex. Penal Code Ann. § 22.041(c) ("Abandoning or Endangering Child").

47

The inference we draw follows from the Supreme Court's teaching in *Esquivel-Quintana*. The Supreme Court acknowledged that states criminalizing sexual abuse of a minor used different labels and included different elements— observing that only two states "had offenses labeled 'sexual abuse of a minor' in 1996," and that "[m]any jurisdictions set a different age of consent for offenses that include an element apart from the age of participants, such as offenses that focus on whether the perpetrator is in some special relationship of trust with the victim." 137 S. Ct. at 1572; *see also* Plurality 40.

The Supreme Court did not, at that juncture, throw up its hands and declare that "sexual abuse of a minor" had no settled meaning at the time of IIRIRA's enactment. *Cf.* Plurality 53 ("[T]here was no discrete, well-understood offense of 'child endangerment,' just as there were no discrete offenses of 'child abuse, child neglect, and child abandonment,' in 1996[.]"); *id.* 51–53. Nor did it suggest that the states' varying approaches revealed that Congress could have intended for "sexual abuse of a minor" in §1227(a)(2)(A)(iii) to encompass conduct criminalized in a small minority of jurisdictions—for example, to require an element that the victim be younger than 18, as was true in 10 states—based on the percentage of the population that happened to reside in such states. *Esquivel-Quintana*, 137 S. Ct. at 1571; *cf.* Plurality 40–41. Instead, the Court determined that the "generic federal definition of 'sexual abuse of a minor'" accorded with the

48

approach taken by a majority of states, "requir[ing] the age of the victim to be less than 16." *Esquivel-Quintana*, 137 S. Ct. at 1572.[18]

We apply the Supreme Court's logic to the results of our multijurisdictional analysis. The generic federal definition of a "crime of child abuse, child neglect, or child abandonment" accords with the approach taken by a majority of states, which used a variety of different approaches to criminalize crimes against children and did not, irrespective of the label used, criminalize negligent child endangerment.

D.

---

[18] The plurality argues that "*Esquivel-Quintana* provides no support for this conclusion" because the Supreme Court allegedly drew its inference based on the "express adoption of this age of consent in the statutes of a significant majority of states[.]" Plurality 43. The plurality's narrow reading of *Esquivel-Quintana* is unsupported by the plain text of that opinion and absurd in any event. First, the plurality shoehorns in an "express adoption" requirement neither implicitly nor explicitly endorsed by the Court in *Esquivel-Quintana*—which refers only to the "general consensus" drawn from state criminal codes, 137 S. Ct. at 1572. Second, the plurality's suggestion that state legislatures must affirmatively adopt language *excluding* criminal elements or offenses in order for a court to draw any inference from such exclusion beggars belief. Plurality 43. Taking the plurality at its word: had the Supreme Court in *Esquivel-Quintana* found that the large majority of states omitted the age of consent as an element of sexual abuse of a minor—the Court would be forced to bury its head in the sand, treating this omission as incidental unless states "expressly" stated that age of consent was not an element. Faced with clear evidence that a large majority of jurisdictions did not criminalize negligent child endangerment under any label, we decline the plurality's invitation to put on interpretive blinders.

49

We conclude that the text of 8 U.S.C. § 1227(a)(2)(E)(i) unambiguously forecloses the BIA's interpretation of "a crime of child abuse, child neglect, or child endangerment" as encompassing negligent child endangerment offenses such as section 273a(a) of the California Penal Code. Section 1227(a)(2)(E)(i) may be ambiguous on some counts, including as to other crimes against children that may fall within the definitions of the three enumerated offenses. *See Diaz-Rodriguez*, 12 F.4th at 1136 ("We agree with the Tenth Circuit's observation that 'while the text at issue here does contain *some* ambiguity, Congress's intent is not so opaque as to grant the BIA the sweeping interpretive license it has taken.'" (quoting *Ibarra*, 736 F.3d at 910)). But the distinct, ordinary meanings of "child abuse," "child neglect," and "child abandonment" at the time of IIRIRA's passage did not encompass negligent child endangerment. Even if the language is ambiguous on some counts, this ambiguity does not evince Congress's intent to empower the BIA to render removable noncitizens convicted of child endangerment. We recognize that, in reaching this conclusion, we diverge from other circuits that have considered this question and determined at step one of *Chevron* that the statute is ambiguous. *See Bastias v. U.S. Att'y Gen.*, 42 F.4th 1266, 1268 (11th Cir. 2022); *Garcia v. Barr*, 969 F.3d 129, 133 (5th Cir. 2020); *Mondragon-Gonzalez v. Att'y Gen.*, 884 F.3d 155, 158–59 (3d Cir. 2018); *Florez v. Holder*, 779 F.3d 207, 209, 211 (2d Cir. 2015); *Matthews*, 927 F.3d at 613*; but see Ibarra*, 736 F.3d at 910; *cf.*

50

*Zarate-Alvarez v. Garland*, 994 F.3d 1158, 1161-62 (10th Cir. 2021) (finding statute ambiguous and upholding BIA interpretation of statute as applied to child endangerment committed with knowing and reckless *mens rea*).

Respectfully, none of our sister circuits has applied the rigorous methodology dictated by the Supreme Court in *Esquivel-Quintana*. Courts have found section 1227(a)(2)(E)(i) ambiguous without conducting a thorough statutory analysis. *See Bastias*, 42 F.4th at 1272 (deferring to *Pierre v. U.S. Att'y General*, 879 F.3d 1241, 1249 (11th Cir. 2018)); *Pierre*, 879 F.3d at 1249 (stating that the "INA does not define 'child abuse'" and concluding that the "statute is silent on the issue"); *Mondragon-Gonzalez*, 884 F.3d at 159 (same). Courts have also remarked that other circuits have found the language ambiguous and reflexively adopted the consensus view, moving on to step two. *Garcia*, 969 F.3d at 132; *Florez*, 779 F.3d at 211. Even the original panel majority in *Martinez-Cedillo* held that 8 U.S.C. § 1227(a)(2)(E)(i) was ambiguous after two scant paragraphs, citing to no dictionaries, no related sections of the INA, no criminal or civil statutes, and no state laws aside from section 273a(a) of the California Penal Code.[19] *Martinez-*

---

[19] The *Martinez-Cedillo* panel majority's full analysis at step one of *Chevron* reads as follows:

> Section 1227(a)(2)(E)(i) states that "[a]ny alien who at any time after admission is convicted of a crime of domestic violence, a crime of stalking, or a crime of child abuse, child neglect, or child abandonment is deportable." Unlike the term "crime of domestic violence," no part of the phrase "a crime of child abuse, child neglect, or child

51

*Cedillo*, 896 F.3d at 987.  This "cursory analysis" of § 1227(a)(2)(E)(i) is unpersuasive and suggests "an abdication of the Judiciary's proper role in interpreting federal statutes." *Pereira,* 138 S. Ct at 2120 (Kennedy, J., concurring).

Our analysis, by contrast, is responsive to the Supreme Court's admonition that reviewing courts must ensure that our "legal toolkit is empty and the interpretive question still has no single right answer" before deferring to an agency's construction. *Kisor*, 139 S. Ct. at 2415.  Having found no genuine ambiguity in 8 U.S.C. § 1227(a)(2)(E)(i) evincing Congress's intent to grant the BIA interpretive license, we conclude that the statute forecloses the agency's reading.

## E.

In light of our conclusion that the statute is unambiguous at step one, "[w]e have no need to resolve whether the rule of lenity or *Chevron* receives priority in

---

abandonment" is defined in the INA. There are no federal crimes of child abuse, neglect, or abandonment to provide analogous definitions, and unlike certain common-law crimes like burglary or assault, there are no widely accepted definitions of child abuse, neglect, or abandonment.

Section 1227(a)(2)(E)(i)'s language is broad and susceptible to multiple interpretations. Every circuit court to have considered it has noted its ambiguity. *See Florez*, 779 F.3d at 211 ("[W]e have little trouble concluding that the statutory provision is ambiguous."); *Ibarra*, 736 F.3d at 910 (rejecting the BIA's interpretation but only after acknowledging that "the statutory language is ambiguous"). We agree and therefore pass to step two.

896 F.3d at 987.

this case because the statute, read in context, unambiguously forecloses the Board's interpretation.  Therefore, neither the rule of lenity nor *Chevron* applies." *Esquivel-Quintana*, 137 S. Ct. at 1572.  The plurality finds ambiguity, and then concludes that the BIA's interpretation is reasonable.  I disagree.[20]

The plurality sidesteps any substantive discussion of the immigration rule of lenity, "the longstanding principle of construing any lingering ambiguities in deportation statutes in favor of the [noncitizen]." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 449 (1987); *Fong Haw Tan v. Phelan,* 333 U.S. 6, 10 (1948) ("[S]ince the stakes are considerable for the individual, we will not assume that Congress

---

[20] The BIA's shifting definition remains "so imprecise, it violates 'essential' tenets of due process, most specifically, 'the prohibition of vagueness in criminal statutes.'" *Martinez-Cedillo*, 896 F.3d at 999 (Wardlaw, J., dissenting) (quoting *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018)).  In *Velasquez-Herrera II* and *Soram*, the BIA failed to define the elements of a specific crime—the "crime of child abuse, child neglect, or child abandonment." *Id.* at 999-1000.  The BIA's attempt to define the *mens rea* for this crime is sweeping, including any "intentional, knowing, reckless, or criminally negligent" *mens rea*.  *Soram*, 25 I. & N. Dec at 380.  The agency's attempt to define the *actus reus* is similarly vague.  While the BIA recently clarified the state-by-state risk analysis IJs conduct to determine if a child endangerment offense falls under § 1227(a)(2)(E)(i), *see Rivera-Mendoza*, 28 I. & N. Dec. at 187, the BIA's *actus reus* test extends to "conduct that does not result in *any* injury to the child . . . , combining multiple crimes and including terms covered elsewhere in the immigration codes." *Martinez-Cedillo*, 896 F.3d at 999.  Further, the BIA has repeatedly, without explanation, changed this generic definition.  This fact, coupled with the vagueness of the BIA's current interpretation, "underscores the irrationality of its current position." *Martinez-Cedillo*, 896 F.3d at 1000-01; *see Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 220 (2016); *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009).

meant to trench on his freedom beyond that which is required by the narrowest of several possible meanings of the words used."). The plurality opinion, via footnote, dismisses this longstanding principle on procedural grounds. Plurality 54 n.29 (deeming argument forfeited by Diaz-Rodriguez). Regardless of whether Diaz-Rodriguez surfaced this claim in briefing to us or in the proceedings below, the Supreme Court recognized an open question regarding the immigration rule of lenity, and its priority relative to deference at step two, as part of the analysis required under *Chevron*. *Esquivel-Quintana*, 137 S. Ct. at 1572.

The plurality opinion assumes that because the Supreme Court has yet to apply the immigration rule of lenity and *Chevron* in the same case, it cannot do so. But the fact that there is an open question about how to harmonize the two venerable principles of statutory construction is not a reason to ignore binding precedent on the immigration rule of lenity. *Cf. I.N.S. v. St. Cyr*, 533 U.S. 289, 320 (2001) (applying presumption against retroactivity alongside immigration rule of lenity). There is no doubt that applying the rule in this context would require the plurality to arrive at a conclusion more favorable to petitioner than it does. The plurality provides no persuasive justification for its refusal to apply the "long standing" immigration rule of lenity at *Chevron* step two.

V.

The plurality opinion picks at dictionary definitions, disregards statutory structure, and obfuscates the results of its multijurisdictional survey, all to prop up the BIA's impermissible approach to determining the generic definition of a "crime of child abuse, child neglect, or child abandonment." 8 U.S.C. § 1227(a)(2)(E)(i). Throughout its analysis, the plurality opinion implicitly adopts the BIA's interpretation of the statute, answers the wrong question, and ultimately fails to show that Congress intended to leave an interpretive gap in the statute for the BIA to fill.

Missing in the plurality opinion's anodyne analysis is recognition of a troubling fact: under the BIA's overbroad interpretation of 8 U.S.C. § 1227(a)(2)(E)(i), individuals who for reasons of poverty, cultural difference, work schedules, or bad luck make parenting mistakes may be permanently separated from their families. This harm is not theoretical. In the decade since the BIA decided *Soram*, the agency has extended § 1227(a)(2)(E)(i) to child endangerment statutes in Colorado, New York, and Oregon. Br. of Am. Immigr. Lawyers' Ass'n & Immigr. Def. Proj. 4. Public defenders in California attest to the vast array of conduct criminalized under section 273a(a) of the California Penal Code. Cal. Defenders Br. at 9-10. By blessing the BIA's patchwork analysis, the plurality opinion invites the agency to expand its regulatory domain to new vistas, ceding vast power to an agency which has "no special expertise by virtue of its

55

statutory responsibilities in construing state or federal criminal statutes."

*Marmolejo-Campos v. Holder*, 558 F.3d 903, 907 (9th Cir. 2009) (en banc).

Our responsibility as a reviewing court is to ensure that regulated parties—here, noncitizen families—know what conduct will trigger the "civil death penalty" of removal. *Martinez-Cedillo*, 896 F.3d at 989. The BIA's vague, sweeping interpretation of 8 U.S.C. § 1227(a)(2)(E)(i), countenanced by the plurality, provides no guide. We should grant Diaz-Rodriguez's petition and hold that Congress unambiguously foreclosed the BIA's incorrect interpretation of the crimes of child abuse, child neglect, and child abandonment.

## APPENDIX A

In 1996, the following 14 States criminalized child endangerment committed with a *mens rea* of negligence:

**Alabama**

Ala. Code §§ 12-15-1(10)(f), 13A-13-6(a)(2); *see Pearson v. State,* 601 So.2d 1119, 1126 (Ala. Crim. App. 1992)

**Arizona**

Ariz. Rev. Stat. Ann. § 13-3623(B)(3), (C)(3)

**California**

Cal. Penal Code § 273a; *see People v. Valdez*, 42 P.3d 511, 517–18 (Cal. 2002)

**Colorado**

Colo. Rev. Stat. § 18-6-401(1), (7)(b)(II)

**Missouri**

Mo. Rev. Stat. § 568.050(1)

**Nebraska**

Neb. Rev. Stat. § 28-707(1)(a)

**New Mexico**

N.M. Stat. Ann. § 30-6-1(C)(1)

**New York**

N.Y. Penal Law § 260.10(2); N.Y. Fam. Ct. Act § 1012(e), (f); *see People v. Scully*, 513 N.Y.S.2d 625, 627 (Crim. Ct. 1987)

**Oregon**

Or. Rev. Stat. § 163.545(1)

**South Carolina**

S.C. Code Ann. § 20-7-50(A)(1); *see State v. Fowler*, 470 S.E.2d 393, 396 (S.C. Ct. App. 1996)

**South Dakota**

S.D. Codified Laws §§ 26-8A-2(6), 26-9-1

**Texas**

Tex. Penal Code Ann. § 22.041(c)

**Virginia**

Va. Code Ann. §§ 16.1-228(1), 18.2-371; *see Miller v. Commonwealth*, 769 S.E.2d 706, 713–14 (Va. Ct. App. 2015)

**Wyoming**

Wyo. Stat. Ann. § 6-4-403(a)(ii)

## APPENDIX B

In 1996, the following 23 States and the District of Columbia criminalized child endangerment if committed with a *mens rea* of at least recklessness:

**Arkansas**

Ark. Code Ann. § 5-27-204(a)

**Connecticut**

Conn. Gen. Stat. § 53-21(1); *see State v. Dennis*, 150 Conn. 245, 188 A.2d 65, 66–67 (Conn. 1963)

**Delaware**

Del. Code Ann. tit. 11, § 1102(a)

**District of Columbia**

D.C. Code § 22-1101(b)

**Hawaii**

Haw. Rev. Stat. § 709-904(2)

**Idaho**

Idaho Code § 18-1501(1)–(2); *see State v. Young*, 64 P.3d 296, 299 (Idaho 2002)

**Illinois**

720 Ill. Comp. Stat. 5/12-21.6; *see People v. Jordan*, 843 N.E.2d 870, 879 (Ill. 2006)

**Indiana**

Ind. Code § 35-46-1-4(a)(1)

**Iowa**

Iowa Code § 726.6(1)(a)

**Kansas**

Kan. Stat. Ann. § 21-3608(a)

**Kentucky**

Ky. Rev. Stat. Ann. §§ 530.060(1), 600.020(1)

**Maine**

Me. Stat. tit. 17-A, § 554(1)(C)

**Minnesota**

Minn. Stat. § 609.378(b)(1)

**Montana**

Mont. Code Ann. § 45-5-622(1)

**New Hampshire**

N.H. Rev. Stat. Ann. § 639:3(I)

**North Carolina**

N.C. Gen. Stat. § 14-318.2(a); *see State v. Hunter*, 270 S.E.2d 120, 122

(N.C. Ct. App. 1980)

**Ohio**

Ohio Rev. Code Ann. § 2919.22(A); *see State v. Barton*, 594 N.E.2d 702, 707 n.1 (Ohio Ct. App. 1991)

**Oklahoma**

Okla. Stat. tit. 10, §§ 7102(B)(1), 7115; *see Ball v. State*, 173 P.3d 81, 92 (Okla. Crim. App. 2007)

**Pennsylvania**

18 Pa. Cons. Stat. § 4304(a)

**Tennessee**

Tenn. Code Ann. §§ 37-1-102(b)(1), (b)(12)(G); 37-1-157(a); *see Konvalinka v. Chattanooga-Hamilton County Hospital Authority*, 249 S.W.3d 346, 357 (Tenn. 2008)

**Vermont**

Vt. Stat. Ann. tit. 13, § 1304; *see State v. Amsden*, 75 A.3d 612, 624 (Vt. 2013)

**Washington**

Wash. Rev. Code § 9A.42.030(1)

**West Virginia**

W. Va. Code §§ 61-8D-1(6), 61-8D-4(e); *see* 2014 W. Va. Acts 451

**Wisconsin**

Wis. Stat. §§ 948.03(4), 948.04(2)

# APPENDIX C

In 1996, the following 13 States did not criminalize child endangerment at all. The cited statutory provisions refer to the jurisdiction's other crimes against children.

**Alaska**

Alaska Stat. §§ 11.51.100 (intentional desertion), 11.51.120 (criminal nonsupport)

**Florida**

Fla. Stat. §§ 39.01 (definitions), 827.04 (abuse), 827.05 (neglect)

**Georgia**

Ga. Code Ann. §§ 16-5-70 (abuse and neglect), 19-10-1 (abandonment)

**Louisiana**

La. Stat. Ann. § 14:79.1 (abandonment)

**Maryland**

Md. Code Ann., Art. 27, § 35C (abuse); Cts. & Jud. Proc. § 3-831 (contribution to delinquency); Fam. Law §§ 10-203 (nonsupport and desertion), 10-219 (desertion)

**Massachusetts**

Mass. Gen. Laws ch. 119, § 39; ch. 273, § 1 (abandonment)

**Michigan**

Mich. Comp. Laws §§ 750.135 (abandonment), 750.136b (abuse)

**Mississippi**

Miss. Code Ann. §§ 43-21-105(m) (defining "abused child"); 97-5-1 (abandonment); 97-5-39(1), (2) (contributing to neglect; abuse)

**Nevada**

Nev. Rev. Stat. §§ 200.508, 432B.140 (abuse and neglect)

**New Jersey**

N.J. Stat. Ann. §§ 2C:24-4 (moral or sexual endangerment); 9:6-1, 9:6-3 (abuse, abandonment, cruelty, and neglect)

**North Dakota**

N.D. Cent. Code §§ 14-07-15 (abandonment), 14-09-22 (abuse and neglect)

**Rhode Island**

R.I. Gen. Laws §§ 11-2-1 (abandonment), 11-9-5 (cruelty and neglect), 11-9-5.3 (abuse)

**Utah**

Utah Code Ann. § 76-5-109 (abuse)